Versión para imprimir

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| María del C. Alvarado Pacheco y otros<br><br>    Peticionarios<br><br>      v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>    Recurridos<br>_____<br><br>Monsita Denise Otero Ruiz y otros<br><br>    Peticionarios<br><br>      v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>    Recurridos<br>_____<br><br>Víctor A. Trinidad Hernández y otros<br><br>    Peticionarios<br><br>      v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>    Recurridos | CERTIFICACIÓN<br><br>2013 TSPR 64<br><br>188 DPR ____ |

Número del Caso: CT-2013-5
           Cons. CT-2013-6 y CT-2013-7

Fecha: 11 de junio de 2013

CT-2013-5

Abogadas de la Parte Peticionaria:

        Lcda. Judith Berkan
        Lcda. Mary Jo. Méndez

Oficina de la Procuradora General:

        Lcda. Margarita Mercado Echegaray
        Procuradora General

        Lcda. Tanaira Padilla Rodríguez
        Subprocuradora General

        Lcda. Amarilys Ramos Rodríguez
        Procuradora General Auxiliar

Administración del Sistema de Retiro:

        Lcdo. Rafael Escalera Rodríguez
        Lcda. Beatriz Annexy Guevera
        Lcdo. Carlos M. Hernández Burgos

**CT-2013-6**
Abogados de la Parte Peticionaria:

        Lcdo. Raúl Santiago Meléndez
        Lcdo. Edgar R. Vega Pabón

Oficina de la Procuradora General:

        Lcda. Margarita Mercado Echegaray
        Procuradora General

        Lcda. Amarilys Ramos Rodríguez
        Procuradora General Auxiliar

Administración del Sistema de Retiro:

        Lcdo. Rafael Escalera Rodríguez

**CT-2013-7**
Abogado de la Parte Peticionaria:

        Lcdo. Iván Crespo Arroyo


Materia: Resolución del Tribunal con Votos de Conformidad, Voto Particular y Votos Disidentes.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| María del C. Alvarado Pacheco y otros<br><br>  Peticionarios<br><br>    v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>  Recurridos<br>_____<br><br>Monsita Denise Otero Ruiz y otros<br><br>  Peticionarios<br><br>    v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>  Recurridos<br>_____<br><br>Víctor A. Trinidad Hernández y otros<br><br>  Peticionarios<br><br>    v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>  Recurridos | CT-2013-0005<br>CT-2013-0006<br>CT-2013-0007 |

RESOLUCIÓN

En San Juan, Puerto Rico, a 11 de junio de 2013.

Se ordena la consolidación de los casos de epígrafe por tratarse todos de la misma controversia. Por las razones que exponemos a continuación, proveemos **no ha lugar en esta etapa de los procedimientos** a las peticiones de certificación que presentaron las partes peticionarias.

I

Los hechos de cada caso se exponen por separado para facilitar su comprensión.

**CT-2013-5**

En este caso tenemos ante nuestra consideración una demanda presentada por María del Carmen Alvarado Pacheco, y otros 67 empleados de la Oficina del Contralor de Puerto Rico (los peticionarios). Estos impugnan la constitucionalidad de la Ley Núm. 3-2013 por menoscabar su relación contractual con el Gobierno y tener una aplicación arbitraria e irrazonable al alterar los beneficios de retiro que tenían la expectativa de recibir.

Los peticionarios presentaron su demanda ante el Tribunal de Primera Instancia el 8 de mayo de 2013, a raíz de la aprobación de la Ley Núm. 3-2013. Al mismo tiempo, solicitaron un interdicto preliminar y permanente. En su comparecencia, solicitaron la declaración de inconstitucionalidad de las disposiciones de esa ley que menoscaban las relaciones contractuales del Gobierno con los empleados. Específicamente, hacen referencia al interés propietario y los derechos adquiridos al amparo de la Ley de Sistema de Retiro, Ley Núm. 447 de 15 de mayo de 1951, según enmendada, 3 L.P.R.A. sec. 761 *et seq.*, vigente al momento en que ingresaron al servicio público. El caso se encuentra pendiente aún ante el Tribunal de Primera Instancia, en etapas preliminares.

El 16 de mayo de 2013, los peticionarios presentaron una petición de certificación ante nos. El Departamento de Estado certificó que el 15 de mayo de 2013 se aprobó la Ley Núm. 18-2013, con la intención de reducir el campo de acción del Tribunal Supremo. A esos efectos, enmendó el Art. 3.002 de la Ley de la Judicatura, Ley Núm. 201-2003, 4 L.P.R.A. sec. 24s y la Regla 52.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V, entre otras cosas. En lo pertinente, las enmiendas establecen que este Tribunal solo podrá traer ante sí por recurso de certificación casos que estén pendientes ante el Tribunal de Apelaciones, salvo acuerdo entre las partes para certificarlo desde el Tribunal de Primera Instancia. Además, limitó el certiorari interlocutorio a ciertas instancias específicamente enumeradas en el estatuto.

Así las cosas, la Procuradora General y la Administración de Sistemas de Retiro, aquí recurridas, solicitaron la desestimación de la petición de certificación, por falta de jurisdicción. Los peticionarios se opusieron a la desestimación el 28 de mayo de 2013. Cuestionan la fecha real de la aprobación de la Ley Núm. 18, supra, y su aplicación a este caso.

Además, las partes presentaron varios escritos en fechas posteriores replicando los argumentos de cada una.

Como parte de sus cuestionamientos, presentan como evidencia información impresa de la página cibernética de la Oficina de Servicios Legislativos (OSL) que muestra que para el 16 de mayo de 2013, a las 11:03 de la mañana, no constaba que la ley que pretendía enmendar el trámite de los recursos de certificación hubiera recibido la firma del Gobernador. La Petición de Certificación de los peticionarios se presentó en esa fecha horas antes, a las 8:44 de la mañana.

El 17 de mayo de 2013 a las 3:40 de la tarde, un día después de que se presentó la Petición de Certificación, la OSL informó que la Ley Núm. 18-2013 que firmó el Gobernador el día 15 de mayo se tituló "Para declarar el día 16 de mayo de cada año como el Día de la concientización sobre la condición de angioedema hereditario". Al mismo tiempo se reflejó en la página de internet de la OSL a las 3:30 de la tarde, la Ley Núm. 18-2013 que enmienda el trámite de los recursos de certificación. En esa ocasión, se informó que el Gobernador la firmó dos días antes, el 15 de mayo. Así pues, para el 17 de mayo de 2013, la página cibernética de la OSL reflejó dos Leyes Núm. 18-2013. Posteriormente, la otra Ley Núm. 18, titulada "Para declarar el día 16 de mayo de cada año como el Día de la concientización sobre la condición de angioedema hereditario" se renumeró como la Ley Núm. 19-2013.

Ante esta situación, los peticionarios reclaman que no se les aplique la ley que enmendó el procedimiento para que el Tribunal Supremo atienda las peticiones de certificación de los casos que se encuentren ante el Tribunal de Primera Instancia. Aducen que la ley no estaba vigente el 16 de mayo de 2013, cuando presentaron este recurso. El mismo día en que se opusieron a la desestimación, el 28 de mayo de 2013, los peticionarios presentaron ante nos una "Moción solicitando trámite acelerado de la Petición de Certificación".

Según las alegaciones de la demanda en este caso, los peticionarios son 68 empleados de la Oficina del Contralor de Puerto Rico que entraron al servicio público hace más de 23 años. Alegan que cuentan con entre 44 y 57 años de edad y que entraron al servicio público cobijados por el sistema de pensión de mérito, que concedía beneficios definidos y pensiones que se calculaban a base de años de servicio y de edad. Acorde con la Ley Núm. 447, supra, los peticionarios tenían la expectativa de retirarse con una pensión del 75% del salario promedio devengado durante los 36 meses de su mayor compensación, una vez cumplieran los 30 años de servicio y, al menos, 55 años de edad; o con

el 65% de su salario promedio si se retiraran con menos de 55 años de edad. Al momento de la presentación de la demanda, ninguno de los peticionarios cumplía con el requisito de 30 años de servicio y 55 años de edad, necesarios para retirarse con una pensión del 75% de su salario, según las alegaciones de la demanda.

Con la aprobación de la Ley Núm. 3, supra, los peticionarios plantean que se enfrentan a un panorama de retiro totalmente distinto al que planificaron. Señalan que las enmiendas que introdujo el nuevo estatuto eliminan la pensión por mérito, para introducir un programa híbrido de contribuciones definidas, y aumentan a 61 años la edad mínima para el retiro. Así, alegan que se les ha colocado en la disyuntiva de retirarse antes de que entre en vigencia la nueva ley en aras de no perder beneficios, o quedarse trabajando entre 1.6 y 17 años adicionales a lo que originalmente proyectaron para retirarse, pero con una pensión mucho menor a la que tenían planificada. Según el desglose que presentan en la demanda, la pensión que recibirían bajo la nueva ley podría ser de un mínimo de 30% hasta un máximo de 65% del salario promedio.

En las alegaciones se enumera a cada uno de los demandantes, con el detalle del impacto que cada uno reclama tener a consecuencia de los cambios en el plan de retiro. Se especifica la pensión con la que aspiraban a retirarse y la edad a la que pensaban hacerlo. Al mismo tiempo, calcularon el porciento de reducción en la pensión que esperaban recibir antes de la ley, y después de la aprobación de la Ley Núm. 3-2013.

**CT-2013-6**

El 20 de mayo de 2013 se presentó una solicitud de sentencia declaratoria en que se impugnó la constitucionalidad de la Ley Núm. 3-2013 y una petición de interdicto provisional y permanente contra el Estado Libre Asociado de Puerto Rico (ELA), la Administración de los Sistemas de Retiro de los Empleados del Gobierno y de la Judicatura del ELA de Puerto Rico y el Sr. Héctor Mayol Kauffman, en su capacidad oficial como Administrador del Sistema de Retiro. La demanda la presentaron 390 empleados de la Oficina de la Administración de Tribunales (OAT) que laboran en las regiones judiciales del Tribunal de Primera Instancia, en el Tribunal de Apelaciones, en este Tribunal y en la oficina central de la OAT. Se incluyen además, como demandantes, 68 empleados de la Corporación del Fondo del Seguro del Estado y otros 88 empleados del Departamento de Justicia, Departamento de Hacienda, Departamento de la Familia, Departamento del Trabajo, Administración para el Sustento de Menores, Departamento de Estado, Comisión Estatal de Elecciones, Administración de Desperdicios Sólidos y otras. El 29 de mayo de 2013 los

peticionarios presentaron la primera demanda enmendada. Reclaman que por consecuencia de la Ley Núm. 3, supra, tienen que tomar una decisión inmediata con relación a su jubilación y la pensión por la que contrataron hace más de dos décadas.

Los peticionarios solicitan que se decrete la inconstitucionalidad de la citada ley en su aplicación, en la medida que les priva de derechos adquiridos y menoscaba las relaciones contractuales entre los demandantes y la parte demandada. También requieren que mediante sentencia declaratoria se decrete que el articulado referente a los servidores públicos de alto riesgo es inconstitucional por violar la cláusula de la igual protección de las leyes pues se discrimina contra todos los alguaciles demandantes injustificadamente. Asimismo, reclaman que se emita una orden de injunction preliminar y permanente prohibiendo la implantación de la Ley Núm. 3, supra, con relación a los demandantes; que se emita una orden de injunction preliminar y permanente para proteger los derechos de los demandantes que han sido obligados en muchos casos a presentar sus cartas de renuncia en o antes del 30 de junio de 2013; que se condene a la parte demandada al pago de costas, gastos y honorarios de abogados; y se conceda cualquier otro remedio que en derecho proceda.

El 30 de mayo de 2013 el caso se consolidó en el foro de instancia con otros dos casos sobre el mismo asunto: María del Carmen Alvarado Pacheco v. E.L.A., (KPE2013-2799) CT-2013-5 y Víctor Trinidad Hernández v. E.L.A., (KPE2013-3050). En vista de que diversas instrumentalidades del Estado han fijado como fecha real para la tramitación de las solicitudes de renuncia o su separación del sistema mediante retiro, la del 31 de mayo de 2013 y a su vez, por la propia inminencia de la referida ley, los demandantes acudieron el 31 de mayo de 2013 ante este Tribunal mediante una petición de certificación y de auxilio de jurisdicción al amparo de la Regla 28 de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-B.

**CT-2013-7**

El Sr. Víctor H. Trinidad Hernández y otros presentaron el 21 de mayo de 2013 ante el Tribunal de Primera Instancia, Sala de San Juan, una petición de sentencia declaratoria e interdicto preliminar y permanente para impugnar la constitucionalidad de la Ley Núm. 3-2013. Según se alega, todos los demandantes son miembros de la Policía de Puerto Rico quienes entraron en el servicio público bajo la Ley 447, supra, y la Ley Núm. 1-1990. Aducen que tienen derecho a retirarse con una anualidad equivalente a 75% de su salario promedio si cuentan con 30 años de servicio y con al menos 55 años de edad al momento de su retiro, o 65% de su salario promedio

si cuentan con 30 años de servicio y menos de 55 años de edad.

Al igual que en los casos anteriores, el señor Trinidad Hernández y otros sostienen que la Ley Núm. 3 representa una reducción dramática en los beneficios de retiro que se les prometieron. Como agravante los demandantes expresan que son servidores públicos de alto riesgo y que no pueden aportar al Seguro Social, por lo que no recibirán pensión alguna por ese concepto cuando se retiren. Luego de varios incidentes procesales acaecidos en el Tribunal de Primera Instancia y ante la inminencia de la entrada en vigor de la Ley Núm. 3, supra, el señor Trinidad Hernández y otros presentaron el 5 de junio de 2013 una petición de certificación ante este Tribunal. El 7 de junio de 2013 los peticionarios presentaron una "Moción urgente solicitando trámite acelerado de la petición de certificación". Nos solicitan que ante el poco tiempo que falta para que entre en vigor la Ley Núm. 3, supra, actuemos con celeridad y expidamos el auto de certificación.

## II

**A.** Previo a considerar si debemos emitir los autos de certificación en estos casos, debemos determinar si la recién aprobada Ley Núm. 18, supra, aplica a estos recursos o si esta, en cambio, resulta inconstitucional por violar la doctrina de separación de poderes. De ser válida vendríamos obligados a denegar los recursos. En cambio, si determináramos que la Ley Núm. 18-2013 no aplica o es inconstitucional, debemos resolver si expedimos los autos de certificación en el ejercicio sano de nuestra discreción.

Recientemente, este Tribunal tuvo la oportunidad de abundar en cuanto a la función de la doctrina de separación de poderes en nuestro ordenamiento constitucional. Véase A.A.R., Ex parte, Op. de 20 de febrero de 2013, 2013 T.S.P.R. 16, 2013 J.T.S. 16, 187 D.P.R. ___ (2013). A través de nuestra historia hemos sido proactivos en delimitar los contornos del poder de la Rama Judicial a la luz de esa doctrina. Ello ha sido necesario especialmente en casos en que ha sido institucionalmente necesario defender nuestro ámbito de acción ante intromisiones indebidas de otras ramas constitucionales. Véase Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998) y Colón Cortés v. Pesquera, 150 D.P.R. 724 (2000).

La doctrina de separación de poderes aspira a establecer una serie de fronteras entre las ramas constitucionales del ordenamiento jurídico. Estos límites no necesariamente son evidentes, pero sí son extremadamente poderosos y sus repercusiones permean todo

nuestro ordenamiento. <u>A.A.R., Ex Parte</u>, <u>supra</u>. La frontera más obvia que divide el ámbito de acción entre las ramas constitucionales de gobierno es que nuestra Constitución garantizó que sería la Rama Judicial la que tendría el poder de resolver los casos y controversias que se presenten en los tribunales de Puerto Rico. <u>Misión Ind. P.R. v. J.P.</u>, <u>supra</u>, pág. 112. Ante ello, hace décadas dejamos claro que "**la <u>esencia</u> del Poder Judicial no puede ser destruida**, 'convirtiendo el poder para decidir en una débil oportunidad para consultar y recomendar'". <u>Colón Cortés v. Pesquera</u>, <u>supra</u>, pág. 757 citando a <u>Banco Popular, Liquidador v. Corte</u>, 63 D.P.R. 66, 76 (1944). (Énfasis nuestro.)

Ahora bien, en nuestro esquema constitucional la Asamblea Legislativa tiene un rol limitado en el ámbito de acción del poder judicial. Su rol se limita a crear y suprimir tribunales, con excepción de este Tribunal Supremo, y a determinar su competencia y organización. Const. P.R. Art. V, Sec. 2. L.P.R.A. Tomo I. Sin embargo, esa delegación constitucional de poder también tiene límites ya que las actuaciones legislativas en ese campo solo serán válidas "en cuanto no resulte[n] incompatible[s] con **esta <u>Constitución</u>**". <u>Íd.</u> (Énfasis suplido). Nótese que los padres fundadores quisieron limitar el poder de la Asamblea Legislativa en esta área tomando la Constitución **en su totalidad**, no por secciones específicas.

En defensa de estos principios constitucionales este Tribunal ha pasado juicio en cuanto a actuaciones legislativas que han afectado su jurisdicción y competencia. Específicamente, en <u>Colón Cortés v. Pesquera</u>, <u>supra</u>, establecimos que para determinar si un acto legislativo que afecta la jurisdicción de este Tribunal viola la doctrina de separación de poderes hay que analizar no solo el texto del estatuto en cuestión, sino la **intención** de la Asamblea Legislativa. Es decir, "**[l]o importante no es la forma del acto, sino su contenido**". <u>Íd.</u> pág. 764 (Énfasis suplido.)

Para llevar a cabo ese análisis, fuimos enfáticos en establecer que "[e]ste Tribunal no puede hacer abstracción de la verdadera intención y propósito tras determinada acción legislativa, y conformarse con sólo considerar lo que deliberadamente consignan en informes rendidos por las comisiones legislativas". <u>Íd.</u> Lo que es más, establecimos que

> **[n]o podemos pecar de una ingenuidad tal que nos haga obviar cuál es el <u>verdadero propósito</u> y fin de determinada actuación, cegados por lo que convenientemente se nos presenta en alegatos jurídicos como el "propósito legislativo". No nos vamos a prestar a tal contradicción, ni al juego**

> **de palabras que a la postre no corresponde a la realidad.** Íd. (Énfasis suplido.)

Por eso es que este Tribunal ha dejado claro que mirará con un sentido de alta sospecha cualquier actuación legislativa que se asemeje a una legislación de encargo que procure dictar el resultado de un caso en particular en el Tribunal General de Justicia de Puerto Rico o dilatar su trámite en aras de evadir una revisión judicial efectiva. En esas instancias debemos recordar que "la dama de la justicia es ciega, no ingenua". P.I.P. v. E.L.A et al., 186 D.P.R. 1, 14 (2012).

**B.**    En estos casos, las partes recurridas han presentado una serie de mociones de desestimación. En sustancia, en esas mociones se ha argumentado que este Tribunal carece de jurisdicción para atender estos recursos de certificación debido a la aprobación de la Ley Núm. 18-2013. Ese estatuto recién aprobado, en lo pertinente a este caso, tuvo el fin de alterar el mecanismo de certificación intrajurisdiccional según reconocido en el Artículo 3.002 de la Ley 201-2003, según enmendada, conocida como la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, supra; y en la Regla 52.2 de Procedimiento Civil de Puerto Rico, supra. Por ser un asunto de umbral, dilucidamos el aspecto jurisdiccional en primer lugar. S.L.G. Solá-Moreno v. Bengoa Becerra, 182 D.P.R. 675, 682 (2011).

Previo a la aprobación de la Ley Núm. 18, supra, este Tribunal tenía la facultad para intervenir por iniciativa propia, "en casos pendientes ante los tribunales de inferior jerarquía cuando se planteen cuestiones noveles de derecho, o se planteen cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial". P.I.P. v. E.L.A. et al., supra, pág. 9. Sin embargo, la Ley Núm. 18, supra, alteró este mecanismo y dispuso que, en casos pendientes ante el Tribunal de Primera Instancia, el auto de certificación solo podría ser expedido cuando medie la solicitud de ambas partes en el pleito.[1] Art. 1, Ley Núm. 18, íd. Las partes recurridas en este caso objetan que expidamos el auto de certificación. En particular, alegan que de acuerdo a la Ley Núm. 18, íd., carecemos de jurisdicción para atender la petición de certificación que presentaron los peticionarios.

Es evidente que la Ley Núm. 18, supra, representa un acto legislativo que altera la jurisdicción y competencia

---

[1] Desconocemos por qué la Asamblea Legislativa utilizó la frase "ambas partes" ya que en muchos casos presentados en los tribunales de Puerto Rico existen más de dos (2) partes.

de este Tribunal. Para justificar la necesidad de trastocar la jurisdicción y competencia de este Foro, la Asamblea Legislativa expresó que estaba "convencida [de] que la función especial del Tribunal Supremo en la administración de la justicia en Puerto Rico es servir como órgano de revisión o de apelación y no como tribunal de primera instancia". Exposición de Motivos de la Ley Núm. 18-2013, pág. 2. Por eso, "con el propósito de propiciar una adjudicación más pronta de las causas que se presentan ante su consideración", la Asamblea Legislativa entendió que era necesario modificar el recurso de certificación intrajurisdiccional para que todo caso siga su trámite ordinario y se agoten los procedimientos apelativos antes de que el caso sea atendido por este Tribunal. Íd. Así, la Rama Legislativa entendió que promovía "que el Tribunal Supremo pueda dedicar una mayor parte de sus esfuerzos a pautar el desarrollo del derecho puertorriqueño en consonancia con su mandato constitucional". Íd.

Sin embargo, a tenor con lo que decidió este Tribunal en Colón Cortés v. Pesquera, supra, para determinar la validez constitucional de este tipo de legislación hay que mirar más allá del texto estatutario y auscultar la verdadera intención legislativa. En ese caso expresamos que no podemos prestarnos a un "juego de palabras que a la postre no corresponde con la realidad". Íd. pág. 764. Por ello, una mirada al trámite legislativo de la Ley Núm. 18, supra, es asombrosamente reveladora.

El P. del S. 367 de la Decimoséptima Asamblea Legislativa, que posteriormente se convirtió en la Ley Núm. 18-2013, se presentó el 8 de febrero de 2013 por el Presidente del Senado, Hon. Eduardo Bhatia Gautier. El proyecto se refirió a la Comisión de lo Jurídico y el 11 de febrero fue leído en el Senado de Puerto Rico. Por un espacio de tres (3) meses no hubo trámite en el Senado de Puerto Rico con relación al proyecto. En la primera semana de mayo de 2013 "algo" ocasionó que, como relámpagos, comenzaran nuevos trámites en cuanto al proyecto de ley.

Coetáneamente el 8 de mayo de 2013 se presentó la demanda en el caso CT-2013-5. Las partes demandadas fueron emplazadas un día después. Fue ahí cuando el Senado de Puerto Rico comenzó un trámite acelerado del P. del S. 367, que se convertiría en la Ley Núm. 18, supra.

El día después de ser emplazadas las partes demandadas en el caso CT-2013-5, se celebró una reunión ejecutiva de las Comisiones de lo Jurídico, Seguridad y Veteranos. Ese mismo día se presentó el Primer Informe de la Comisión y la medida fue remitida a la Comisión de Reglas y Calendarios. Posteriormente, el 13 de mayo de 2013 la medida apareció en el Calendario de Órdenes

Especiales del Día. Ese mismo día se aprobó el proyecto en el Senado y fue remitido a la Cámara de Representantes. La noche del 14 de mayo, mientras el Pueblo dormía, ese cuerpo legislativo aprobó la medida. El día después, 15 de mayo de 2013, los presidentes de los cuerpos legislativos ya habían firmado el proyecto y lo remitieron a la Oficina del Gobernador de Puerto Rico para su firma. **Es decir, luego de tres meses de inactividad, el P. del S. 367 recibió la aprobación legislativa, cuatro días después que los funcionarios estatales fueron emplazados con la demanda en el caso CT-2013-5**.

La trama de lo que se convirtió en la Ley Núm. 18, supra, se complica aún más con lo ocurrido en la Oficina del Gobernador. Como vimos, el P. del S. 367 aprobado por la Asamblea Legislativa llegó al despacho del Gobernador de Puerto Rico en algún momento del 15 de mayo del 2013. La contención del Estado en este caso es que el Gobernador, Hon. Alejandro García Padilla, convirtió en ley el P. del S. 367 ese mismo día.

Sin embargo, la parte peticionaria ha traído ante nuestra consideración una serie de eventos que colocan en duda cuándo en efecto advino a la vida la Ley Núm. 18, supra. Y es que el 16 de mayo de 2013 todavía no aparecía en el portal cibernético del trámite legislativo que la Ley Núm. 18, supra, hubiera sido aprobada. Tampoco aparecía como aprobada en el Sistema de Información de la Oficina de Servicios Legislativos. Para colmo, otra medida legislativa, el P. de la C. 940, fue enviada al Gobernador para su aprobación el 15 de mayo y fue firmada por este el 16 de mayo de 2013. Esa Ley apareció en el portal de la Oficina de Servicios Legislativo como la Ley Núm. 18 de 16 de mayo de 2013. **De hecho, por un tiempo aparecían dos (2) leyes número 18**. No es hasta el 17 de mayo de 2013 que aparece por primera vez en el portal legislativo que el P. del S. 367 en efecto se convirtió en la Ley Núm. 18, supra. La otra medida, el P. de la C. 940, pasó a ser la Ley Núm. 19-2013.

Desatar ese nudo gordiano es un misterio. Lo que sí puede tomar en consideración esta Curia es que el **16 de mayo de 2013** el Gobernador Hon. Alejandro García Padilla le cursó una misiva al Juez Asociado señor Estrella Martínez, con copia a todos los jueces y juezas de este Tribunal, en que contestó una serie de preocupaciones que el hermano Juez Asociado le había expresado en otra comunicación. En su carta **—de 16 de mayo de 2013—** el señor Gobernador le comunicó al Juez Asociado señor Estrella Martínez que le daría "sería consideración a sus argumentos en torno al P. del S. 367". Es decir, el Gobernador de Puerto Rico, con su palabra escrita, le dejó saber a los miembros de este Foro que el 16 de mayo de 2013 todavía estaba estudiando el P. del S. 367.

No obstante, las partes recurridas se sostienen en que en efecto la Ley Núm. 18, _supra_, se firmó el día antes, el 15 de mayo. Así, nos encontramos ante la extraña encrucijada de dar por cierto el récord oficial del Gobierno de Puerto Rico y los escritos de las partes recurridas, que sostienen que la Ley Núm. 18, _supra_, se firmó el 15 de mayo, o dar por cierta la palabra del Gobernador de Puerto Rico, quien nos expresó que el 16 de mayo –cuando se presentó el recurso CT-2013-5- aún no había firmado ese estatuto, pues lo estudiaba con detenimiento.

El Art. VI, Sec. 5 de la Constitución de Puerto Rico, L.P.R.A. Tomo I, establece que "las leyes deberán ser promulgadas conforme al procedimiento que se prescriba por ley y contendrán sus propios términos de vigencia". Por su parte, el Art. III Sec. 19 de la Constitución de Puerto Rico, L.P.R.A. Tomo I establece:

> Cualquier proyecto de ley que sea aprobado por una mayoría del número total de los miembros que componen cada cámara se someterá al Gobernador y se convertirá en ley si éste lo firma o si no lo devuelve con sus objeciones a la cámara de origen dentro de diez días (exceptuando los domingos) contados a partir de la fecha en que lo hubiese recibido.

De otro lado, el Art. 37 del Código Político de Puerto Rico, 2 L.P.R.A. sec. 182, establece que cuando el Gobernador apruebe un proyecto de ley, deberá estampar su firma, así como la fecha de su aprobación y depositarlo en la oficina del Secretario de Estado. Por su parte, el Art. 1 de la Ley Núm. 2 de 24 de julio de 1952, 2 L.P.R.A. sec. 186, dispone que el Secretario de Estado promulgará las leyes estampando el sello en ellas una vez sean aprobadas por el Gobernador o cuando se hayan convertido en ley conforme al Art. III, Sec. 19 de la Constitución de Puerto Rico, L.P.R.A. Tomo I.

Se desprende de lo anterior que la entrada en vigor de una ley depende de que: (1) el proyecto sea aprobado en ambas cámaras por la mayoría parlamentaria y (2) el Gobernador no lo vete o devuelva en los próximos diez días. Además, su término de vigencia estará sujeto a lo que se disponga en la propia ley.

A tenor con lo que resolvió este Tribunal en _Colón Cortés v. Pesquera_, _supra_, el trámite legislativo tiene que considerarse a la hora de determinar el "verdadero propósito y fin de determinada actuación" legislativa. _Íd._ pág. 764. Es evidente que el "despertar" del trámite legislativo para aprobar la Ley Núm. 18, _supra_, se debió a

la presentación de la demanda de epígrafe, en la que varios empleados impugnan la constitucionalidad de la Ley Núm. 3, _supra_. Ante la posibilidad de que los peticionarios presentaran una petición de certificación, y sumidos en un aparente pánico al prever la posible intervención de este Tribunal en este caso así como en otros casos de interés público, la Asamblea Legislativa aprobó una legislación de encargo dirigida a evitar la revisión judicial en etapas interlocutorias en estos casos pendientes ante los tribunales de Puerto Rico. Ese es el tipo de intervención legislativa que este Tribunal, con la anuencia de miembros actuales del Foro, declaró inválida en _Colón Cortés v. Pesquera_, _supra_.

Pero hay más. Al igual que en ese caso, las expresiones de ciertos legisladores juegan un papel importante en la búsqueda de la verdadera intención legislativa. _Íd._ pág. 763 esc. 9. Del Diario de Sesiones surge que durante el debate para aprobar la eventual Ley Núm. 18, _supra_, el Presidente del Senado y autor de la medida, Hon. Eduardo Bhatia Gautier, dejó meridianamente claros los verdaderos propósitos de esta Ley. Por su pertinencia, citamos de forma extensa:

> [E]se diseño de buscar la manera de llevar todo al Tribunal Supremo para tratar de interrumpir lo que es la política pública por mandato de la democracia, eso exactamente se acabó. Eso se acabó. El acceso a la justicia de la que el compañero habla es el acceso a la justicia de los que a ellos le dé la gana. Sin que haya una evidencia, sin que haya absolutamente una oportunidad de las partes a pasar prueba, que es exactamente lo que este Tribunal Supremo se está dedicando a hacer. No permitir que las partes digan qué es lo que está ocurriendo. No permitir que el país sepa lo que está ocurriendo.
>
> Este Tribunal Supremo, lamentablemente, lamentablemente ha tomado como norte el usurpar, el usurpar el derecho de las partes de tener un juicio. Simplemente toman el caso y deciden como ellos quieren, como simplemente un grupo de...si son los jueces del Supremo...Y qué, qué [sic] coincidencia que se llevan los casos que afectan al Partido Nuevo Progresista. Se los llevan rapidito, rapidito, ésos tienen "federal express" pa'l [sic] Tribunal Supremo. Eso no es justicia, eso no es justicia. Eso es destruir la justicia en este país y es lo que está pasando. Y eso se tiene que acabar ya.
>
> ...

¿Cuál es el miedo? ¡Ah!, yo sé cuál es el miedo. El miedo es que el juez, el juez de una sala inferior llega a unas conclusiones de derecho distintas a las del Tribunal Supremo. Ese es el miedo. El miedo es no permitir que los tribunales funcionen. El miedo es hacer y deshacer de acuerdo a la voluntad de una mayoría de personas en el Tribunal Supremo. Y eso no debe estar correcto. Eso no es correcto.

Este capítulo en este conflicto no lo empecé yo, señor Presidente. De hecho, yo le voté en contra a esta guerra. Este capítulo en esta lucha y en esta guerra la empezaron los que empezaron a sumarle números de jueces innecesariamente.

...

Pero de ahora en adelante, de ahora en adelante, se le quita la facultad ésta al Tribunal Supremo porque han abusado, han abusado, esta facultad que se les dio y han cogido de rehén a las partes en estos conflictos que hay en Puerto Rico. Diario de Sesiones, Senado de Puerto Rico, Vol. LXI, Núm. 31, págs. 3655-3657.

Res ipsa loquitur. Por su parte, mientras se consideraba la medida en los cuerpos legislativos, los medios noticiosos reportaron que el Gobernador de Puerto Rico expresó lo siguiente:

Hay unas áreas donde ustedes saben en el pasado cuatrienio se afectó el proceder que había funcionado bien el tribunal y ustedes saben cómo trató el pasado gobierno al Tribunal Supremo, como un banquete total. Yo voy a hacer una evaluación seria y ponderada de esa medida del Presidente del Senado.[2]

Estas expresiones son reveladoras, ya que demuestran que la intención de las demás ramas con la Ley Núm. 18, supra, no era realmente garantizar la eficiencia del sistema judicial en Puerto Rico y asegurar que este Tribunal se mantuviera "pautando el derecho".

También induce a error la expresión que aparece en la Exposición de Motivos de la Ley Núm. 18, supra, pág. 2, de que en los "últimos años ha continuado la tendencia histórica de reducir la competencia de los tribunales apelativos para agilizar el trámite procesal y la

---

[2] http://www.noticel.com/noticia/141824/agp-tiene-en-mente-el-banquete-total-de-pnp-con-el-supremo.html (Última visita el 4 de junio de 2013.)

resolución de los casos y controversias ante la consideración de la Rama Judicial de Puerto Rico". Adviértase que esa expresión da a entender que existe un retraso en la resolución de controversias en este Tribunal. Sin embargo, la información empírica desmiente esa aseveración. En la actualidad, este Foro atiende recursos que apenas llegan al mes de presentados en su secretaría. Antes de que se aumentara el número de jueces de este Tribunal por petición de este Foro, según dispone la Constitución, los recursos tardaban más de seis meses en atenderse. Véase, In re Solicitud Aumentar Núm. Jueces TS, 180 D.P.R. 54, 64 (2010). Asimismo, si se analiza el Informe Estadístico del año fiscal 2011-2012 notamos que el número de casos pendientes a considerar por el Tribunal se redujo de 442 a 123 si se compara con el año fiscal 2009-2010.[3] Eso significa una reducción de más del 70 por ciento en tan solo dos años. De igual modo, el número de recursos de auto inhibitorio, *mandamus* y *quo warranto* presentados en el año fiscal 2011-2012 fue de ocho. Véase, Informe Estadístico del año fiscal 2011-2012. Sin embargo, la Asamblea Legislativa decidió "liberarnos" de la carga de trabajo que supone atender esos ocho recursos en un año.

En palabras del Juez Presidente señor Hernández Denton:

> nosotros en el Tribunal Supremo estamos bien al día, totalmente al día. El Tribunal de Apelaciones también está bien al día. El proceso judicial nosotros hemos tratado de garantizarlo a través de todos estos años. Existen tres foros: Tribunal de Primera Instancia, Tribunal de Apelaciones y Tribunal Supremo….[4]

Al igual que expresamos en Colón Cortés v. Pesquera, supra, pág. 764, no podemos cegarnos "por lo que convenientemente se nos presenta en alegatos jurídicos como el 'propósito legislativo'". Este Tribunal tiene que ir más allá. Es evidente que las expresiones que se dieron durante el proceso de aprobación de la Ley Núm. 18, supra, demuestran por un lado, un revanchismo contra las determinaciones de este Tribunal, saga de una mal llamada "guerra", y por otro, se revela una aspiración de dilatar y, eventualmente dejar sin un remedio efectivo en una etapa importante del caso, a los empleados gubernamentales que impugnan la constitucionalidad de la nueva Ley de Retiro.

---

[3] El informe se puede ver en el siguiente enlace: http://www.ramajudicial.pr/sistema/supremo/estadisticas/INFORME-ESTADISTICO-TRIBUNAL-SUPREMO-A-FISCAL-2011-2012.pdf
[4] http://www.wapa.tv/noticias/locales/juez-presidente-del-supremo-guarda-silencio 20130520163511.html (Última visita el 4 de junio de 2013.)

A esta conclusión también llegó un ex miembro de esta Curia, al expresar que

> [l]a aprobación festinada de la Ley 18 (sin vistas públicas), unida a la total ausencia de datos estadísticos y análisis empírico que justifiquen los cambios, aparenta ser un revanchismo político-partidista en respuesta al aumento en la composición del Tribunal Supremo y a varias de sus decisiones.
>
>                              ...
>
> Por ser el Tribunal Supremo el foro judicial de última instancia, la facultad legislativa de alterar y fijar su competencia no es irrestricta. Tiene que ejercerse prudencialmente y con armonía con la Constitución y, por ende, según los principios del debido proceso de ley y sus elementos cardinales de justicia accesible, rápida y económica. La Legislatura parece haber olvidado que nunca "podrá impedir que los casos judiciales en alguna forma o en otra, lleguen hasta la consideración del Tribunal Supremo". (Diario, Asamblea Constituyente, 592). A. Negrón García, El acceso al Tribunal Supremo, El Nuevo Día, 31 de mayo de 2013, p. 57.

El distinguido ex Juez Asociado señor Negrón García tiene razón. La Ley Núm. 18, supra, representa una intromisión inconstitucional de la Rama Legislativa con el ámbito de acción de la Rama Judicial. Según los principios de Colón Cortés v. Pesquera, supra, ese estatuto es insostenible ya que su trámite de aprobación demuestra un interés específico en inmunizar al Estado de la revisión judicial de casos que impugnen la constitucionalidad de las leyes de retiro. Además, su historial demuestra una indudable misión de revancha por parte de la Asamblea Legislativa contra pasadas acciones de esta Curia. Es inconcebible que en nuestro sistema constitucional esa sea una razón válida para legislar cambios en la jurisdicción y competencia del Tribunal Supremo.

Como vimos, la Ley Núm. 18, supra, alteró la manera en que este Tribunal puede expedir autos de certificación intrajurisdiccional. El estatuto llega al extremo de que para poder hacer efectiva nuestra jurisdicción en casos de certificación provenientes del Tribunal de Primera Instancia, "ambas partes" de un pleito tienen que dar su anuencia para que el auto pueda expedirse. En un caso como el de epígrafe, la Asamblea Legislativa conjuró el escenario anómalo en que una de las partes, con tan solo negar su anuencia, tiene en sus manos el poder de determinar si existe jurisdicción del Tribunal Supremo en

cuanto al auto de certificación intrajurisdiccional. Con eso controla a su antojo la jurisdicción y competencia de este Tribunal. Así, en estos casos no podríamos intervenir porque la Rama Ejecutiva no lo quiere ni lo permite. Ello es inaudito y claramente inconstitucional.

Por otro lado, el esquema de la Ley Núm. 18, supra, para atender los recursos de certificación y certiorari viola la Sección 3 del Artículo V de la Constitución de Puerto Rico, L.P.R.A. Tomo I, porque efectivamente impide que este Foro sea el tribunal de última instancia en Puerto Rico. El estatuto también limitó la jurisdicción de este Foro para emitir autos de certiorari con relación a decisiones interlocutorias del Tribunal de Apelaciones. El Art. 1 de la Ley Núm. 18, supra, limita la intervención de este Tribunal a decisiones interlocutorias del foro apelativo intermedio que denieguen mociones de carácter dispositivo, que versen sobre la admisibilidad de testigos de hechos o peritos esenciales, que involucren asuntos de privilegios evidenciarios, descalificaciones de abogados, anotaciones de rebeldía o en casos de relaciones de familia. Al limitar de esta manera nuestra intervención en asuntos interlocutorios queda meridianamente clara la intención legislativa de insular al Estado de la revisión judicial en los casos específicos que hoy tenemos ante nuestra consideración, si proseguir con el litigio se hace intolerable para un número considerable de los empleados demandantes, por el transcurso del tiempo.

La Ley Núm. 18, supra, garantiza que cualquier remedio interdictal o cualquier otro asunto interlocutorio en este caso o en otro contra el Gobierno, no importa cuán meritorio y urgente sea para evitar un daño irreparable, para proteger el interés público o para evitar un fracaso de la justicia, nunca llegue a este Foro. Queda así expuesta la actuación tenebrosa del Estado que intentó remover los casos en su contra de la revisión judicial de este Tribunal. Ante la naturaleza de las reclamaciones de los demandantes-peticionarios de autos, la Ley Núm. 18, supra, pretende implosionar el camino para que estos no puedan lograr remedios importantes y urgentes que se les nieguen en los foros de jerarquía inferior. La revisión del dictamen final del Tribunal de Primera Instancia sería muy tarde para atender los posibles daños irreparables.

En un ordenamiento constitucional todo poder tiene sus límites. Aunque la Asamblea Legislativa puede por delegación constitucional alterar la competencia de este Tribunal, la manera en que lo haga no puede ir en contra de otras disposiciones constitucionales. Nuestra Carta Magna establece que el Poder Judicial se ejerce por este Tribunal Supremo y que solo este es el tribunal de última instancia en Puerto Rico. Const. P.R., Art. V, Secs. 1 y 3. L.P.R.A. Tomo I. Los constituyentes tenían claro el

alcance de este esquema. El delegado Gutiérrez Franqui explicó este sistema de la siguiente manera.

> Eso quiere decir que está fuera del alcance de la Asamblea Legislativa de Puerto Rico la jurisdicción del Tribunal Supremo. Lo que está a su alcance es la competencia. **Y quiere decir además, al estipular esta proposición que nosotros hemos traído, que el Tribunal Supremo será el tribunal de última instancia, que la Asamblea Legislativa no podrá impedir que los casos judiciales de alguna forma o en otra, lleguen hasta la consideración del Tribunal Supremo**. Esto es lo que quiere decir que será el tribunal de última instancia. Y cuando se dice que la Asamblea Legislativa puede reorganizar y abolir tribunales, se dice en forma no incompatible con las disposiciones de esta constitución; **que quiere decir que lo que haga nunca podrá privar al Tribunal Supremo de su condición de tribunal de última instancia.** 1 Diario de Sesiones de la Convención Constituyente de Puerto Rico, Ed. Conmemorativa 2003, pág. 592 (1952) (Énfasis suplido).

Dicho de otro modo por el ex Juez Presidente señor Trías Monge:

> La intención ... al disponer en la sección 2 del artículo V que la Asamblea Legislativa podría determinar la competencia de los tribunales del país **en modo alguno conllevaba la facultad de privar al Tribunal Supremo de entender, a su entera discreción, en cualquier causa que le fuere presentada, se opusiere o no la parte demandada o fuese el asunto concernido de la supuesta competencia del Tribunal Supremo conforme a los estatutos vigentes.** J. Trías Monge, Historia Constitucional de Puerto Rico, San Juan, Editorial de la Universidad de Puerto Rico, 1982, Vol. III, pág. 95. (Énfasis nuestro.)

En esta coyuntura hay que distinguir los conceptos jurisdicción y competencia. Hemos expresado que "[la] jurisdicción es el poder o autoridad de un tribunal para considerar y decidir casos y controversias". S.L.G. Solá-Moreno v. Bengoa Becerra, supra, a la pág. 682 citando a Asoc. Punta Las Marías v. A.R.PE., 170 D.P.R. 253, 263 n. 3 (2007). El Art. V, Sec. 2 de la Constitución de Puerto Rico, supra, instauró un sistema judicial unificado en lo referente a su jurisdicción. Eso significa que en Puerto Rico "cualquier parte del Sistema Judicial tiene la facultad de resolver una causa". Vives Vázquez v. E.L.A., 142 D.P.R. 117, 135 (1996). Véase, además, J. Trías Monge,

El sistema judicial de Puerto Rico, San Juan, Ed. U.P.R., 1978, pág. 136.

En el Informe de la Comisión de la Rama Judicial de la Convención Constituyente se recomendaba la creación de un tribunal unificado para asegurar, entre otras cosas, que se eliminaran los problemas técnicos jurisdiccionales **que plagaban al sistema y dificultaban la obtención de justicia en los tribunales.** Cosme v. Hogar Crea, 159 D.P.R. 1, 18 (2003) (Opinión de Conformidad emitida por la Jueza Asociada señora Naveira Merly a la que se unió el Juez Asociado señor Corrada del Río). (Énfasis nuestro.)

Véase, además, 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2613 (1961).

Por su parte, la competencia es "la manera en que se organiza y canaliza el ejercicio de la jurisdicción que tiene el tribunal". Lemar S.E. v. Vargas Rosado, 130 D.P.R. 203, 207 (1992) citando a M.A. Velázquez Rivera, Jurisdicción y competencia de los tribunales de Puerto Rico, 48 Rev. Jur. U.P.R. 27, 29 (1979). Véase, además, Rodríguez v. Singular, 160 D.P.R. 167 (2003). En esencia, las reglas de competencia establecen la tramitación ordenada de los asuntos judiciales dentro de nuestro sistema de jurisdicción unificada. Cosme v. Hogar Crea, supra, págs. 9–10.

La Constitución le confiere competencia a este Foro para atender en primera instancia autos de *habeas corpus* y para dilucidar en **última instancia sobre todas las otras controversias judiciales.** Art. V, Sec. 2 de la Constitución de Puerto Rico, supra. Véase, además, R. Hernández Colón, Práctica jurídica de P.R.: derecho procesal civil, Ed. Lexis Nexis de P.R., San Juan, 2010, sec. 506, págs. 48-49.

Las enmiendas que introdujo la Ley Núm. 18-2013 trastocan inconstitucionalmente ese esquema. Como vimos, ese estatuto no nos permite certificar en esta etapa a menos que el Ejecutivo consienta y nos impide revisar decisiones interlocutorias que se podrían convertir en académicas antes de llegar ante la consideración de este Foro por la vía ordinaria. Para todo propósito práctico, los tribunales de jerarquía inferior serían los de última instancia en casos como este.

En otras palabras, aunque se expresa que se restringe la competencia del Tribunal Supremo, **en realidad lo que se hace es privarle de jurisdicción** para atender ciertos asuntos. Esa privación se da por completo en el caso de muchas resoluciones interlocutorias que de no revisarse causarían un daño irreparable o atentan contra el interés

público, perpetuando así un fracaso de la justicia. La privación de nuestra jurisdicción también se da cuando se coloca esta a merced del veto de otra rama de gobierno, como se hizo con el recurso de certificación proveniente del Tribunal de Primera Instancia. No permitir la certificación en ciertas circunstancias también podría hacer irreversible un daño o atentar contra el interés público, y constituiría un fracaso de la justicia. En esas circunstancias se pasó por alto que según el esquema constitucional, aunque la Asamblea Legislativa tiene la facultad de reglamentar la competencia de los tribunales, ello no puede resultar en el despojo de nuestra jurisdicción para atender, a nuestra entera discreción, cualquier causa que se nos presente. J. Trías Monge, op cit., pág. 95.

A la luz de los criterios esbozados por este Tribunal es evidente que los Arts. 1 y 2 de la Ley Núm. 18, supra, en la medida en que alteran los incisos (d) y (e) del texto original del Art. 3.002 de la Ley de la Judicatura de 2003, supra, y la Regla 52.2 (d) de Procedimiento Civil, resultan inconstitucionales de su faz por representar una violación de la doctrina de separación de poderes. La verdadera intención de este estatuto –**expresada abiertamente por su autor y evidenciada por el trámite acelerado y atropellado para su aprobación**– era maniatar a este Tribunal y evadir la revisión judicial de estos y los demás casos contra el Gobierno en etapas medulares y significativas. Ello es insostenible y no podemos avalarlo. En realidad, quien quedaría maniatado por la Ley Núm. 18, supra, es el Pueblo de Puerto Rico, al ver truncado el acceso a la justicia en una etapa significativa y decisiva del proceso legal.

No debemos olvidar que los ciudadanos acuden a este Foro "para defender, vindicar y reclamar sus derechos". In re Solicitud Aumentar Núm. Jueces TS, supra, pág. 60. Esa tarea es de importancia trascendental en nuestro sistema democrático. Cuando se trastoca la competencia de este Tribunal, se limita de forma aguda el acceso a la justicia a que tienen derecho todos en Puerto Rico. El Juez Presidente señor Hernández Denton afirmó recientemente que el acceso a la justicia "incluye que los ciudadanos estén enterados de sus derechos y cómo exigirlos, que tengan acceso a un experto del derecho, que los procedimientos judiciales sean económicamente accesibles, y que la justicia se imparta sin atrasos". F. Hernández Denton, Acceso a la Justicia y el Estado de Derecho, 81 Rev. Jur. U.P.R. 1129, 1132 (2012) (Énfasis suplido.) Esa frase del Juez Presidente es muy contundente. Presume que existe un procedimiento judicial accesible.

La limitación de la competencia de este Foro de manera inconstitucional en nada abona al ideal de que

todos tengan acceso a la justicia. Como último interprete de nuestra Constitución, este Foro tiene la encomienda delicada de analizar los planteamientos constitucionales que las partes presenten. Existen situaciones apremiantes que requieren que acojamos un caso mediante el recurso extraordinario de la certificación para resolverlo. Se puede afirmar que el auto de certificación es un recurso que la ciudadanía tiene a su alcance para tener acceso a la justicia en casos de alto interés público. Por otra parte, el auto de certiorari interlocutorio permite al Tribunal atender controversias que afectan de manera irremediable a las partes y pueden incidir en el resultado final de un caso. Bien utilizado, el auto de certiorari interlocutorio provee un remedio a tiempo para evitar que un error de un foro de jerarquía inferior cause un daño irreparable. Si bien las otras ramas pueden limitar la disponibilidad del recurso de certiorari interlocutorio a este Tribunal, no pueden eliminarlo en situaciones de interés público ni en situaciones que de no atenderse en la etapa interlocutoria propiciarían un fracaso a la justicia. Eliminarlo en esas circunstancias no solo impide que se imparta justicia sino que para todo efecto legal, convierte al foro intermedio en el tribunal de última instancia en ese asunto, en contra del mandato expreso de la Constitución de Puerto Rico.

En nuestro ordenamiento jurídico "existe una política judicial que fomenta el mayor acceso posible de los ciudadanos a los tribunales para que sus controversias puedan ser resueltas en los méritos". Negrón v. Srio. de Justicia, 154 D.P.R. 79, 93 (2001) y casos allí citados. Por eso comenta el tratadista Hiram A. Sánchez Martínez en su libro Práctica Jurídica de Puerto Rico Derecho Procesal Apelativo, Lexis Nexis of Puerto Rico, San Juan, 2001, Sec. 102, pág. 3, que existe "un principio de justicia muy arraigado en las tradiciones y conciencia del pueblo puertorriqueño -que la decisión definitiva de un asunto no esté exclusivamente en manos de una sola persona-...". Por esa razón, no favorece que se elimine de forma absoluta el derecho de un litigante a acudir mediante petición de certiorari ante un tribunal de mayor jerarquía. Íd. En particular, expone

> que la Asamblea Legislativa debería reconocerle, al menos al Tribunal Supremo, una esfera mínima de acción en la cual ejercer su función constitucional como tribunal de última instancia, aunque sea a través de recursos discrecionales. Tal interpretación sería cónsona con el propósito esencial del Derecho procesal apelativo puertorriqueño como mecanismo de "control de calidad" y disuasivo de la tentación de prevaricación entre los foros inferiores. Íd., pág. 4.

Este asunto delicado se complica más si analizamos los tipos de casos que se afectan con la Ley Núm. 18, supra. Tómese por ejemplo el caso de los remedios provisionales que contienen las Reglas 56 y 57 de Procedimiento Civil, 32 L.P.R.A. Ap. V, tales como: (1) embargo o prohibición de enajenar; (2) orden para hacer o desistir de hacer; (3) cancelaciones de anotaciones preventivas de embargo e; (4) injunctions preliminares entre otros. En la medida que se priva a este Tribunal de revisar determinaciones interlocutorias en las situaciones antes citadas, se da al traste con el mandato constitucional de que este Foro sea el "tribunal de última instancia en Puerto Rico". Constitución de Puerto Rico Art. V Sec. 3, supra. Por el contrario, la Ley Núm. 18, supra, convertiría en irrevisables ese tipo de decisiones de los foros de jerarquía inferior.

Precisamente la Ley Núm. 177-2010 enmendó la Regla 52.1 de Procedimiento Civil de 2009, 32 L.P.R.A. Ap. V, con el propósito de permitir que el Tribunal de Apelaciones expida recursos de certiorari para revisar asuntos interlocutorios por los siguientes fundamentos:

a. casos que revistan interés público
b. situaciones en la que esperar a la apelación constituiría un fracaso irremediable a la justicia.

Esa enmienda que introdujo la Ley Núm. 177, supra, es un reconocimiento sabio de parte de la Asamblea Legislativa de que existen situaciones imprevisibles en las que hay que brindarle una herramienta al Poder Judicial para que resuelva casos excepcionales. La Ley Núm. 18, supra, no contiene un lenguaje similar al empleado en la Ley Núm. 177, supra. De esa forma, se despoja a los litigantes de su derecho a revisar determinaciones interlocutorias cuando entiendan que son ilegales o hasta inconstitucionales.

Claro está, no debemos perder de perspectiva que el concepto "acceso a la justicia" no significa que cualquiera puede plantear cualquier cosa en un tribunal, cuando le plazca. Tiene que haber un caso y controversia justiciable. Lozada Sánchez et al. v. JCA, 184 D.P.R. 898 (2012) (Martínez Torres J.); Acevedo Vilá v. Meléndez, 164 D.P.R. 875 (2005) (Hernández Denton J.); E.L.A. v. Aguayo, 80 D.P.R. 552, 584 (1958) (Serrano Geyls J.). Por ello, el caso no puede ser académico ni prematuro. Asoc. Fotoperiodistas v. Rivera Schatz, 180 D.P.R. 920, 933 (2011) (Martínez Torres J.); San Gerónimo Caribe Project v. A.R.Pe., 174 D.P.R. 640, 652 (2008) (Hernández Denton J.). Para que un litigante pueda instar una acción en el Tribunal General de Justicia de Puerto Rico es necesario que ostente legitimación activa. Lozada Sánchez et al. v. JCA, supra; Fund. Surfrider y otros v. A.R.Pe., 178 D.P.R.

563 (2010) (Martínez Torres J.); <u>Romero Barceló v. E.L.A.</u>, 169 D.P.R. 460 (2006) (Op. Disidente de Rodríguez Rodríguez J.); <u>Acevedo Vilá v. Meléndez</u>, <u>supra</u>; <u>Hernández Torres v. Hernández Colón</u>, 131 D.P.R. 593 (1992) (Hernández Denton J.); <u>Hernández Torres v. Hernández Colón</u>, 129 D.P.R. 824 (1992) (Hernández Denton J.). Para determinar si una parte tiene legitimación activa, tiene que demostrar que "ha sufrido un daño claro y palpable; que el daño es real, inmediato y preciso, y no uno abstracto e hipotético; que existe conexión entre el daño sufrido y la causa de acción ejercitada; y que la causa de acción surge bajo el palio de la constitución o de una ley". <u>Mun. Fajardo v. Srio. Justicia <i>et al.</i></u>, Op. de 8 de noviembre de 2012, 2012 T.S.P.R. 170, 2012 J.T.S. 183, 187 D.P.R. __ (2012) (Martínez Torres J.). Véanse, además, <u>Lozada Tirado v. Testigos Jehova</u>, 177 D.P.R. 893, 924 (2009) (Hernández Denton J.); <u>Col. Peritos Elec. v. A.E.E.</u>, 150 D.P.R. 327, 331 (2000) (Hernández Denton J.); <u>Asoc. Maestros P.R. v. Srio. Educación</u>, 137 D.P.R. 528, 535 (1994) (Hernández Denton J.).

Como expresó el Juez Presidente, el acceso a la justicia consiste "en que los procedimientos judiciales sean económicamente accesibles, y que la justicia se imparta sin atrasos". F. Hernández Denton, <u>supra</u>, 1132. Podemos añadir que el acceso a la justicia también incluye que los ciudadanos afectados tengan mecanismos procesales disponibles para hacer valer sus derechos de forma efectiva. Enunciamos sin ambages que la Ley Núm. 18-2013 en nada abona al importante principio de acceso a la justicia que pregona con vigor la Rama Judicial. Por eso nos decepciona que la Oficina de Administración de los Tribunales no se opusiera al P. del S. 367, hoy Ley Núm. 18, <u>supra</u>, como era su deber, cuando tuvo la oportunidad de hacerlo. Véase, Informe de la Comisión de lo Jurídico, Seguridad y Veteranos del Senado de Puerto Rico de 10 de mayo de 2013, págs. 2-5.

**III**

Por los fundamentos que anteceden, concluimos que los Arts. 1 y 2 de la Ley Núm. 18, <u>supra</u>, en la medida en que alteran los incisos (d) y (e) del texto original del Art. 3.002 de la Ley de la Judicatura de 2003, <u>supra</u>, y la Regla 52.2 (d) de Procedimiento Civil son inconstitucionales de su faz. La forma atropellada en que se aprobó el P. del S. 367 y el historial legislativo de esa medida revelan las intenciones de las Ramas Ejecutiva y Legislativa de impedir que los peticionarios acudieran ante este Tribunal mediante las peticiones de certificación que nos ocupan. También estos artículos de la Ley Núm. 18, <u>supra</u>, son inconstitucionales por privar a este Foro de ser el tribunal de última instancia en ciertos casos e incidentes procesales, como estos. Este

Tribunal siempre ha brindado la debida deferencia a las leyes aprobadas por los representantes elegidos por el Pueblo. Véanse, A.A.R., Ex parte, supra, (Pabón Charneco J.); Lozada Sánchez et al. v. JCA, supra, (Martínez Torres J.) Delgado, Ex parte, 165 D.P.R. 170, 192-193 (2005) (Rodríguez Rodríguez J.); Caquías v. Asoc. Res. Mansiones Río Piedras, 134 D.P.R. 181, 189 (1993) (Hernández Denton J.). Pero esa deferencia termina en la línea que la Constitución trazó.

Al concluir de esa forma, resulta innecesario dilucidar el enigma de la fecha de aprobación de la Ley Núm. 18, supra. Por tanto, concluimos que este Tribunal tiene jurisdicción y competencia para atender las peticiones de certificación que se nos presentan en estos casos. Veamos ahora si debemos ejercer nuestra discreción para expedir los autos solicitados en esta etapa de los procedimientos.

En el pasado, el recurso de certificación intrajurisdiccional ha sido utilizado por este Tribunal "para atender asuntos que requieren urgente solución, ya sea porque se afecta la administración de la justicia o porque el asunto es de tal importancia que exige una pronta atención". U.P.R. v. Laborde Torres y otros I, 180 D.P.R. 253, 272-273 (2010).

Tampoco debemos perder de vista que el recurso de certificación es "de carácter excepcional porque la norma preferida en nuestro ordenamiento es que los casos maduren durante el trámite ordinario para evitar así que el foro de última instancia se inmiscuya a destiempo". Íd., pág. 272. Véase, además, Rivera v. J.C.A., 164 D.P.R. 1, 7 (2005). Asimismo, la certificación permite que este Foro dilucide algunos casos que de otra forma evadirían nuestros pronunciamientos. U.P.R. v. Laborde Torres y otros I, supra, pág. 273; Presidente de la Cámara v. Gobernador, 167 D.P.R. 149, 160-161 (2006).

Aunque las alegaciones de las demandas en estos casos exponen daños concretos y detallados, que parecen ser suficientes de su faz, no podemos olvidar que esas alegaciones exponen hechos sobre los cuales, en ausencia de estipulación, es indispensable presentar prueba en el foro primario. Esa es la razón por la cual declaramos no ha lugar las peticiones de certificación, en esta etapa de los casos. Es decir, estos casos presentan cuestiones de hecho para las cuales es necesario presentar evidencia. En eso se diferencian estos casos de otros que hemos decidido.

Por ejemplo, en Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1 (2010), certiorari denegado, Domínguez Castro v. Puerto Rico, 131 S. Ct. 152, 562 U.S. ___ (2010), la

controversia medular era auscultar la constitucionalidad de la Ley Núm. 7-2009, mejor conocida como Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico, 3 L.P.R.A sec. 8791 *et seq.*, al amparo de varias cláusulas constitucionales. De esa forma, en ese caso no existían controversias de hecho que requirieran enviar el caso al foro primario para recibir prueba.

Por su parte, en Asoc. Fotoperiodistas v. Rivera Schatz, 180 D.P.R. 920 (2011), la controversia que se nos presentó era analizar la justiciabilidad del caso ante la actuación del Presidente del Senado que restituyó el acceso de la prensa a las sesiones legislativas. Concluimos en ese caso que la controversia se había tornado académica porque el Presidente del Senado implantó medidas administrativas para corregir la situación. Íd., pág. 948. No había controversias de hecho en ese caso que requirieran el desfile de prueba.

Finalmente, en P.I.P. v. E.L.A. et al., supra, nos tocó dilucidar la constitucionalidad de una pieza legislativa que dispuso para la celebración de un referéndum que se celebró el 19 de agosto de 2012. En ese referéndum, se le propuso al Pueblo enmendar las Secciones 2, 3, 4, y 7 del Art. III de la Constitución de Puerto Rico, L.P.R.A. Tomo I, con el fin de reducir el número de miembros de los Cuerpos Legislativos. En ese caso sostuvimos la constitucionalidad de la Resolución Concurrente del Senado Núm. 35 de 13 de abril de 2010 y la Ley Núm. 12-2012 por entender que cumplían con nuestra Constitución. Como se desprende de nuestra jurisprudencia, hemos atendido certificaciones sin el beneficio de un desfile de prueba cuando se trata de cuestiones puramente de derecho. P.I.P. v. E.L.A. et al., supra; Domínguez Castro et al. v. E.L.A. I, supra.

En los casos ante nuestra consideración es necesario presentar evidencia sobre la edad de los demandantes y los años cotizados por ellos para poder calcular cómo les afecta la Ley Núm. 3, supra. Eso nos lleva a concluir que en el ejercicio de nuestra discreción, no proceden los autos de certificación en esta etapa.

Ahora bien, los intereses públicos involucrados en estos casos son excepcionales. Los peticionarios han hecho unos planteamientos que merecen una consideración seria y pronta. **Por eso enfatizamos el deber que tiene el Tribunal de Primera Instancia, Sala de San Juan, de atender las controversias planteadas por las partes demandantes-peticionarias de forma diligente con toda la urgencia necesaria.** La Ley Núm. 3, supra, entrará en vigor en poco menos de un mes y, de no proveerse un remedio

interlocutorio oportuno, los peticionarios se verán obligados a tomar decisiones drásticas que podrían ir desde renunciar a sus empleos y acogerse a un plan de pensión menor del esperado o continuar trabajando por años y acogerse a la nueva estructura de retiro provista por esa ley. Por eso, el trámite que el foro primario debe dar a estos casos **debe ser atento, expedito y deliberado.** Las repercusiones de estos casos pueden afectar a los peticionarios por el resto de sus días. Ante ese escenario, **la Sala de Instancia deberá asegurarse de que las partes demandantes-peticionarias tengan a su disposición cualquier remedio provisional de naturaleza interdictal o de cualquier otra índole que sea necesario para preservar sus derechos frente a la fecha límite que se avecina. Véase, Art. 678 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3524. Como mínimo, el foro primario debe resolver ese asunto antes de que entre en vigor la Ley Núm. 3, <u>supra</u>, el 1 de julio de 2013, pues su deber es evitar que la demora judicial deje sin remedio a una parte que lo amerite.** De igual modo, el Tribunal de Primera Instancia debe atender con premura las mociones dispositivas que tiene ante sí, de manera que la parte que resulte perjudicada por su decisión pueda utilizar los mecanismos de revisión judicial que el ordenamiento legal le provee.

Como parte de ese trámite y ante la inminencia de la fecha en que entra en vigor la Ley Núm. 3-2013, **es conveniente y necesario que el Tribunal de Primera Instancia celebre una vista no más tarde del 18 de junio de 2013 en la que se presente evidencia** sobre la edad de los demandantes-peticionarios y los años cotizados en el servicio público, a menos que las partes logren estipular esos hechos. Recibida esa prueba y con la misma premura, el tribunal tiene el deber de realizar las determinaciones de hechos correspondientes mediante resolución a esos efectos.

No podemos terminar sin hacer una exhortación pública a proteger los derechos del Pueblo por encima de cualquier otra consideración. La única "guerra" que debemos librar en las tres ramas de Gobierno es contra la injusticia.

Siempre habrá diferencias sobre el impacto o corrección de las decisiones de este Foro. De ese concurso de ideas vive la democracia. Sin embargo, debemos estar claros en que un elemento esencial de esa democracia es que existan los mecanismos para que las personas afectadas puedan llevar sus casos y controversias justiciables a los tribunales. Esas personas no pueden ser las víctimas colaterales de una mal llamada "guerra" contra este Tribunal. Para evitar eso, este Foro exigirá para sí la misma deferencia que le otorga a las actuaciones discrecionales de las otras ramas que no violen la

Constitución ni las leyes. Que no quede duda de que con el mismo fervor haremos valer la Constitución y esas leyes, en protección de los derechos del Pueblo en la democracia a la que todos aspiramos.

Publíquese inmediatamente.

Notifíquese inmediatamente a las partes y al Tribunal de Primera Instancia por teléfono, correo electrónico o fax, y notifíquese posteriormente por la vía ordinaria.

Lo acordó y ordena el Tribunal, y certifica la Secretaria del Tribunal Supremo. EL Juez Asociado señor Martínez Torres emitió un Voto particular de conformidad. La Jueza Asociada señora Pabón Charneco emitió un Voto particular de conformidad. El Juez Asociado señor Kolthoff Caraballo emitió un Voto particular de conformidad. El Juez Asociado señor Rivera García emitió un Voto particular de conformidad. El Juez Asociado señor Estrella Martínez emitió un Voto particular. El Juez Presidente señor Hernández Denton emitió un Voto particular disidente al que se unió la Jueza Asociada señora Fiol Matta. La Jueza Asociada señora Fiol Matta emitió un Voto particular disidente. La Juez Asociada señora Rodríguez Rodríguez emitió un Voto particular disidente.

Aida Ileana Oquendo Gralau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| María del C. Alvarado Pacheco y otros<br><br>    Peticionarios<br><br>       v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>    Recurridos<br>_____<br><br>Monsita Denise Otero Ruiz y otros<br><br>    Peticionarios<br><br>       v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>    Recurridos<br>_____<br><br>Víctor A. Trinidad Hernández y otros<br><br>    Peticionarios<br><br>       v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>    Recurridos | CT-2013-0005<br>CT-2013-0006<br>CT-2013-0007 |

Voto de conformidad emitido por el Juez Asociado señor MARTÍNEZ TORRES

En San Juan, Puerto Rico, a 11 de junio de 2013.

La Juez Asociada señora Rodríguez Rodríguez no solo rehusó defender la integridad de este Foro y la separación de poderes en su mal llamado voto particular disidente (En realidad es un voto concurrente porque coincide con denegar

el auto de certificación, pero por fundamentos distintos a los de la mayoría. Claro está, disidencia suena mejor para las gradas). También hace una imputación grave de falta de imparcialidad a los tres miembros de esta Curia, a saber los Hons. Kolthoff Caraballo, Estrella Martínez y el que suscribe, que en aras de evitar un posible choque constitucional nos reunimos con el Presidente del Senado luego de presentarse el proyecto que hoy es la Ley Núm. 18-2013.

Es necesario, entonces, aclarar el récord frente a las tergiversaciones de la Juez Asociada. Allí nadie se reunió para discutir un caso en específico, futuro o ya presentado, mucho menos estos casos consolidados. Tres integrantes de este Tribunal, con la responsabilidad constitucional de ser miembros del cuerpo que constitucionalmente conforma el Poder Judicial, nos reunimos con el jerarca de otro poder constitucional para inquirir acerca de la razón para la presentación de un proyecto de ley dirigido a eliminarle a este Foro, en ciertos casos, la jurisdicción —es decir, la autoridad— de atender ciertos asuntos antes que se hagan académicos, con el pretexto de reglamentar nuestra competencia. Lo mismo expresamos públicamente. Esa reunión no es inusitada. De hecho, terminada la reunión en la oficina del hermano Juez Asociado señor Estrella Martínez, el Presidente del Senado pasó a la oficina del señor Juez Presidente. No hay nada antiético en defender al Poder Judicial que regenteamos ni en intercambiar impresiones de

política pública con los jerarcas de los otros poderes constitucionales. Así ocurrió, por ejemplo, cuando el Juez Presidente señor Todd hizo sugerencias de enmienda a la Comisión de lo Judicial de la Convención Constituyente. Véase J. Trías Monge, Historia constitucional de Puerto Rico, Vol. II, San Juan, Ed. U.P.R., 1982, pág. 97. Como señaló el otrora Juez Presidente señor Andréu García, cualquier legislación de reforma al sistema judicial debería contar con la participación efectiva de la Rama Judicial. Mensaje del ex Juez Presidente señor Andréu García, Autonomía presupuestaria para la Rama Judicial, 20 de diciembre de 2002. Disponible en ramajudicial.pr/orientación/prensa-20-12-01.html (última visita 11 de junio de 2013). Y es que por si la Juez Asociada no se ha enterado, valga recordar que el Poder Judicial lo ejerce este Tribunal Supremo (Const. P.R., Art. V, Sec. 2). Véase, In re Aprob. Rs. Y Com. Esp. Ind., 184 D.P.R. 569 (2012). Bastaba llamar a los jueces presentes en esas dos reuniones para que la Juez Asociada se enterara de lo que se discutió en ellas.

Por eso es lamentable que en su afán de defender al Gobierno actual la Juez Asociada eche al suelo los estándares mínimos de convivencia, respeto mutuo y deferencia que son indispensables para el funcionamiento óptimo de un cuerpo colegiado. Pero no puedo pedirle peras al olmo. Por mi parte le aseguro al Pueblo que seguiré adjudicando conforme a mi conciencia y no doy valor a los reclamos de probidad de toda

aquella persona que coloque a un partido político por encima del derecho y su juramento de imparcialidad.


                              RAFAEL L. MARTÍNEZ TORRES
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

María del C. Alvarado
Pacheco y otros

     Peticionarios

        v.

Estado Libre Asociado de
Puerto Rico y otros

     Recurridos
_____

Monsita Denise Otero Ruiz y
otros

     Peticionarios

        v.

Estado Libre Asociado de
Puerto Rico y otros

     Recurridos
_____

Víctor A. Trinidad Hernández
y otros

     Peticionarios

        v.

Estado Libre Asociado de
Puerto Rico y otros

     Recurridos

CT-2013-0005
CT-2013-0006
CT-2013-0007

Voto Particular de Conformidad emitido por la Jueza Asociada señora PABÓN CHARNECO.

En San Juan, Puerto Rico, a 11 de junio de 2013.

*De nada nos vale hablar de independencia judicial si la*

> *Legislatura de Puerto Rico puede en cualquier momento fijar la jurisdicción que el Tribunal Supremo tiene.*[5]

Estoy conforme firmemente con la Resolución de epígrafe. La decisión que hoy emite este Foro representa una vindicación de la Doctrina de Separación de Poderes al impedir un trastoque que otra rama del ordenamiento ha intentado llevar a cabo con la jurisdicción de este Tribunal de manera inconstitucional. Nuevamente nos vemos obligados a poner en vigor los contornos de "esas fronteras invisibles pero poderosas que delimitan el ámbito de acción de cada Rama del gobierno". *A.A.R., Ex parte*, Op. de 20 de febrero de 2013, 2013 T.S.P.R. 16, 2013 J.T.S. 16, 187 D.P.R. ___ (2013), pág. 62. Esa labor nunca es sencilla, pero es parte de lo que sostiene a nuestro ordenamiento. Y como muy bien se discute en la Resolución que antecede, no es la primera vez que este Tribunal se ve obligado a deslindar las fronteras de la Doctrina de Separación de Poderes.

No obstante, en aras de atender algunos de los planteamientos contenidos en los votos disidentes que hoy se emiten me siento obligada a emitir estas breves expresiones.

**I**

Hace poco este Tribunal pudo abundar en cuanto a la Doctrina de Separación de Poderes. *A.A.R., Ex parte*,

---

[5] 1 Diario de Sesiones de la Convención Constituyente de Puerto Rico, pág. 589 (1952).

supra. En esa ocasión revisitamos los fundamentos de esa Doctrina y vimos cómo esta es parte intrínseca de nuestro ordenamiento constitucional, siendo vehículo para garantizar la libertad de los ciudadanos en un sistema democrático como el nuestro. Por ser más una doctrina de filosofía política que una norma legal, es entendible que existan diferencias en cuanto a cómo la Rama Judicial debe poner en vigor la Doctrina de Separación de Poderes. En ocasiones, como en *A.A.R., Ex Parte*, supra, la Doctrina se sostiene al no ejercer nuestro poder constitucional, dejando así que las otras ramas ejerzan sus facultades. Sin embargo, la Separación de Poderes en ocasiones se defiende haciendo un ejercicio afirmativo del Poder Judicial.

Las situaciones que más evidentemente ameritan la utilización de ese poder vindicador surgen cuando las otras Ramas se inmiscuyen con la Rama Judicial en un intento de limitar el poder que la Constitución le delegó a esta. Por eso este Tribunal no ha vacilado en ejercer su poder para declarar inconstitucionales aquellas actuaciones legislativas contrarias a la Doctrina de Separación de Poderes. *Misión Ind. P.R. v. J.P.,* 146 D.P.R. 64 (1998); *Colón Cortés v. Pesquera*, 150 D.P.R. 724 (2000). Obviamente, la utilización de ese Poder no es un ejercicio fácil y conlleva un cierto grado de choques con las otras ramas del ordenamiento. Pero precisamente para eso existe el sistema de pesos y contrapesos inherente a

la Doctrina de Separación de Poderes. Es por ello que se presume la existencia de funcionarios valientes que defenderán los poderes de las Ramas que les fueron encomendadas.

En los casos que tenemos ante nuestra consideración hoy no hay duda de la verdadera intención de la Asamblea Legislativa de Puerto Rico al aprobar la Ley 18-2013. Las expresiones de su autor en el hemiciclo del Senado hablan por sí solas. El manejo en la Oficina del Gobernador ha puesto en duda la fecha en que efectivamente se firmó el estatuto. El tracto de las Demandas de epígrafe demuestran el indudable interés legislativo de crear una serie de **"islas jurisdiccionales"** en nuestro ordenamiento para impedir que, de alguna forma u otra, los casos de autos fueran revisados efectivamente por este Tribunal. Como muy bien explica la Resolución que antecede, esa actuación rebasa las fronteras constitucionales al violar la Doctrina de Separación de Poderes.

El que este Tribunal declare inconstitucionales las intromisiones legislativas con el poder de la Rama Judicial no es novel. Al igual que en la jurisdicción federal, la Rama Legislativa "no puede aprobar legislación que elimine un área de jurisdicción en aras de controlar el resultado en un caso en particular". J. Nowak & R. Rotunda, *Constitutional Law*, 7ma ed., Ed. Thomson West, 2004, pág. 38. Y como vimos, este Tribunal ha sido valiente y ha declarado inconstitucionales anteriores

actuaciones legislativas, aunque ello conllevara la paralización de importantes proyectos de infraestructura para la administración de turno. Los casos de autos representan otro evento más en la saga de ocasiones en que este Tribunal ha tenido que defender su jurisdicción: hoy no se han pautado nuevas normas ni se han revocado precedentes.

Es por eso que hoy me hago eco de las elocuentes palabras de la Juez Asociada señora Rodríguez Rodríguez. Hace siete (7) años – a saber en el **2006**- sentenció la compañera:

> Esencial para nuestra convivencia democrática es el respeto que una rama de gobierno le debe a la otra. Respeto que se traduce en el mutuo reconocimiento y resguardo de las facultades y prerrogativas de cada cual. Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998); Banco Popular, Liquidador v. Corte, 63 D.P.R. 66 (1944).
> Este Tribunal ha respetado siempre ese equilibrio constitucional. **No hemos vacilado cuando las actuaciones de una rama irrumpen sobre las facultades intrínsecas de otra rama. Así, hemos sido enfáticos al rechazar la intromisión indebida de la Asamblea Legislativa con el ejercicio de la función judicial**. *Acevedo Vilá v. Aponte Hernández*, 168 D.P.R. 443, 491 (2006).

Sin embargo, como en toda controversia constitucional, y más en una en la cual se determina que ha habido una violación a la Doctrina de Separación de Poderes, es normal que existan diferencias de criterio. Debemos recordar que una opinión judicial no puede probar de forma lógica que su resultado es absolutamente correcto, solo puede explicar el razonamiento del Juez

individual que la suscribió. Por eso, era de esperarse algún tipo de disidencia ante la Resolución de epígrafe. No obstante, no puedo disimular mi asombro ante la inconsistencia palpable de los que hoy disienten.

Por un lado, me decepciona profundamente el proceder del Juez Presidente señor Hernández Denton quien ha abandonado la postura valiente que asumió en *Colón Cortés v. Pesquera*, supra. En ese caso defendió las facultades de este Tribunal frente a un intento legislativo de afectar un caso pendiente. Véase además, *Misión Ind. P.R. v. J.P.*, supra. La situación que tuvimos ante nosotros en los casos de autos fue aún más grave toda vez que se pretendió convertir al Tribunal de Apelaciones en el tribunal de última instancia en el que muchos asuntos interlocutorios se tornarían irrevisables por este Foro, causando así un fracaso de la justicia.

Ciertamente nos encontramos ante un conflicto único en nuestra historia constitucional. Esperaba que al menos el Juez Presidente señor Hernández Denton hubiera mantenido su valiente metodología interpretativa que le permitía defender a este Foro. Es verdaderamente lamentable que en el ocaso de su carrera en este Tribunal el Juez Presidente se retire dándole la espalda a su Rama y permitiendo que su legado pase a la historia matizado por que ante ataques a esta Rama resolvió dependiendo del color del cristal con que miró la controversia.

Por su parte, la Juez Asociada señora Rodríguez Rodríguez se ha refugiado nuevamente en su albergue de retórica y sofismas. Vimos que la compañera también asumió posturas valientes para defender a esta Rama de ataques inconstitucionales, pero hoy claudicó a su rol y huyó a las fronteras del derrotismo. Hace poco más de un año, la Juez Asociada señora Rodríguez Rodríguez se comprometió a defender la Constitución "con [las] uñas y con [los] dientes". *In re Aprob. Rs. y Com. Esp. Ind.*, 184 D.P.R. 575, 677 (2012). Sin embargo, hoy parece que algún ente le limó las uñas y le removió sus dientes. Cabe preguntarse qué ocasionó ese cambio doctrinal en cuanto a cómo se concibe el rol de este Foro. La respuesta quizás está en algún momento luego del 2 de enero de 2013. No obstante, todavía se mantiene en su presagio de hecatombes judiciales míticas y medioevos constitucionales que la ha caracterizado desde marzo de 2009. Hoy tuvo que valerse de un "grimorio judicial" para explicar por qué en el pasado había que defender a la Rama Judicial de ataques constitucionales de otras Ramas y hoy hay que dar deferencia. Ello a pesar de que "fuentes de derecho" que la compañera cita a menudo también han cuestionado la validez de la Ley Núm. 18, *supra*.[6] La historia será en última instancia juez de las razones por las cuales hoy se nos revela un cambio en su metodología adjudicativa.

---

[6] Véase L.J. Torres Asencio, *Un nuevo golpe a la administración de la Justicia*, disponible en http://derechoalderecho.org/2013/05/25/un-nuevo-golpe-a-la-administracion-de-la-justicia/.

**II**

En conclusión, reafirmo mi conformidad con la Resolución de epígrafe. El derecho aplicable a esta controversia ya se había establecido en *Colón Cortés v. Pesquera*, supra, y estoy obligada a seguirlo. Defender la Doctrina de Separación de Poderes no es tarea sencilla: los roces entre las Ramas son inevitables. Pero nuestro sistema se nutre de esos eventos que marcan el desarrollo constitucional de una sociedad. Toda vez que mi cargo me obliga a defender a este Tribunal Supremo, estoy conforme con la Resolución de epígrafe.

Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| María del C. Alvarado Pacheco y otros<br>    Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br>    Recurridos<br>―――――――――――――――――――<br>Monsita Denise Otero Ruiz y otros<br>    Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br>    Recurridos<br>―――――――――――――――――――<br>Víctor A. Trinidad Hernández y otros<br>    Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br>    Recurridos | CT-2013-5<br>Cons con.<br>CT-2013-6<br>CT-2013-7 | Certificación |

Voto Particular de Conformidad emitido por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 11 de junio de 2013.

Con relación a toda la situación surgida con la aprobación de la Ley Núm. 18-2013, es menester dejar consignadas unas cortas expresiones.

**I**

**Durante el proceso de la aprobación de esta ley, ciertamente se intentó tender puentes de comunicación que evitaran un choque entre ramas de gobierno que ostentan igual jerarquía constitucional**. Como resultado, y *a contrario sensu*, las ramas hermanas de gobierno aceleraron el trámite en la aprobación de la medida, ante la presentación del caso de epígrafe. Esto, sin duda, fue muy lamentable.

Como se intima correctamente en la Resolución del Tribunal, en todo este doloroso proceso no hemos sido incautos, sino más bien hemos actuado de buena fe. Sin embargo, cuando se trata de la defensa de la jurisdicción y la competencia de este Tribunal no debe confundirse la buena fe con pobreza de espíritu.

El Tribunal Supremo es una institución centenaria que antecede, incluso, nuestra Ley Suprema. Por lo tanto, <u>**es imposible que los que hemos recibido la encomienda de velar por nuestra Constitución y los intereses del Pueblo en ella forjados, no defendamos incesantemente la institución que sirve de garantía a la protección de esos intereses**</u>. Los principios que enmarcan nuestra Constitución y las leyes de este País demandan, no solo acceso a los tribunales, **sino acceso oportuno**. Por eso, no escatimaremos en la consecución de ese fin, aun a costa de la deferencia que le debemos a las demás ramas hermanas. Y es que, como dice el dicho popular, "lo cortés no quita lo valiente".

**II**

En cuanto a la causa de acción de los múltiples demandantes, de los documentos presentados por todas las partes aparenta que los empleados públicos han sufrido un claro y sustancial menoscabo permanente de las condiciones en sus anualidades futuras de retiro. Esta situación amerita una pronta consideración de este Tribunal, sobre todo ante la festinada fecha de vigencia de la ley.

Por esto es necesario que, como claramente se señala en la Resolución de esta Curia, el tribunal de primera instancia celebre sin dilación alguna una vista evidenciaria, mediante la cual al menos se certifiquen las alegaciones de los peticionarios en cuanto a sus edades y los años cotizados, de manera que se pueda corroborar la anualidad que finalmente recibirán bajo los parámetros de la Ley Núm. 3-2013.

Como dice el lema de esta augusta Rama: "la justicia somos todos". Hoy una parte importante de ese "todos" necesita que esa justicia se muestre eficiente, para que sea **oportuna**. Eso es lo que "todos" queremos.

                              Erick V. Kolthoff Caraballo
                              Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| María del C. Alvarado Pacheco, *et al.* | |
| | CT-2013-05 cons. |
| Monsita Otero Ruiz, *et al.* | CT-2013-06 cons. |
| Víctor A. Trinidad Hernández, *et al.* Peticionarios | CT-2013-07 |
| v. | |
| Estado Libre Asociado de Puerto Rico et al. Recurridos | |

Voto Particular de Conformidad emitido por el Juez Asociado señor Rivera García

En San Juan, Puerto Rico, a 11 de junio de 2013.

> Nuestra Constitución ha delegado en nosotros, los jueces[,] un inmenso poder. Somos los defensores de los derechos de nuestros ciudadanos, los intérpretes de la constitución y el freno a la usurpación de poder por las ramas políticas del gobierno.[7]

En el día de hoy, una mayoría de este

Tribunal se ve precisada a ejercer por imperativo

---

[7] Ponencia del Hon. Juez Presidente Federico Hernández Denton, La separación de poderes y la interpretación constitucional en Puerto Rico, XIII Encuentro de Presidentes y Magistrados de los Tribunales Constitucionales y de las Salas Constitucionales de América Latina, México, 2006. Disponible en: http://www.scribd.com/doc/51523764/La-Separacion-de-Poderes-y-la-Interpretacion-Constitucional-en-Puerto-Rico-2006 (Última visita 11 de junio de 2013).

constitucional su responsabilidad de proteger los derechos del pueblo y de nuestra Constitución. Por medio de una intromisión indebida de la Rama Legislativa y el Poder Ejecutivo se pretende cercenar el postulado de acceso a la justicia de los ciudadanos que acuden a este foro judicial en la búsqueda de esa justicia. Asimismo, se intenta privar de un remedio efectivo a los empleados públicos que impugnan la constitucionalidad de la nueva Ley de Retiro, Ley Núm. 3-2013. El Estado, en su maltrecha tesis, aduce que este Tribunal no posee jurisdicción para atender la petición de certificación de los empleados públicos fundamentándose en la recién aprobada Ley Núm. 18-2013, la cual enmendó, entre otros preceptos, el Art. 3.002 de la Ley de la Judicatura y la Regla 52.2 de Procedimiento Civil.

Tras justipreciar todos los factores y circunstancias de la aprobación del referido estatuto, sin lugar a dudas, ciertas disposiciones de la Ley Núm. 18-2013 resultan inconstitucionales de su faz por transgredir la doctrina de separación de poderes que constituye uno de los cimientos del andamiaje constitucional. Nuestros pronunciamientos en Colón Cortés v. Pesquera, 150 D.P.R. 724 (2000), resuenan en nuestra conciencia judicial al enfrentarnos a una intrusión de gran envergadura en las responsabilidades y funciones de este Tribunal para con el pueblo. En aquella ocasión, reconocimos que "[l]o importante al determinar si cierta actuación infringe el principio de separación de

poderes, es si la intención clara y específica de la ley fue afectar el resultado de un pleito en particular". Íd., pág. 764.

Como bien resalta el dictamen mayoritario, tanto el trámite legislativo como las expresiones vertidas en el hemiciclo por el Presidente del Senado, Hon. Eduardo Bhatia Gautier, y recogidas en el Diario de Sesiones, revelan diáfanamente los verdaderos propósitos de esta Ley. Esto es, **que fue diseñada y engendrada por encargo para afectar el resultado de un caso en particular**: el de los empleados del Gobierno de Puerto Rico ante la nueva Ley de Retiro, *supra*. De esta forma, se le arrebata insidiosamente a la ciudadanía el derecho de beneficiarse de un acceso a una justicia rápida y efectiva mediante los remedios procesales en toda su extensión ante el foro de última instancia.

Es un axioma que nuestra Constitución delega en la Asamblea Legislativa el poder de crear y suprimir tribunales -con excepción del Tribunal Supremo- y a determinar su competencia y organización.[8] Empero, de igual jerarquía es la máxima de que la Asamblea Legislativa no tiene el poder constitucional para limitar la jurisdicción del Tribunal General de Justicia.[9] Así tampoco podrá afectar la competencia de forma que esa actuación legislativa incida sobre la jurisdicción

---

[8] Const. P.R. Art. V., Sec. 2. L.P.R.A. Tomo 1.

[9] Véase, Cosme v. Hogar Crea, 159 D.P.R. 1, 18 (2003).

constitucionalmente reconocida al Tribunal Supremo de Puerto Rico.

Cónsono con lo anterior, el profesor Felix F. Stumpf plantea que bajo el principio de la separación de poderes, la rama judicial tiene que proteger su independencia y autonomía rechazando las intromisiones indebidas de las ramas legislativa y ejecutiva, lo cual ocurre comúnmente cuando la legislatura aprueba leyes que usurpan poderes judiciales inherentes o explícitos. (Traducción nuestra) F. Stumpf, Inherent Powers of the Courts: Sword and Shield of the Judiciary, Nevada, The National Judicial College, pág. 7.

En ese sentido, la integridad del poder judicial queda intrínsecamente afianzada a la convergencia de dos elementos: la *separación de poderes* y la *independencia judicial*. Sobre este particular, conviene recordar los pronunciamientos del ex Juez Presidente señor Andréu García en ocasión de un mensaje ante estudiantes de derecho:

> La razón de ser de estas disposiciones constitucionales es el no exponer al sistema judicial, que depende enteramente de las otras ramas de gobierno para su composición y financiamiento, a las represalias, presiones y a situaciones de indebida intervención de esas ramas, en garantía de la independencia judicial. Constituiría un serio peligro para la democracia que la rama judicial se vea sujeta a cambios sustanciales, modificaciones, creaciones, eliminaciones de sus tribunales y jueces con cada cambio de Gobierno. Ello propiciaría la inestabilidad del sistema de justicia y la desconfianza en los tribunales por parte de la ciudadanía que depende de la rama judicial para asuntos vitales de su existencia: su familia, sucesión, dilucidación de pleitos, desagravios, y

más importante aún, justicia por los atentados a su vida, propiedad y persona.[10]

Estos postulados han sido defendidos impetuosamente por los miembros de esta Curia, lo que significa que no es la primera vez y auguro que no será la última. De hecho, en una comparecencia ante la Asamblea Legislativa el entonces Juez Presidente señor Andreu García bien expresó:

> **Nuestra ciudadanía no está debidamente informada de cómo funciona la separación de poderes, sistema en el que la Rama Judicial tiene igual rango que la Rama Ejecutiva y la Rama Legislativa, y el cual no permite la intervención indebida con la independencia judicial. Sobrevive la percepción generalizada de que el poder político tiene facultad de intervención en los asuntos judiciales.[11]**

Definitivamente, mediante las acciones de los otros dos poderes públicos, hoy se quiere debilitar la Rama Judicial al romper con el equilibrio que evita la concentración de poder. Así, la separación de poderes se quiebra ante una lucha sin sentido y sin precedentes en nuestra historia constitucional. Resulta desafortunado que para justificar su proceder, la Asamblea Legislativa invoque que el propósito de la Ley Núm. 18-2013 es "propiciar una adjudicación más pronta de las causas que

---

[10] J. Andréu García, La independencia judicial ante la propuesta enmienda a la Constitución del Estado Libre Asociado de Puerto Rico, Mensaje ante la Asociación Nacional de Estudiantes de Derecho, el 25 de agosto de 1994, 20 Rev. Jur. U.I.P.R. 23, 27 (1994).

[11] Mensaje del ex Juez Presidente señor Andreu García, Autonomía Presupuestaria para la Rama Judicial, 20 de diciembre de 2002. Citando ponencia ante la Asamblea Legislativa de 11 de abril de 2002. Disponible en: http://www.ramajudicial.pr/orientacion/prensa/20-12-02.html (última visita 10 de junio de 2013).

se presentan ante [la] consideración"[12] de este Foro y, por lo tanto, en beneficio de las partes vinculadas al proceso judicial. Lo innegable es que tal intento desemboca en una acumulación indebida de poder y en la disminución de los poderes de otra rama, siendo esto incompatible con nuestro ordenamiento constitucional. A todas luces, quien se vería afectado en última instancia por las actuaciones inconstitucionales de los poderes políticos es el pueblo de Puerto Rico, de manera que se le priva de aquellos instrumentos procesales que le permiten dilucidar los reclamos de alto interés público de manera rápida y eficiente. Ante esos antecedentes, es preciso atisbar un pensamiento que jamás pierde vigencia: **"no existe tiranía peor que la ejercida a la sombra de las leyes y con apariencias de justicia"**.[13]

Asimismo, cuando juré al cargo de Juez Asociado de este Tribunal, me comprometí a

> dirigir mis esfuerzos y compromisos para que el poder judicial sea más accesible, equitativo, con sentido humanista y dentro del marco de la independencia judicial. Es nuestro norte que una Rama Judicial investida de independencia judicial es la mejor garantía de nuestro sistema de vida democrático y de los derechos naturales de la humanidad. Claro está, sin olvidar o soslayar el principio de la separación de poderes y la deferencia a las demás Ramas Constitucionales. En esencia la separación de poderes que desde los antiguos griegos y romanos, pasando por el esquema "del Espíritu de las Leyes", de Montesquieu, la transformación de la teoría de "El Federalista" hasta los padres de nuestra

---

[12] Exposición de motivos Ley Núm. 18-2013.

[13] Charles de Montesquieu, filósofo y jurista francés.

Constitución, es y será espina dorsal de nuestro sistema constitucional.[14]

Ahora bien, el olvido selectivo de algunos miembros de esta Curia en asuntos de trascendencia, y que van a la médula de la sana administración de la justicia, no deja de sorprendernos. Realmente nos perpleja como con irreverente amnesia, los principios básicos de la doctrina de separación de poderes asegurados a través de la independencia judicial, quedan vulnerables a los ataques de actores que a todas luces actúan pérfidamente y se alejan de "proveer un equilibrio en el ejercicio del poder político que garantice, a su vez, la protección de las libertades individuales". F. Hernández Denton, <u>La Independencia Judicial en Puerto Rico</u>, X° Encuentro de los Presidentes y Magistrados de los Tribunales y Salas Constitucionales de América Latina, Konrad Adenauer Stiftung Ed., Santiago de Chile, 2003, pág. 3.

En sintonía con mi contención, reafirmo con vehemencia que es pernicioso, y por ende reprochable, que no se mantenga una unidad de criterio cuando de intromisiones indebidas a los poderes constitucionales de nuestra rama se trata. Arriban a mi pensamiento las palabras ilustres, tal vez olvidadas hoy, cuando se proclamaba que "[e]n todo el hemisferio se reconoce la importancia del principio de independencia judicial… la autonomía e independencia del

---

[14] <u>Ceremonia Jur. Juez Rivera García</u>, 179 D.P.R. IX, XVIII (2010).

Poder Judicial constituyen premisas indispensables para su funcionamiento eficaz". Íd.

Sin embargo, ante la coyuntura histórica y las actuaciones de algunos distinguidos miembros de esta Curia, parece ser que el concepto de independencia judicial ha sufrido una mutación: es decir, que recurramos a la indignidad del silencio y nos dejemos despojar de nuestras facultades constitucionales como último foro revisor dentro de la jurisdicción estatal. En ese contexto, luego de analizar el tortuoso trámite del P. del S. 367, medida aprobada sin la celebración de vistas públicas y ausente de la participación e insumo de distintos sectores de la comunidad jurídica y académica, siento el deber de invocar ciertos pronunciamientos tras la aprobación de la Ley de Reforma Judicial de 2003:

> Dicho estatuto es el producto de un diálogo entre los poderes públicos del país y de un estudio abarcador de la Rama Judicial que realizó una Comisión presidida simultáneamente por el Juez Presidente y por el Secretario de Estado. A diferencia de las leyes aprobadas anteriormente que afectaron la judicatura, en esta ocasión se escuchó y se le brindó una participación directa al Poder Judicial en el proceso de legislar asuntos de trascendencia judicial.

> Al firmar dicha ley, la Gobernadora reiteró que 'su administración, en pleno ejercicio de su responsabilidad histórica, ha establecido una política pública clara de respeto a la independencia judicial, de puertas abiertas, y de diálogo continuo sobre las áreas de fortalecimiento y reforma del sistema judicial del país'.

> En su exposición de motivos, la Ley afirma que, al aprobarla, tanto el Poder Ejecutivo como el Legislativo reconocen la importancia de la independencia judicial en nuestro ordenamiento

constitucional. Señala al respecto: En virtud de la presente Ley, se reconoce y afirma que la Rama Judicial será independiente, accesible y cumplirá sus servicios de manera equitativa, rápida, económica, sensible y con un enfoque humanista.

…

Por último, se reconoce en la referida ley que los retos del Siglo XXI requieren el fortalecimiento del sistema judicial en todas sus dimensiones. Este proceso de voluntad conjunta propicia los cambios al sistema judicial que el Pueblo de Puerto Rico necesita y merece. Debemos asegurarnos que la Rama Judicial sea autónoma y esté libre de presiones externas. Así mismo, debe haber una colaboración efectiva, diálogo genuino, entendimiento sincero y respeto en todo momento entre las tres ramas de gobierno.

…

**En fin, aunque la Constitución de Puerto Rico reconoce la importancia de un Poder Judicial independiente y establece unas medidas para garantizar su posición protagónica en nuestro ordenamiento, a través de los años los tribunales se han ganado el respeto del país y de los otros poderes. El Poder Judicial ha superado ataques de las otras ramas de gobierno y como consecuencia ha fortalecido su independencia de éstas. Actualmente es el garante máximo de los derechos humanos en Puerto Rico. En reconocimiento a estos logros los otros dos poderes públicos recientemente han aprobado leyes descritas anteriormente que, sin lugar a dudas, nos permiten cumplir con nuestras obligaciones con la independencia e imparcialidad que requiere nuestra democracia.**

Hernández Denton, *La Independencia Judicial en Puerto Rico*, supra, págs. 18-20.

Los manifiestos actos *ultra vires* de la Asamblea Legislativa y las declaraciones del señor Presidente del Senado vertidas durante el debate de la pieza legislativa en controversia son concluyentes en cuanto a las motivaciones subyacentes y el claro menosprecio hacia los atributos y funciones del Tribunal Supremo. Por ello, es preciso plantear las siguientes interrogantes: ¿En qué quedó el discurso sobre la superación a los ataques de

otras ramas y el ganarnos el respeto del país y de los otros poderes? Peor aún, al encontrarnos frente a una medida que pretende situar al ciudadano en una posición de desventaja ante las acciones del Estado, quitándole el remedio procesal de obtener un dictamen justo, final y concluyente de manera oportuna, quiero saber ¿a dónde fue a parar el ánimo de que la Rama Judicial sea independiente, accesible de manera que cumpla sus servicios de manera equitativa, rápida, económica, sensible y con un enfoque humanista?

En ese entorno, también debemos cuestionar, ¿dónde está la pasión que ferozmente distinguía a nuestra Máxima Institución Judicial como garante de los derechos humanos? Ciertamente, sería un día lúgubre si sumisamente permitiéramos esta intromisión en las prerrogativas constitucionales de esta Curia y accediéramos a la invitación que nos hace la disidencia. Esta claudicación, deja al desnudo que las posturas de ciertos miembros de este Tribunal varían dependiendo de quién ostenta el poder político en un momento histórico.

Al así actuar, ignoran el principio arraigado en nuestro ordenamiento jurídico que impide que la Rama Legislativa restrinja nuestra jurisdicción apelativa al punto de que nos inhabilita cumplir con el imperativo constitucional de revisión. Este principio rector mantiene la uniformidad de los procesos y protege a la Institución

de ataques políticos que tienen como norte eludir nuestro poder revisor de sus actuaciones.

Consciente de las limitaciones a los contornos del poder de legislación, los padres de la Constitución de Puerto Rico fueron explícitos cuando enunciaron lo siguiente:

> Aquí se dispone, claramente y en palabras que no dejan lugar a dudas, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia. Se dispone asimismo que en materia de jurisdicción el Tribunal Supremo y los demás tribunales de Puerto Rico constituirán un sistema integrado y que solamente podrá intervenir la Asamblea Legislativa en cuestiones de competencia. Eso quiere decir que está fuera del alcance de la Asamblea Legislativa de Puerto Rico la jurisdicción del Tribunal Supremo. Lo que está a su alcance es la competencia. **Y quiere decir además, al estipular esta proposición que nosotros hemos traído, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia, que la Asamblea Legislativa no podrá impedir que los casos judiciales en alguna forma o en otra, lleguen hasta la consideración del Tribunal Supremo.**
>
> Diario de Sesiones de la Convención Constituyente de Puerto Rico, Tomo 1, págs. 591-592, 25to Día de Sesión, (Expresiones del delegado Sr. Gutiérrez Franqui).

A estas expresiones se unen las del Juez Todd, quien abundó sobre el tema de separación de poderes e independencia judicial al señalar que:

> La base fundamental del sistema democrático americano, la independencia judicial, debe ser garantizada en la Constitución en tal forma que nadie pueda ponerla en duda. Aun cuando debe existir la interdependencia de las tres ramas de gobierno, o sea, la Ejecutiva, la Legislativa y la Judicial, estableciéndose lo que en nuestro sistema judicial se conoce con el nombre de "checks and balances", cada una de ellas, en ciertos y determinados aspectos es y debe ser

independiente de las otras. **Es, sin embargo, la Rama Judicial, la balanza moderadora en la cual, en última instancia, habrían de pesarse las actuaciones tanto de la Rama Ejecutiva como de la Rama Legislativa. Es en la revisión judicial de esas actuaciones que los jueces son llamados a determinar si se ha violado o no algún precepto constitucional de alguna ley. Bajo nuestro sistema de gobierno, esta función judicial constituye la garantía suprema que tiene el pueblo de que sus derechos serán en todo momento preservados y reconocidos.**

Diario de Sesiones de la Convención Constituyente de Puerto Rico, Tomo 1, págs. 591-592, Primer Día de Sesión, 17 de septiembre de 1951, (Expresiones del Juez Presidente del Tribunal Supremo Roberto H. Todd).

Conocido es que la independencia judicial busca "garantizarle a la sociedad que los derechos de cada uno serán evaluados en un foro libre e imparcial…".[15] Basta decir que va más allá de un mero requisito constitucional, sino que "representa un alto grado de crecimiento personal, es decir, persigue un proceso decisional independiente de las preferencias personales del juez o jueza". C. Ramos González, Independencia Judicial, 43 Rev. Jur. U.I.P.R. 273 (2009).

En virtud de este axioma, en *In re* Reforma Judicial, 136 D.P.R. 1 (1994), el ex Juez Asociado señor Negrón García expresó lo siguiente mediante voto separado:

Ni el Poder Ejecutivo ni la Asamblea Legislativa deberían atentar así contra la independencia judicial; menos debilitar nuestros procesos democráticos. Todo lo contrario, deberían retomar conciencia de las más sanas tradiciones constitucionales y de buen gobierno olvidadas por quienes hasta hace poco detentaron esos poderes. *In re* Reforma Judicial, supra, pág. 43.

---

[15] Secretariado de la Conferencia Judicial, La Independencia Judicial en Puerto Rico, 1988, pág. 13.

En aras de evitar la concentración de poderes y así asegurar la convivencia democrática entre las ramas de gobierno, la independencia judicial se hace indispensable hoy más que nunca. Esto, pues, cuando se ejerce este principio:

> …fortalece el propio sistema democrático adoptado por nuestra Constitución. Este noble principio garantiza que los jueces resuelvan los casos ante sí con total independencia de criterio, sin ceder a presiones de la política partidista o de la opinión pública. La sociedad puertorriqueña debe entender la importancia de **contar con una Judicatura independiente para su propia protección.**[16]

Y es que el Tribunal Supremo, como último foro representativo del Poder Judicial no puede callar mientras se diseña el escenario perfecto para un ardid contra el pueblo de Puerto Rico. Ante tal afrenta a la dignidad y los derechos de nuestros ciudadanos, se hace urgente el llamado a hacer ver que la Rama Judicial tiene igual rango que la Rama Ejecutiva y la Rama Legislativa. Precisamente, hoy es un momento oportuno para que esa "percepción generalizada de que el poder político tiene facultad de intervención en los asuntos judiciales" sea desterrada.

Cónsono con lo expuesto, es imperativo retomar nuestra obligación de defender la posición constitucional del poder judicial cuando las otras dos ramas de gobierno intentan afectar un caso específico. Por esta razón, debemos rechazar enérgicamente esta insostenible intervención en

---

[16] Mensaje del ex Juez Presidente señor Andreu García, <u>Autonomía Presupuestaria para la Rama Judicial</u>, supra.

los asuntos judiciales. Esto, enfatizo, no para beneficio de los Jueces de esta Curia y sí para el desarrollo de nuestra democracia.

Con fiel arraigo a los principios de una sana administración de la justicia y el acceso a ella por parte de los ciudadanos, es impostergable que cada miembro de este Tribunal siga el principio rector que presupone la independencia judicial. De forma que defienda la separación de poderes y reclame la demarcación de las responsabilidades que sabiamente delega nuestro sistema republicano de gobierno. Así pues, como magistralmente ha expresado el ex Juez Presidente: **"la independencia judicial no es un privilegio de los jueces, ni siquiera se concibe la misma en beneficio de ellos. La independencia judicial es un derecho del pueblo para que los jueces puedan dispensar justicia libres del temor que representa[n]…posibles medidas de represalia"**.[17]

Por último, debo puntualizar lo que, a mucho pesar, concibo como un descarnado servicio a nuestra Rama Judicial. Me refiero a la complicidad de la Oficina de Administración de los Tribunales en la consecución de la aprobación de esta Ley a través de su comparecencia por escrito durante el trámite legislativo de la misma. La referida ponencia, desnuda de fundamentos jurídicos y estadísticos, en nada enaltece la política pública del Poder Judicial que muy bien plasmó el entonces Juez

---

[17] Íd.

Presidente señor Andreu García al aseverar la necesidad del fortalecimiento de la independencia de nuestra rama de gobierno cuando expresó que:

> **La Rama Judicial debe ser la que atienda sus necesidades de sedes, de salas y de competencias,** de conformidad con los cambios rápidos que están ocurriendo y continuarán ocurriendo en Puerto Rico. **Es la Rama que cuenta con la información necesaria para hacer determinaciones de esa naturaleza, ya que está en mejor posición de conocer lo que hace falta para lograr el funcionamiento integral del sistema, incluso la carga de trabajo, la distribución de los recursos humanos, las vías de acceso y la interrelación necesaria de cada tribunal con las otras ramas de gobierno.**
>
> **Cónsono con lo anterior, también les propongo nuevamente que cualquier legislación de reforma del sistema judicial se apruebe sólo si la legislación cuenta con el apoyo, la aprobación y la participación efectiva de la propia Rama Judicial.**[18]

Lo cierto es que las actuaciones de la Directora Administrativa derrotan la política pública enunciada por la propia Rama Judicial. Es nefasto que en momentos en que el sistema judicial es víctima de infundados ataques, sea esta funcionaria la emisaria que se preste a avalar esta inaceptable transgresión del espacio reservado para el ejercicio de nuestra función constitucional.

Así concluye otra estrofa de este Bolero de Ravel, que tiene como melodía la de nunca acabar. Sólo queda el "silencio ensordecedor" que arropa ciertos pasillos de esta Honorable Curia, que nunca debería negarse a defender su Constitución "con uñas y dientes", tal y como recientemente

---

[18] Íd.

lo expresara la distinguida compañera y Juez Asociada, señora Rodríguez Rodríguez.[19]

Asimismo, al avalar la Ley Núm. 18-2013, pareciera que una parte de este Tribunal ya no está consciente de que este es el "foro de última instancia donde se atienden los asuntos más acuciantes que aquejan" a nuestros ciudadanos; foro que debe "ser un recinto para la discusión serena, abierta, ejemplarizante, racional, imparcial y equilibrada, y sin ataduras de clase alguna".[20]  Hoy, cuando hay que salir a la defensa de las prerrogativas de esta Curia y del bienestar de la ciudadanía, algunos ya no gritan "¡Qué lástima!".[21]  Sí, "**[e]s obvio . . . que no basta que se proclame en una Constitución escrita el principio de separación de poderes o la autonomía del Poder judicial para que un país tenga auténticas libertades y para que sus jueces gocen de efectiva independencia"**.[22]  Ciertamente, se necesitan esos hombres y mujeres libres y valientes para la garantía eficaz de este principio: "indoblegables ante intereses, entidades o propósitos que resulten extraños al fin mismo de la Justicia, y que tengan capacidad de

---

[19] Opinión disidente Juez Asociada señora Rodríguez Rodríguez, *In re Aprob. Rs. y Com. Es. Ind.*, 184 D.P.R. 575, 677 (2012).

[20] Opinión disidente Juez Asociada señora Rodríguez Rodríguez, *In re Solicitud para Aumentar el Número de Jueces en el Tribunal Supremo*, 180 D.P.R. 54, 119 (2010).

[21] Íd.

[22] José Castán Tobeñas, *Poder Judicial e Independencia Judicial*, Ed. Reus, Madrid, 1951, pág. 41.

acción"[23]. Es por ello que estoy conforme con la Resolución de la mayoría de este Tribunal, pues de la demagogia y la retórica sobre la Justicia clamadas a conveniencia nunca obtendremos ese fin superior, sino solo una desnutrida y falsa percepción de este noble ideal.

Consecuentemente, ante las desatinadas contradicciones de algunos miembros de este Foro y el ataque a nuestra Institución y a los derechos de nuestro pueblo, me hago eco de aquellas expresiones que denuncian que "el proceder de las tiranías es hacer que parezca razón y derecho lo que ha sido usurpación".[24]

                              Edgardo Rivera García
                                   Juez Asociado

---

[23] In re Solicitud para Aumentar el Número de Jueces en el Tribunal Supremo, *supra*.

[24] Joaquín Setantí, escritor español.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| María del Carmen Alvarado Pacheco y otros<br>   Peticionarios<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico, representado por su Secretario de Justicia, Luis Sánchez Betances, en su capacidad oficial y otros<br>   Recurridos | CT-2013-005<br><br><br><br><br><br><br><br>Cons. | |
| Monsita Denise Otero Ruiz y Otros<br>   Peticionarios<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico, Luis Sánchez Betances en su capacidad de Secretario de Justicia de Puerto Rico y Otros<br><br>   Recurridos | CT-2013-006 | Certificación |
| Víctor A. Trinidad Hernández y Otros<br>   Peticionarios<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico, representado por su Secretario de Justicia, Luis Sánchez Betances, en su capacidad oficial y otros<br>   Recurridos | Cons.<br><br>CT-2013-007 | |

Voto Particular emitido por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 11 de junio de 2013.

Nos encontramos ante una controversia de alto interés público que requiere una adjudicación final y firme antes del 30 de junio, para beneficio de decenas de miles de servidores públicos. Nos hallamos ante el recurso idóneo para reafirmar

con acciones la política de acceso a la justicia. Nos enfrentamos al deber de ejercer oportunamente nuestra competencia como tribunal de última instancia y facilitar la administración justa, rápida y económica de una controversia de alto impacto en la planificación financiera del gobierno y en la vida de sus servidores públicos.

Ante todos esos retos, considero que la respuesta adecuada de este Tribunal consistía en traer inmediatamente a nuestra atención el reclamo de los empleados públicos peticionarios y adjudicar la controversia, lo cual pudimos haber hecho desde el pasado mes de mayo. Curiosamente, con el curso de acción trazado por la mayoría del Tribunal, las Ramas Legislativa y Ejecutiva -aunque no *de jure*- logran *de facto* que este Tribunal no conceda un **remedio adecuado y completo en el momento oportuno**. Ante el medio camino recorrido por una mayoría de este Tribunal y su abstención en transitar el trayecto completo del ejercicio de nuestras facultades y deberes ministeriales impuestos por la Constitución de Puerto Rico, disiento de la negativa a expedir el presente recurso.

I

Seiscientos-catorce (614) empleados públicos han acudido ante este Tribunal implorando nuestra intervención oportuna en la etapa más crucial de la implantación de la Ley Núm. 3-2013. Sin embargo, una mayoría de esta Curia ha provisto No Ha Lugar en esta etapa a sus peticiones. Veamos en detalle los reclamos incoados por estos servidores públicos en tres peticiones de certificación que versan sobre el mismo asunto.

El 16 de mayo de 2013, sesenta y ocho empleados de la Oficina del Contralor de Puerto Rico ("empleados públicos" o "peticionarios") presentaron ante nos una petición de certificación, solicitando que esta Curia intervenga con una demanda de sentencia declaratoria e interdicto preliminar y permanente presentada por ellos el 8 de mayo de 2013, ante el Tribunal de Primera Instancia.[25] En esencia, los empleados públicos piden que traigamos de inmediato ante nuestra consideración la referida demanda, en la cual solicitan que se declare inconstitucional la Ley Núm. 3-2013, la cual enmienda la Ley Núm. 447 de 15 de mayo de 1951, mejor conocida como la *Ley de Sistemas de Retiro de los Empleados Públicos*, por ésta alegadamente afectar los intereses propietarios, los derechos adquiridos y los beneficios de retiro contractualmente conferidos a los peticionarios por el Gobierno de Puerto Rico, en violación de la Sec. 7 del Art. II de la Constitución de Puerto Rico.

En respuesta a la petición de certificación de los empleados públicos, el 21 de mayo de 2013, el Gobierno de Puerto Rico ("ELA") y la Administración de los Sistemas de Retiro de los Empleados del Gobierno y de la Judicatura del Estado Libre Asociado de Puerto Rico ("Administración de los

---

[25]Amerita resaltar que desde el 16 de mayo de 2013, esta Curia ha tenido ante sí la controversia que nos atañe. Sin embargo, ha tomado casi un mes emitir la decisión que hoy se certifica. Este problema se recrudece aún más cuando consideramos que, por virtud de la Regla 23(b)(2) de nuestro Reglamento, el Tribunal de Primera Instancia se ha visto impedido de emitir una sentencia que disponga de esta controversia, hasta tanto esta Curia deniegue la expedición del auto de certificación presentado. 4 L.P.R.A. Ap. XXI-B R. 23(b)(2).

Sistemas de Retiro") (colectivamente "el Estado"), presentaron, independientemente, una moción de desestimación al amparo de la Regla 32 del Reglamento de esta Curia. Ambas mociones arguyen que este Tribunal no posee jurisdicción para atender el recurso de referencia. Sostienen su contención en la Ley Núm. 18-2013, la cual enmienda, en lo pertinente, el Art. 3.002 de la Ley Núm. 201-2003, mejor conocida como la *Ley de la Judicatura del Estado Libre Asociado de Puerto Rico*, y la Regla 52.2 de las Reglas de Procedimiento Civil de Puerto Rico, 32 L.P.R.A. Ap. V, a los fines de limitar la competencia del Tribunal Supremo al momento de expedir recursos de certificación intrajurisdiccional. A esos efectos, arguyen que en casos pendientes ante el Tribunal de Primera Instancia, el Tribunal Supremo sólo podrá traer los mismos ante sí cuando exista la anuencia de todas las partes y concurra un conflicto entre decisiones previas del Tribunal de Apelaciones, se planteen cuestiones noveles de derecho, o se presenten cuestiones de alto interés público.

El 28 de mayo de 2013, los empleados públicos presentaron una moción en oposición a la desestimación solicitada por el Gobierno. En ésta, los peticionarios arguyen que el trámite para la aprobación y firma de la Ley Núm. 18-2013 estuvo viciado de incertidumbre respecto a la fecha real en la cual fue firmada por el Gobernador de Puerto Rico. Resaltan que el 15 de mayo de 2013, los presidentes del Senado y de la Cámara de Representantes de Puerto Rico enviaron al Gobernador el proyecto que originó la referida Ley, el P del S. 367, para su evaluación y firma. Coetáneo a

lo anterior, sostienen que la Asamblea Legislativa también envió para la firma del Gobernador otro proyecto legislativo, el P de la C. 940, cuyo trámite legislativo, más no su contenido, es pertinente al caso de marras.

Los peticionarios, descansando en la información provista por la Oficina de Servicios Legislativos ("OSL"), alegan que el P de la C. 940 fue firmado y convertido en la Ley Núm. 18-2013 el 16 de mayo de 2013 y publicada por el Departamento de Estado al día siguiente. Véase, Exhibit 2, *Oposición a Moción de Certificación*. Por otra parte, los empleados públicos sostienen que, por razones desconocidas, el P del S. 367 también fue firmado y convertido en la Ley Núm. 18-2013, creando así la anomalía de dos proyectos legislativos catalogados con el mismo número de Ley. Íd. Sin embargo, resaltan que el P del S. 367, una vez fue convertido en Ley, fue publicada por el Departamento de Estado el 20 de mayo del año en curso, tres días luego de firmarse el P de la C. 940.

Los empleados públicos añaden que, posteriormente, el P del S. 367 mantuvo su numeración como la Ley Núm. 18-2013, mas el P de la C. 940 fue renumerado como la Ley Núm. 19-2013. Ello, a pesar de que el P de la C. 940 fue publicado por el Departamento de Estado con anterioridad a la Ley correspondiente al P del S. 367. Los peticionarios unen lo anterior a su contención de que el 16 de mayo de 2013 -fecha en la cual los empleados públicos presentaron su petición de certificación ante nos- el P del S. 367 no aparecía publicado como Ley en los registros de la OSL (Exhibit 1, *Oposición a*

*Moción de Certificación*); sin embargo, el P de la C. 940 (hoy la Ley Núm. 19-2013) ya había sido aprobado como la Ley Núm. 18-2013.

A la luz de todo lo anterior, sugieren que la Ley Núm. 18-2013 (el P del S. 367) no fue promulgada el 15 de mayo del año en curso, según lo arguye el Estado. Más bien, intiman que ésta fue aprobada posterior a que los peticionarios sometieran su recurso de certificación.

El 29 de mayo de 2013, el Estado presentó mociones en contestación a las alegaciones de los peticionarios. En sus mociones arguyen que la Ley Núm. 18-2013 fue firmada por el Gobernador el 15 de mayo de 2013, un día antes de la presentación del recurso de certificación de los empleados públicos. Sustentan lo anterior en una copia de la Ley Núm. 18-2013 firmada por el Gobernador el 15 de mayo, al igual que una copia de la página de trámite legislativo de la Cámara de Representantes de Puerto Rico, la cual presenta la misma información contenida en la copia indicada.

Posteriormente, este Tribunal consolidó el recurso de los peticionarios con dos recursos de certificación que consideran el mismo asunto. En concreto, la primera de estas dos peticiones fue presentada el 31 de mayo de 2013, por 390 empleados de la Oficina de Administración de Tribunales ("OAT"), 68 empleados de la Corporación del Fondo del Seguro del Estado ("CFSE") y 88 empleados de múltiples agencias de la Rama Ejecutiva. Asimismo, el 5 de junio de 2013, un grupo de policías presentó un tercer recurso de certificación.

En términos generales, y al igual que el recurso de certificación presentado por los empleados de la Oficina del Contralor de Puerto Rico, estos nuevos peticionarios arguyen que la Ley Núm. 3-2013 es inconstitucional por violentar sus derechos adquiridos al amparo de la Sec. 7 del Art. II de la Constitución de Puerto Rico.[26] Igualmente, los nuevos peticionarios solicitan que esta Curia adjudique sus reclamos de forma expedita, ya que alegan estar expuestos a sufrir daños patrimoniales inminentes e irreparables.

Al igual que en el caso de los empleados de la Oficina del Contralor de Puerto Rico, el Estado se ha opuesto a estos nuevos recursos. Una vez más, arguye que este Foro carece de jurisdicción para atenderlos, por virtud de la Ley Núm. 18-2013.

Teniendo presente el marco fáctico indicado, analicemos qué dispone la Constitución respecto a la competencia de este Tribunal y su función como Tribunal de última instancia. Como veremos, aunque la Ley Núm. 18-2013 afectó nuestra competencia legislativa al amparo de la Ley de la Judicatura y las Reglas de Procedimiento Civil, en nada puede afectar nuestra competencia constitucional de última instancia, la cual puede ser ejercida en casos de interés público como los de autos, para traerlos de inmediato ante nuestra consideración, por exigir un trámite expedito para la concesión de un remedio oportuno.

---

[26] A la luz de la afinidad existente entre los recursos incoados, catalogaremos colectivamente a los peticionarios de los tres autos de certificación como "peticionarios" o "empleados públicos".

II

El Art. V, Sec. 2 de la Constitución de Puerto Rico,[27] delega en la Asamblea Legislativa el poder para crear y suprimir tribunales, con excepción del Tribunal Supremo. Const. P.R., L.P.R.A., Tomo 1, pág. 402 (2008). A su vez, esta Sección confiere a la Asamblea Legislativa la facultad para determinar la **competencia y organización** del Tribunal General de Justicia.

El ejercicio de este poder, por parte de la Asamblea Legislativa, queda sujeto a dos condiciones de umbral. En primer lugar, esa Rama no puede afectar la jurisdicción de los tribunales; sólo puede incidir sobre su competencia y organización. En segundo plano, la Rama Legislativa no puede emitir ley alguna que contravenga el Art. V, Sección 3 de la Constitución, el cual provee que el Tribunal Supremo de Puerto Rico es el Tribunal **"de última instancia** en Puerto Rico". (Énfasis suplido.) Art. V, Sec. 3, Const. P.R., L.P.R.A., Tomo 1, pág. 412 (2008). Véanse, también: Col. Abogados v. E.L.A, 181 D.P.R. 135, 167 (2011) (Sentencia); Petrovich v. Srio. de Hacienda, 79 D.P.R. 250, 260 (1956).

Respecto a esta primera limitación, es preciso distinguir el término *jurisdicción* del término *competencia*. Es conocido que el término *jurisdicción* significa "el poder o autoridad de un tribunal para considerar y decidir casos o controversias". Rodríguez v. Registrador, 75 D.P.R. 712, 717

_____

[27]"La Asamblea Legislativa, en cuanto no resulte incompatible con esta Constitución, podrá crear y suprimir tribunales, con excepción del Tribunal Supremo, y determinará **su competencia y organización**". (Énfasis suplido.) Const. P.R., L.P.R.A., Tomo 1, pág. 402 (2008).

(1953). La Constitución de Puerto Rico estableció que "[l]os tribunales de Puerto Rico constituirán un sistema judicial unificado en lo concerniente a jurisdicción...". Art. V, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1. Ello implica que en Puerto Rico, "**cualquier parte del Sistema Judicial tiene la facultad para resolver una causa**". (Énfasis suplido.) Vives Vázquez v. E.L.A., 142 D.P.R. 117, 135 (1996). Véase, también, J. Trías Monge, El sistema judicial de Puerto Rico, San Juan, Ed. U.P.R., Sec. 6, pág. 136 (1978).

Ahora bien, lo anterior es diferente al concepto *competencia*. El término *competencia* implica la distribución del "trabajo judicial entre los distintos tribunales y salas que integran el Tribunal General de Justicia". Cosme v. Hogar Crea, 159 D.P.R. 1, 7 (2003). En el caso particular del Tribunal Supremo, la Constitución le otorga *competencia en primera instancia* sobre autos de *habeas corpus* **y le reserva una *competencia en última instancia* sobre toda controversia judicial.** Asimismo, la Ley de la Judicatura y las Reglas de Procedimiento Civil, entre otras leyes especiales, le confieren al Tribunal Supremo competencia sobre ciertos recursos y casos en nuestro ordenamiento legal.

Todo lo anterior apunta a que, aunque ciertamente la Asamblea Legislativa puede afectar la competencia **legislativamente conferida** a los distintos componentes del Tribunal General de Justicia, incluyendo aquella competencia otorgada a esta Curia por virtud de la Ley de la Judicatura y las Reglas de Procedimiento Civil, **ésta no tiene poder constitucional para limitar la jurisdicción del Tribunal**

**General de Justicia, ni para afectar la competencia en última instancia constitucionalmente reconocida al Tribunal Supremo de Puerto Rico.**[28] Cosme v. Hogar Crea, *supra*, pág. 18.

Concretamente, cuando se trata del Tribunal Supremo, el Art. V, Sec. 3 de la Constitución de Puerto Rico limita esa facultad de la Rama Legislativa. Ello, pues, la Constitución expresamente dispone que el Tribunal Supremo es el Tribunal de última instancia en Puerto Rico. Consecuentemente, **el Tribunal Supremo siempre tendrá la discreción de ejercer oportunamente su competencia final sobre cada caso que se presente en los Tribunales de Puerto Rico.**

El delegado a la Asamblea Constituyente, tratadista de derecho constitucional puertorriqueño y exjuez presidente de este Tribunal, el señor Trías Monge, explicó en las siguientes palabras las consecuencias prácticas de la interacción entre el poder de la Asamblea Legislativa al amparo de la Sec. 2 del Art. V de la Constitución, *vis-a-vis*

---

[28]Amerita resaltar que la Sec. 2 del Art. V de la Constitución de Puerto Rico, la cual instaura la facultad de la Asamblea Legislativa para afectar la competencia y organización de los tribunales de justicia, encuentra su precedente directo en el Art. VI de la Constitución de 1947 del estado de New Jersey. Véase, Informe de la Comisión de la Rama Judicial, Diario de sesiones de la Convención Constituyente de Puerto Rico, Tomo 4, págs. 2609-2610. Al examinar el Art. VI de la Constitución de New Jersey de 1946, encontramos que ésta limitaba la facultad de la Asamblea Legislativa para alterar la competencia de los tribunales, sólo a aquellos de inferior jerarquía. El texto era expreso en salvaguardar a la Corte Suprema del Estado de New Jersey de tal intromisión. ("The judicial power shall be vested in a Supreme Court, a Superior Court, County Courts and inferior courts of limited jurisdiction. The inferior courts and their jurisdiction may from time to time be established, altered or abolished by law."). Art. VI, Sec. 1, Const. N.J., 1946.

los poderes del Tribunal Supremo al amparo de la Sec. 3 del mismo articulado:

> La intención de la Comisión al disponer en la sección 2 del artículo V que la Asamblea Legislativa podría determinar la competencia de los tribunales del país **en modo alguno conlleva[] la facultad de privar al Tribunal Supremo de entender, a su entera discreción, en cualquier causa que le fuese presentada,** <u>se opusiese o no la parte demandada o fuese el asunto concernido de la supuesta competencia del Tribunal Supremo conforme a los estatutos vigentes</u>. (Énfasis suplido.) III J. Trías Monge, <u>Historia Constitucional de Puerto Rico</u>, San Juan, Ed. Universidad de Puerto Rico, pág. 95 (1982). Véase, también, J. Trías Monge, El sistema judicial de Puerto Rico, *supra*, pág. 122.

Los padres de la Constitución de Puerto Rico fueron explícitos en confirmar lo anterior, al expresarse en los siguientes términos:

> Aquí se dispone, claramente y en palabras que no dejan lugar a dudas, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia. Se dispone asimismo que en materia de jurisdicción el Tribunal Supremo y los demás tribunales de Puerto Rico constituirán un sistema integrado y que **solamente podrá intervenir la Asamblea Legislativa en cuestiones de competencia. Eso quiere decir que está fuera del alcance de la Asamblea Legislativa de Puerto Rico la jurisdicción del Tribunal Supremo.** Lo que está a su alcance es la competencia. Y quiere decir además, al estipular esta proposición que nosotros hemos traído, **que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia, que la Asamblea Legislativa no podrá impedir que los casos judiciales en alguna forma o en otra, lleguen hasta la consideración del Tribunal Supremo.** Diario de Sesiones de la Convención Constituyente de Puerto Rico, Tomo 1, págs. 591-592, 25to Día de Sesión, (Expresiones del delegado Sr. Gutierrez Franqui).

Las expresiones así vertidas en la Asamblea Constituyente, perfilan los rasgos fundamentales de aquello que constituye ser un Tribunal de última instancia. En primer lugar, "[e]ste lenguaje nos provee de inmediato la característica esencial de foro máximo de [competencia] apelativa, en contraste con los otros tribunales ... de [competencia] original. A su vez destaca la nota singular del linaje constitucional del Tribunal Supremo frente a los otros que son producto de la Asamblea Legislativa". In re Informe Com. Asesora Presidente, 119 D.P.R. 165, 194 (1987) (Voto Explicativo del Juez Asociado señor Negrón García). En segundo plano, estas manifestaciones articulan "los dos fines básicos de un tribunal de última instancia: **hacer justicia individual y sentar las normas jurídicas básicas que han de gobernar la vida de un país**". Íd., pág. 197.[29]

Es en virtud de esta segunda consideración -el hacer justicia individual- que nuestra función "como Tribunal de última instancia, [nos impone] la responsabilidad constitucional de asegurarnos que... [los] principio[s] de [jurisdicción y competencia] produzca[n] los resultados esperados **de suerte que facilitemos la administración justa, rápida y económica de las causas que se presentan ante nuestros tribunales de justicia**". (Énfasis suplido.) Vives

---

[29]Es por ello que, en consecución de estos fines, nuestros dictámenes resultan en la expresión final, suprema y obligatoria de la interpretación de las leyes. Col. Abogados v. E.L.A, supra, pág. 196; Ex parte Andino Torres, 152 D.P.R. 509, 519 (2000) (Voto de Inhibición del Juez Asociado señor Rivera Pérez); In re: Vargas Soto, 146 D.P.R. 55, 198 (1998) (Opinión de Conformidad en parte, Disidente en parte y Concurrente en parte del entonces Juez Asociado señor Hernández Denton).

Vázquez v. E.L.A, 142 D.P.R. 117, 135 (1996). Como corolario de esta responsabilidad constitucional, **somos llamados a intervenir oportunamente en el tracto judicial, cuando la protección de derechos constitucionales así lo requiera y cuando resulte imperativo para lograr la protección adecuada del remedio que, en su día, le corresponda a las partes.** Pueblo v. Montero Luciano, 169 D.P.R. 360, 389 (2006) (Énfasis suplido.) ("nuestra función como tribunal de última instancia requiere que velemos que en nuestro País **exista un sistema de justicia donde se respeten [los] derechos fundamentales**" de los individuos).

Lo anterior responde a que "la ciudadanía [confía] en este Foro como último recurso para vindicar [sus] derecho[s] y proveer[le] objetivamente... un remedio justo y equitativo". Mundo Ríos v. CEE, 2012 T.S.P.R. 166 en la pág. 23, 187 D.P.R. ___ (2012) (Opinión Disidente de la Juez Asociada señora Rodríguez Rodríguez). Es por ello que en el pasado, ante el peligro de que la lentitud de los procesos judiciales inferiores amenazara nuestra facultad para otorgar un remedio oportuno en un caso de gran interés público, fuimos prontos en ejercer nuestra prerrogativa constitucional como Tribunal de última instancia para traer ante nuestra consideración un caso pendiente ante el Tribunal de Primera Instancia. Íd., en las págs. 5 y 8 (Opinión Per Curiam). Esto, con el fin de proteger derechos constitucionales de alta jerarquía.

En iguales términos, el Reglamento de esta Curia también vislumbra la posibilidad de que traigamos ante nuestra

consideración un caso para su inmediata resolución, independientemente de la etapa en que se encuentre el pleito, incluyendo aquellas fases del proceso previas al descubrimiento o al desfile de prueba. Es por ello que los miembros de este Tribunal adoptaron la Regla 51 de nuestro Reglamento, la cual dispone lo siguiente:

> (a) El tribunal podrá, **a iniciativa propia** o a solicitud de parte, **ordenar una vista evidenciaria para celebrarse ante sí o ante un Comisionado o una Comisionada Especial.** Salvo que el tribunal otra cosa disponga y en tanto ello no sea incompatible con estas reglas, las Reglas de Procedimiento Civil y de Evidencia aplicarán a toda vista de esta índole y el Secretario o la Secretaria expedirá las citaciones y otros mandamientos que requiera el Comisionado o la Comisionada Especial como si se tratara de una orden del tribunal.
>
> (b) El Comisionado o la Comisionada Especial resolverá los planteamientos sobre admisibilidad conforme a derecho. Terminada la presentación de la prueba, el Comisionado o la Comisionada rendirá un informe **con determinaciones de hechos fundadas exclusivamente en la prueba presentada y admitida.** El informe deberá presentarse al tribunal, con copia a las partes, dentro de los treinta (30) días de terminada la presentación de la prueba. **De ser necesario, el tribunal podrá requerir el informe en un plazo más corto. Junto con el informe se remitirá toda la prueba documental y material que haya sido presentada.** Aquella prueba presentada y que no haya sido admitida se identificará claramente como tal y se indicará, además, la razón por la que no fue admitida.
>
> (c) Las partes tendrán un término simultáneo de veinte (20) días, contados desde la notificación del informe, para ofrecer sus comentarios u objeciones. Transcurrido dicho término, **el tribunal resolverá lo que en derecho proceda.**
>
> (d) Se hará una grabación de sonido de cualquier vista que se celebre **ante el**

**propio tribunal** o ante un Comisionado o Comisionada. El operador u operadora de la grabadora certificará la corrección de cualquier transcripción hecha. La transcripción sólo se hará en los casos siguientes: (1) cuando el tribunal o el Comisionado o la Comisionada así lo ordenen por considerar la transcripción indispensable para formular sus determinaciones de hechos, o (2) cuando cualquiera de las partes objete las determinaciones de hechos del Comisionado o Comisionada, y el tribunal considere indispensable la transcripción para resolver las objeciones. De no ser posible la grabación, se tomarán notas taquigráficas de la vista, las cuales sólo se transcribirán conforme a las normas antes señaladas. No obstante lo anterior, si por cualquier razón la transcripción de la evidencia oral se tarda indebidamente, el tribunal podrá requerirle al Comisionado o Comisionada que proceda a formular **sus determinaciones de hechos** sin la transcripción.

(e) **Esta regla no aplica a los procedimientos dispuestos en las Reglas 14 y 15 de este reglamento, los cuales se regirán por lo establecido allí.** (Énfasis suplido.) 4 L.P.R.A. Ap. XXI-B, R. 51.

Del texto citado se deducen varios principios referentes a la capacidad de este Tribunal para recopilar cualquier tipo de prueba conducente a la pronta adjudicación de un caso de gran interés público. En primer lugar, este Tribunal está investido con la autoridad de celebrar una vista evidenciaria y recibir prueba de forma directa, o a través de un comisionado especial, para así arribar a sus propias determinaciones de hechos. En segundo plano, este mecanismo dispone para que la recopilación de prueba se realice en plazos cortos, de forma tal que el Tribunal pueda resolver conforme a derecho de manera expedita. Finalmente, esta Regla es aplicable a procedimientos distintos a aquellos iniciados

al amparo de nuestra facultad para regular la profesión de la abogacía y la notaría (Reglas 14 y 15 de nuestro Reglamento). Incluso, los comentarios provistos por esta Curia en el propio Reglamento disponen que este mecanismo traspasa su uso en instancias surgidas al amparo de la Regla 28 de nuestro Reglamento (Mociones en auxilio de nuestra Jurisdicción), pudiendo emplearse "en cualquier caso **que el Tribunal lo estime conveniente**". (Énfasis suplido.) Íd., Regla 51, n.28.

De tal manera queda evidenciado que este Tribunal, como foro de última instancia, cuenta con la autoridad legal y los mecanismos necesarios para poder intervenir en un pleito pendiente ante la consideración de un tribunal inferior, no importa su etapa, con el fin de disponer del mismo de forma final y firme, en aras de impartir justicia oportuna.

Y es que así debe ser, ya que esta responsabilidad constitucional de impartir justicia mediante nuestra consideración oportuna de los casos de interés público pendientes ante el Tribunal General de Justicia es un corolario forzoso de la cláusula del debido proceso de ley, por ser un principio de justicia muy arraigado en la conciencia del pueblo puertorriqueño el que este Tribunal emita decisiones finales y firmes que salvaguarden los remedios justos y adecuados de la ciudadanía cuando el tracto judicial ordinario amenaza tal legítima expectación. Declinar ejercer este encargo de rango constitucional implica negarle el derecho al pueblo de Puerto Rico de acudir a este Tribunal de última instancia, cuando aún exista una controversia viva

que atender respecto a la viabilidad de los remedios que solicita.

A su vez, nuestra intervención en casos como estos es exigida por la política pública de esta rama de fomentar el acceso a la justicia. Ello, en función de que "**los estatutos que regulan la jurisdicción o la facultad de los tribunales de atender y resolver las controversias ante sí de la ciudadanía, son de alto interés público, y ... dicho interés urge el mayor acceso posible de los ciudadanos a sus tribunales de justicia**". (Énfasis suplido.) H. A. Sánchez Martínez, Derecho procesal apelativo, Hato Rey, Ed. Lexis-Nexis de Puerto Rico, § 103, pág. 4 (2001).

Habiendo repasado estas consideraciones de rango constitucional, pasemos a articular las razones por las cuales erró una mayoría de este Tribunal al no expedir los recursos de epígrafe.

III

En sus mociones de desestimación, el Estado arguye que este Tribunal no posee jurisdicción para entender en las peticiones de certificación de los empleados públicos, por virtud de la Ley Núm. 18-2013, la cual enmendó el Art. 3.002 de la Ley de la Judicatura y la Regla 52.2 de Procedimiento Civil, a los fines de impedir nuestra intervención en aquellos casos de gran interés público pendientes ante el Tribunal de Primera Instancia, en los cuales no exista la anuencia de todas las partes para presentar la certificación indicada. No le asiste la razón.

Como cuestión de umbral, las mociones de desestimación del Estado invocan la Regla 32 del Reglamento de esta Curia para sostener que los recursos que nos ocupan deben ser desestimados, ya que "... este tribunal carece de jurisdicción para considerarlo[s]". 4 L.P.R.A. Ap. XXI-B, R.32(b)(1). Al así proceder, las mociones del Estado obvian la diferencia existente entre el concepto *jurisdicción* y el término *competencia*.

Como bien indicamos anteriormente, el término *jurisdicción* implica la autoridad de un Tribunal para considerar y decidir determinado caso o controversia. Debido a que los tribunales de Puerto Rico, incluyendo esta Curia, constituyen parte de un sistema judicial unificado en lo concerniente a jurisdicción, el Estado pasa por alto que este Tribunal posee amplia facultad, al igual que cualquier otro tribunal de nuestro sistema general de justicia, para entender y resolver la materia legal que atañe a los casos de autos. A la luz de esta conclusión, no cabe hablar de la aplicabilidad de nuestra Regla 32(b)(1) a los recursos de certificación en disputa. Ello, pues, la jurisdicción de este Tribunal en este asunto es más que evidente.

En todo caso, interpretamos que el Estado pretendió argüir que por virtud de la Ley Núm. 18-2013, este Tribunal carece de competencia al amparo de la Ley de la Judicatura y la Regla 52.2 de Procedimiento Civil para considerar las peticiones de certificación de los empleados públicos. No obstante, esta alegada insuficiencia de competencia a la luz de la Ley Núm. 18-2013, laceraría la competencia *en última*

*instancia* que nuestra Constitución nos reserva sobre toda controversia judicial. Distinto a los tribunales de inferior jerarquía, cuya existencia y competencia puede ser alterada cuando el designio del Poder Legislativo así lo pretenda, la existencia y la competencia constitucional de esta Curia como Tribunal de última instancia sobrevive inmóvil ante los embates de las otras Ramas, cuyas expectativas de política pública depositadas al filo de la media noche en la Ley Núm. 18-2013, no sobreviven el escrutinio de las facultades que nos reserva la Constitución y sobrepasan ilegítimamente las fronteras de sus poderes delegados.

Como bien discutimos anteriormente, al reseñar algunos de nuestros pronunciamientos jurisprudenciales, esta facultad constitucional de constituir el Tribunal de última instancia en nuestro sistema general de justicia, nos impone la responsabilidad indeleble de **hacer justicia individual**. En esa faena revestida de rango constitucional, hemos sido precisos en establecer que **tenemos el deber de administrar las causas que se presentan ante los tribunales inferiores, de tal forma que se respeten los derechos constitucionales de las partes, se facilite la resolución justa de los casos y se garantice la concesión de un remedio justo y adecuado.**

Ante ello, cuando el tracto judicial ordinario amenaza con perjudicar la facultad de este Tribunal para entender en un caso de gran interés público, hemos resuelto con ausencia de ambivalencia que, con el fin de otorgar un remedio justo y equitativo en el ejercicio y en la defensa de nuestra competencia constitucional en última instancia, se justifica

nuestra intervención oportuna para garantizar que las dilaciones inherentes al cauce judicial ordinario no aniquilen el desagravio que en su día este Tribunal pudiera otorgar. Véase, Mundo Ríos v. CEE, *supra*.

Esta prerrogativa constitucional exigía que esta Curia atendiera inmediatamente los recursos ante nos, para darle vigor a la política de acceso a la justicia de esta Rama. Ello, pues, si nuestro sistema de tribunales no resuelve sus reclamos oportunamente y dispone de forma pronta el Derecho aplicable a las controversias aquí presentadas, los peticionarios y el Estado sufrirán un grave menoscabo a sus intereses.

En primer lugar, los empleados públicos que tocan a nuestras puertas se enfrentan al cruel dilema de tener que decidir, antes del 1 de julio del año en curso, entre dos alternativas de planificación financiera, cuyas repercusiones lesionarán potenciales derechos constitucionales. Por un lado, los peticionarios enfrentan la difícil opción de tener que renunciar a sus empleos en aras de mitigar las embestidas de la Ley Núm. 3-2013, la cual amenaza con privarles de los beneficios y las aportaciones patrimoniales al fondo de retiro que les fueron prometidas cuando firmaron su contrato para fungir como servidores públicos. Ello, con la consecuencia desdichada de no poder contar con el 100 por ciento de su remuneración salarial actual, por tener que renunciar a sus empleos, a fin de preservar algunos de los beneficios de retiro que les fueron acordados. Aquellos que no opten por esta primera alternativa, deben continuar en sus

funciones hasta pasada la edad original de retiro que les fue garantizada en la Ley Núm. 447, *supra*, antes de ser enmendada, sacrificando, además, el disfrute de un porcentaje significativo de ingresos que ordinariamente hubiesen recibido al momento de su retiro si la Ley Núm. 3-2013 no hubiese sido promulgada. Ello, con el propósito de continuar recibiendo el 100 por ciento de su salario.

En consecuencia, si este Tribunal no emite una expresión **final y firme** respecto a la validez constitucional de la Ley Núm. 3-2013 antes del 1 de julio del año en curso, los servidores públicos se verán obligados a tomar una decisión sin que su reclamo fuera atendido con la finalidad necesaria y, de esta manera, actuarán en un vacío jurídico. Este problema se acentúa aún más cuando tomamos en consideración que determinadas provisiones de la Ley Núm. 3-2013 ya han entrado en vigor. En particular, la Ley indicada provee para que el Art. 4-109 de la Ley Núm. 447, *supra*, según fue creado por la Ley Núm. 3-2013, entre en vigor inmediatamente. Véase, Sec. 42, Ley Núm. 3-2013. Este articulado obliga a los empleados públicos interesados en preservar sus beneficios de retiro, según éstos estaban configurados antes de promulgarse la Ley Núm. 3-2013, a que presenten ante la Administración de Sistemas de Retiro una solicitud a esos efectos antes del 30 de junio de 2013, fecha en la cual entrarán en vigor las restantes provisiones de la Ley impugnada. Véase, Sec. 30, Ley Núm. 3-2013. De tal manera, la propia Ley acelera la decisión de los empleados, acrecentando así la necesidad de que este Foro intervenga oportunamente y se exprese con

inmediatez y finalidad. Más aun cuando las normas administrativas de la Administración de los Sistemas de Retiro le imponen a los empleados públicos unas condiciones más lesivas al calendario provisto en el propio estatuto, lo cual nos requería emitir un remedio interdictal.[30]

Por otra parte, el Estado también enfrentará el peligro inherente a la incertidumbre de no conocer oportunamente si su política pública de cara a la crisis del sistema de retiro, sobrevivirá nuestra facultad constitucional de revisión judicial. Resulta sorprendente como el propio Estado pueda consentir a la situación de incertidumbre actual, frente a las exigencias de las casas acreditadoras que evalúan nuestra salud crediticia, poniendo en jaque la estabilidad del fisco y propiciando una serie de consecuencias colaterales nefastas que incidirán sobre las múltiples esferas de la economía puertorriqueña.

Ante tales peligros, soy del criterio que la Ley Núm. 18-2013 no constituía un escollo para que expidiéramos los recursos de los peticionarios y, en el ejercicio de nuestra

---

[30] En el caso CT-2013-0006, los peticionarios presentaron una moción en auxilio de nuestra jurisdicción, al amparo de la Regla 28 de nuestro Reglamento. En su escrito, los empleados públicos presentaron comunicaciones administrativas de la Corporación del Fondo del Seguro del Estado y de la Administración de Compensaciones por Accidentes de Automóvil, las cuales instaban a aquellos empleados interesados en renunciar a sus empleos para garantizar la preservación de sus beneficios de retiro, a hacerlo antes del 31 de mayo de 2013. Esta fecha es más aun onerosa que aquella provista por la propia Ley Núm. 3-2013, la cual dispone para tales peticiones hasta el 30 de junio del año en curso. Véase, Sec. 30, Ley Núm. 3-2013. Ante esta realidad, urgía que proveyéramos *Ha Lugar* la moción en auxilio de jurisdicción de los peticionarios, con el fin de emitir una decisión final y firme ante los daños inminentes e irreparables que tal directriz administrativa podría generar.

competencia como Tribunal de última instancia, trajéramos ante nosotros los casos pendientes ante el foro primario para atenderlos debidamente y dar fin a la incertidumbre que estas controversias presentan. Ello con el propósito de administrar estos casos de forma justa, rápida y económica, evitando que el trámite judicial ordinario privara a los empleados públicos y al Estado de un dictamen judicial que les otorgara el remedio justo de poder decidir, de manera informada, cuál de las alternativas indicadas debían seleccionar.

No obstante, la decisión de una mayoría de este Tribunal omite considerar oportunamente estas controversias de gran interés público y claudica a su facultad constitucional de garantizar un remedio justo, adecuado y oportuno. En su lugar, este Foro opta por instruir al Tribunal de Primera Instancia a que se asegure "que la parte demandante tenga a su disposición **un remedio provisional de naturaleza interdictal o de cualquier otra índole que sea necesario** para preservar sus derechos frente a la fecha límite que se avecina". (Énfasis nuestro.) Resolución CT-2013-0005. Al así obrar, este Tribunal evita ejercer la plena facultad de sus poderes constitucionales.

Concretamente, este Foro opta por relevarse a sí mismo de la competencia que la Ley Suprema le impone como Tribunal de última instancia para interpretar todo estatuto, a la luz del significado de la Constitución; prefiriendo, en su lugar, colocar su encargo constitucional sobre los hombros de un tribunal de inferior jerarquía, para que éste, "[c]omo mínimo, ... res[uelva] este asunto antes de que entre en

vigor la Ley Núm. 3, *supra*, el 1 de julio de 2013". Íd. Ello, pues, la mayoría interpreta que es el "**deber** [del foro primario] evitar que la demora judicial deje sin remedio a una parte que lo amerit[a]".[31] Resolución CT-2013-0005.

No obstante, tal conclusión ignora que el principal encargado de evitar tales males es, precisamente, este Tribunal. Es por eso que me opongo a que los pleitos de marras continúen su curso ordinario, sin garantía alguna de que los mismos sean resueltos **de forma final y firme** por este Tribunal antes del 1 de julio de 2013. Sostengo mi contención en el entendimiento de que, bajo el esquema de la Ley Núm. 3-2013, el mes de junio resulta ser uno crucial para los intereses de los peticionarios. En otras palabras, la decisión de este Tribunal "implosiona[] el camino para que los demandantes ... puedan lograr remedios importantes y urgentes", de cara a sus "daños concretos y detallados, que parecen ser suficientes de su faz". Íd. El remedio contemplado en el *No Ha Lugar* provisto en la Resolución mayoritaria, pasa por alto que posponer nuestra intervención

---

[31]En iguales términos, la Resolución mayoritaria ordena que el Tribunal de Primera Instancia celebre una vista evidenciaria antes del 17 de junio de 2013. Este mandato presenta varios peligros. En primer lugar, entiendo que el daño de no poder tomar una decisión informada antes del 1 de julio de 2013 es lo suficientemente real y patente como para considerar en sus méritos los planteamientos constitucionales que nos presentan los peticionarios. En segundo plano, nada garantiza que, una vez celebrada la vista, el foro primario posponga su decisión hasta el 1 de julio de 2013, según se lo permite la decisión que hoy emite esta Curia. Tal posibilidad atenta contra la finalidad y certeza que este pleito exige. Un día más sin que se resuelva el caso de autos en sus méritos es un día muy tarde.

con posterioridad al mes de junio nos privaría de conceder un remedio adecuado, completo y oportuno.

En resumidas cuentas, este Tribunal claudica hoy a ejercer los deberes ministeriales que emanan de nuestra competencia constitucional como tribunal de última instancia, a saber: (1) no le están haciendo justicia individual a los servidores públicos que están tomando una decisión desinformada; (2) no están interviniendo oportunamente para dirimir si procede proteger garantías constitucionales; (3) posponen irrazonablemente nuestra facultad constitucional de pautar las normas jurídicas que gobernarán, no solamente la vida de 614 peticionarios, sino de miles de empleados públicos que se encuentran en la espera de obtener una norma final y firme; y (4) no podrán ofrecerle un remedio completo, adecuado y oportuno, en caso de que sus reclamos prevalezcan.

En su defecto, intentan distinguir esta controversia de otros casos que en el pasado este Tribunal ha certificado, tal como es el caso de la Ley Núm. 7-2009, Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1 (2010). Fundamentan su distinción en su entendimiento de que en aquel caso la controversia medular era la constitucionalidad de la ley. ¿Acaso no es esa la controversia medular que requería un ejercicio inmediato de nuestra competencia constitucional en el caso de autos? Precisamente, sin resolver esa interrogante no podemos evaluar si procede ordenarle a la Rama Ejecutiva que cese y desista de hacer cumplir la ley impugnada por los servidores públicos. Por eso es que era necesario que esta Curia decretara prontamente la constitucionalidad o

inconstitucionalidad de la Ley Núm. 3-2013. En caso contrario, el mes de julio resultará muy tarde y será imposible conceder un **remedio adecuado, completo y oportuno,** en caso de que la parte peticionaria prevalezca en los méritos.

Lamentablemente, la mayoría no recorrió la totalidad del trayecto al limitarse a atender el alcance de la Ley Núm. 18-2013 y obvió el tramo de atender la constitucionalidad o inconstitucional de la Ley Núm. 3-2013, el cual conducía a la meta del reclamo de los empleados públicos peticionarios en el momento oportuno. Teníamos en nuestras manos la oportunidad de atender con premura una controversia de alto interés público, la cual incide sobre el bienestar patrimonial de miles de empleados públicos, sus familiares inmediatos y el pueblo de Puerto Rico, en aras de traer certeza respecto a la constitucionalidad o inconstitucionalidad de la Ley Núm. 3-2013, para que éstos pudiesen tener un remedio adecuado que les permitiese planificar su futuro financiero. Sin embargo, una mayoría de este Tribunal optó por no recorrer el camino completo, ante tan crucial coyuntura para la vindicación de derechos constitucionales de la más alta jerarquía y la dispensación oportuna de justicia.

Tal proceder ignora que la Ley Núm. 18-2013, aunque afectó nuestra competencia al amparo de la Ley de la Judicatura y las Reglas de Procedimiento Civil, en nada afectó nuestra competencia constitucional de última instancia, la cual puede ser ejercida en casos de interés

público como los de autos, para traer de inmediato un caso ante nuestra consideración, en el cual la concesión de un remedio oportuno exige un trámite judicial expedito. Ante tal lamentable realidad, no me queda otra alternativa que disentir.

IV

Por los fundamentos antes expuestos, hubiese declarado *No Ha Lugar* las mociones de desestimación presentadas por el Estado y traería de inmediato a nuestra atención los recursos que nos ocupan.

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| María del C. Alvarado Pacheco y otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos<br>_____<br><br>Monsita Denise Otero Ruiz y otros<br><br>    Peticionarios<br>        v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos<br>_____<br><br>Víctor A. Trinidad Hernández y otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos | CT-2013-0005<br>CT-2013-0006<br>CT-2013-0007 | *Certiorari* |

Voto Particular Disidente emitido por el Juez Presidente SEÑOR HERNÁNDEZ DENTON al cual se une la Jueza Asociada SEÑORA FIOL MATTA

En San Juan, Puerto Rico, a 11 de junio de 2013.

Disentimos enérgicamente del curso de acción seguido por cinco jueces de este Tribunal al declarar inconstitucional esencialmente toda la Ley Núm. 18-2013

(Ley Núm. 18), aprobada por la Legislatura en virtud de la facultad que la Constitución le asignó para modificar la competencia del Tribunal Supremo. La Resolución que se emite para anular una acción legislativa no solo es innecesaria y a destiempo, sino que trastoca los principios constitucionales más básicos de nuestro sistema democrático al provocar un desbalance entre las ramas de Gobierno. El proceder mayoritario representa un golpe judicial a la separación de poderes bajo una alegada defensa del acceso a la justicia, principio cardinal que no está en juego en esta ocasión.

Lo único que procede en esta etapa de los procedimientos es denegar sin más los recursos de certificación intrajurisdiccional presentados por las partes demandantes en los casos sobre la impugnación de constitucionalidad de las leyes de retiro. Solo así cumplimos con nuestra función judicial de respetar la Ley Núm. 18, que a todas luces es constitucional de su faz. No es genuino evadir esta función bajo el pretexto de defender el acceso a la justicia. Sin embargo, concurrimos con denegar el recurso, pues así las partes tendrán la oportunidad de presentar la prueba y sus argumentos de derecho en el foro de primera instancia.

No debemos utilizar nuestro poder como jueces y juezas del Tribunal Supremo para transferir a este Foro las incomodidades o disgustos suscitados por las actuaciones de la Asamblea Legislativa que, gústenos o no, se han conducido conforme a la Constitución. Luego del cambio

reciente en los comicios electorales, la decisión emitida hoy se aparta convenientemente del pronunciamiento esbozado en Yiyi Motors, Inc. v. E.L.A., 177 D.P.R. 230, 287 (2009), sobre el efecto del proceso electoral en la "marea judicial". Por nuestra parte, hemos sido firmes en que la interpretación constitucional no puede estar sujeta a los vaivenes de las "mareas" de nuestro ordenamiento democrático.

I.

Los tres recursos consolidados versan sobre demandas en las que se solicita que se declare inconstitucional la Ley Núm. 3-2013 (Ley Núm. 3) sobre la Reforma de Retiro. Tras instar las mismas, las partes demandantes acudieron ante el Tribunal Supremo mediante sendas peticiones de certificación intrajurisdiccional. Antes de presentarse estas solicitudes, se aprobó y entró en vigor la Ley Núm. 18, la cual, en lo pertinente a los casos que nos ocupan, modificó la competencia de este Tribunal para atender peticiones de certificación intrajurisdiccional provenientes del Tribunal de Primera Instancia.

Fundamentándose en dicha legislación, las partes demandadas solicitaron la desestimación de las referidas peticiones, al entender que este Tribunal no tenía jurisdicción para atenderlas. Las partes demandantes se opusieron a la desestimación. Todas presentaron sus respectivas réplicas y dúplicas sobre este asunto.

II.

Antes de la aprobación de la Ley Núm. 18, la Ley de la Judicatura de 2003, Ley Núm. 201-2003, según enmendada, 4 L.P.R.A. ant. sec. 24s (Ley de la Judicatura), otorgó al Tribunal Supremo la facultad de expedir discrecionalmente el auto de certificación intrajurisdiccional, *motu proprio* o a solicitud de parte, para atender un asunto pendiente ante cualquiera de los tribunales de inferior jerarquía. Esto, cuando se planteara la existencia de un conflicto de intereses entre decisiones previas del Tribunal de Apelaciones, cuestiones noveles de derecho o asuntos de alto interés público que involucraran una cuestión constitucional sustancial. Ley de la Judicatura, *supra*.

No obstante, la Ley Núm. 18 modificó la competencia original y apelativa del Tribunal Supremo. En lo pertinente a las solicitudes de certificación intrajurisdiccional, enmendó la Ley de la Judicatura, *supra*, y las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. V. Como resultado, el Art. 3.002 (f) de la Ley de la Judicatura, *supra*, ahora dispone lo siguiente:

> [m]ediante auto de certificación, a ser expedido discrecionalmente, cuando medie solicitud de ambas partes, podrá traer inmediatamente ante sí para considerar y resolver cualquier asunto pendiente ante el Tribunal de Primera Instancia cuando se plantee la existencia de un conflicto entre decisiones previas del Tribunal de Apelaciones, se planteen cuestiones noveles de derecho o se planteen cuestiones de alto interés público que incluyan cuestión constitucional sustancial al amparo de la Constitución del Estado Libre Asociado de Puerto Rico o de la Constitución de Estados Unidos. Íd.

Como vemos, para que este Tribunal pueda expedir un recurso de certificación de un caso pendiente ante el foro primario, este tiene que ser solicitado por todas las partes y debe cumplir además con una de las tres características señaladas. De lo contrario, no podemos ejercer nuestra jurisdicción en ese momento. Como los recursos ante nos no cumplen con ninguno de estos requisitos, no tenemos jurisdicción para atenderlos en esta etapa de los procedimientos.

Sin embargo, una mayoría de este Tribunal resuelve que tenemos jurisdicción en estos casos, puesto que declara inconstitucionales de su faz los Arts. 1 y 2 de la Ley Núm. 18.[32] Para ello, viola nociones básicas sobre justiciabilidad y normas prudenciales de autolimitación judicial. Peor aún, su análisis constitucional es errado en Derecho. Veamos.

**A.    Justiciabilidad y normas de autolimitación judicial**

Los tribunales podemos evaluar únicamente casos justiciables. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958). Un asunto no es justiciable en la medida en que no presente un caso o controversia. Íd. Por ello, los tribunales sólo debemos intervenir en controversias reales y vivas. Íd. Al respecto, hemos expresado que "el principio de justiciabilidad como autolimitación del ejercicio del poder

---

[32] Estos artículos también versan sobre la competencia original y apelativa del Tribunal Supremo respecto a los siguientes recursos: (1) *quo warranto*, (2) auto inhibitorio, (3) *mandamus*, (4) certificación intrajurisdiccional de casos ante el Tribunal de Apelaciones, (5) certificación interjurisdiccional, (6) *certiorari* sobre asuntos interlocutorios y (7) recurso gubernativo.

judicial responde en gran medida al papel asignado a la judicatura en una distribución tripartita de poderes, diseñada para asegurar que no intervendrá en áreas sometidas al criterio de otras ramas de gobierno". Fund. Surfrider y otros v. A.R.Pe., *supra*, pág. 571 citando a Com. De la Mujer v. Srio. De Justicia, 109 D.P.R. 715, 721 (1980). Esta doctrina exige a los tribunales "preguntarse y evaluar si es o no apropiado entender en un determinado caso, mediante un análisis que les permite ejercer su discreción en cuanto al límite de su poder constitucional". Smyth, Puig v. Oriental Bank, 170 D.P.R. 73, 76 (2007).

Para determinar si una controversia es justiciable se debe evaluar si: (1) es tan definida y concreta que afecte las relaciones jurídicas entre las partes que tienen un interés jurídico antagónico; (2) es real y sustancial y permite un remedio específico mediante una sentencia de carácter concluyente; y (3) es propia para una determinación judicial, a diferencia de una disputa de carácter hipotético o abstracto. E.L.A. v. Aguayo, *supra*, págs. 583-584. Por lo tanto, no se considera justiciable la controversia en la cual se busque resolver una cuestión política o una de las partes no ostente legitimación activa; también cuando hechos posteriores al comienzo del pleito la convierten en académica, las partes buscan obtener una opinión consultiva o se promueve un pleito que no está maduro. Noriega v. Hernández Colón, 135 D.P.R. 406, 421-422 (1994).

Además del principio de justiciabilidad, las normas de autolimitación judicial sirven de guía para situaciones en las que un tribunal es llamado a evaluar la validez constitucional de una medida legislativa. Estas normas disponen que un tribunal: (1) no juzgará la constitucionalidad de una ley en un proceso no adversativo; (2) no decidirá una cuestión constitucional antes de que sea necesario hacerlo; (3) no formulará una norma constitucional más amplia que la que requieran los hechos del caso; (4) no juzgará una cuestión constitucional adecuadamente sometida, si también se somete un fundamento de otra índole que permita disponer del caso; (5) no juzgará la validez de una ley a instancia de quien no puede probar que su aplicación le causa daños; (6) no juzgará la validez de una ley a instancias de quien se ha valido de sus beneficios; (7) cuando se cuestione la validez de una ley, aun cuando se suscite una duda seria sobre su constitucionalidad, primero decidirá si hay una interpretación razonable que permita soslayar la cuestión constitucional; y (8) no entenderá en una cuestión constitucional si los autos no son adecuados para hacer una determinación de esa índole. E.L.A. v. Aguayo, *supra*, pág. 596.

Como señalamos anteriormente, las partes demandantes impugnaron en el foro primario la constitucionalidad de la Ley Núm. 3. Posteriormente, presentaron sendas peticiones de certificación ante este foro. El Estado solicitó la desestimación de las peticiones por entender que la Ley

Núm. 18 privó a este Tribunal de jurisdicción para certificar estos asuntos. Luego, las partes presentaron varios escritos. En dos de las solicitudes, se impugnó la constitucionalidad de la Ley Núm. 18.

Al acoger este planteamiento y declarar inconstitucionales los Arts. 1 y 2 de la Ley Núm. 18, una mayoría de esta Curia ignora por completo los principios de justiciabilidad y las normas de autolimitación judicial aplicables. Por un lado, se excede en su análisis de la controversia que tiene ante su consideración y, por otro, resuelve *motu proprio* controversias que no fueron planteadas por las partes ni existen en el caso.

En esta etapa de los procedimientos, la única controversia que este Tribunal tiene que resolver es si proceden las certificaciones presentadas. Al contestar en la negativa, el Tribunal estaba impedido de evaluar y decretar la inconstitucionalidad de la Ley Núm. 18. No obstante, aun partiendo de la premisa errónea de que el Tribunal tenía que evaluar la constitucionalidad de esta pieza legislativa a modo de *dictum*, a pesar de que decidió no expedir los casos, el análisis se debió limitar a la única disposición de la Ley Núm. 18 en controversia actualmente. A saber, aquella parte del Art. 1 que versa sobre la competencia del Tribunal Supremo para atender recursos de certificación intrajurisdiccional provenientes del Tribunal de Primera Instancia.

En cambio, una mayoría del Tribunal decreta la inconstitucionalidad de gran parte de la Ley Núm. 18,

mediante Resolución, sin realizar el más mínimo esfuerzo de encontrar una interpretación que permita reconocer su validez. De esta forma, da al traste con la deferencia que se busca otorgar a la Asamblea Legislativa mediante la doctrina de autolimitación judicial. Por el contrario, decide una cuestión constitucional antes de que sea necesario hacerlo, formula una norma constitucional excesivamente amplia a la que requieren los hechos de los casos, no analiza los variados fundamentos de índole no constitucional que le permitían disponer de las peticiones de certificación y no busca interpretaciones razonables en aras de salvar la constitucionalidad de la Ley Núm. 18.[33] Lo anterior lleva al resultado absurdo de que a pesar que se denieguen los recursos presentados ante este Tribunal, se declara inconstitucional la gran mayoría de una pieza legislativa cuyas disposiciones -con excepción de un solo párrafo- son inaplicables e irrelevantes para la disposición de las peticiones de certificación. En específico, una mayoría de este Tribunal invalida las disposiciones de la Ley Núm. 18 relativas a los recursos de *quo warranto*, auto inhibitorio, *mandamus*, certificación intrajurisdiccional de casos ante el Tribunal de Apelaciones, certificación interjurisdiccional, *certiorari* sobre asuntos interlocutorios y recurso gubernativo. De un plumazo, aprovecha para declarar inconstitucionales partes de la ley que, aunque no están en controversia, no son de

---

[33] Un ejemplo de lo anterior es la creativa, aunque errónea, teoría planteada por el compañero Juez Asociado señor Estrella Martínez en su Voto Particular Disidente.

su agrado. Más que un ejercicio válido del poder judicial, este proceder es análogo a una opinión consultiva. Recordemos "que no es función de los tribunales actuar como asesores o consejeros". Ortiz v. Panel del F.E.I., 155 D.P.R. 219, 251-252 (2001) citando a Com. De la Mujer v. Srio. De Justicia, *supra*, pág. 721 (1980).

Al hacer esto, una mayoría del Tribunal también hace caso omiso de la cláusula de separabilidad establecida en el Art. 14 de la Ley Núm. 18, la cual dispone que:

> [s]i cualquier cláusula, **párrafo**, subpárrafo, artículo, disposición, sección, inciso o parte de esta Ley fuere declarada inconstitucional por un tribunal competente, la sentencia a tal efecto dictada no afectará, perjudicará ni invalidará el resto de esta Ley. El efecto de dicha sentencia quedará limitado a la cláusula, párrafo, subpárrafo, artículo, disposición, sección, inciso o parte de la misma que así hubiere sido declarada inconstitucional. (Énfasis suplido).

¿Contempló una mayoría del Tribunal este Artículo? Cabe destacar que el mismo sigue siendo válido pues sobrevivió al improcedente decreto de inconstitucionalidad.

Eso no es todo. Además de violar nociones elementales sobre justiciabilidad y normas prudenciales de autolimitación judicial, el decreto de inconstitucionalidad emitido es errado en Derecho por dos razones. Primero, la Asamblea Legislativa tiene la facultad constitucional expresa de modificar la competencia de este Tribunal. Segundo, tampoco surge de los hechos que se haya configurado una interferencia indebida de la Asamblea

Legislativa con la función judicial. Comencemos por explicar lo primero.

**B.   Prerrogativa constitucional de la Asamblea Legislativa para modificar la competencia de los tribunales**

Las enmiendas introducidas por la Ley Núm. 18 a la Ley de la Judicatura, surgen del ejercicio básico de las prerrogativas que nuestra Constitución concede expresamente a la Asamblea Legislativa. La Sec. 2 del Art. V de la Constitución de Puerto Rico expresa que "los tribunales de Puerto Rico constituirán un sistema judicial unificado en lo concerniente a jurisdicción, funcionamiento y administración. La Asamblea Legislativa, en cuanto no resulte incompatible con esta Constitución, podrá crear y suprimir tribunales, con excepción del Tribunal Supremo, y **determinará su competencia y organización**". Art. V Sec. 2 Const. E.L.A., L.P.R.A., Tomo 1. (Énfasis suplido).

Además, la Sec. 5 del mismo Artículo de la Constitución establece que el Tribunal Supremo, cada una de sus salas, así como cualquiera de sus jueces, podrán conocer en primera instancia de recursos de hábeas corpus y **de aquellos otros recursos y causas que se determinen por ley**. Const. E.L.A., *supra*, Sec. 5. También, nuestra Constitución dispone que el Tribunal Supremo será el tribunal de última instancia en Puerto Rico. Íd., Sec. 3.

A diferencia de lo que se argumenta en la Resolución del Tribunal, no nos cabe duda de que el texto claro de estas disposiciones reserva a la Asamblea Legislativa la facultad exclusiva de modificar la competencia original y apelativa del Tribunal Supremo. En efecto, hemos reafirmado

y explicado que la excepción a esa facultad es que el Tribunal Supremo sea el tribunal de última instancia en Puerto Rico y, además, conozca en primera instancia de recursos de hábeas corpus y de aquellos otros recursos y causas que se determinen por ley. Petrovich v. Secretario de Hacienda, 79 D.P.R. 250, 260 (1956). Véase además, Lausell Ducos v. A.C.A.A., 111 D.P.R. 593 (1981); Rodríguez v. Registrador, 75 D.P.R. 712 (1953).

Así quedó plasmado en los debates de la Asamblea Constituyente. El Informe de la Comisión de la Rama Judicial expuso sobre la Sec. 2 del Art. V de la Constitución, *supra*, que "esta sección establece la completa unificación de los tribunales de Puerto Rico. La unificación de los tribunales produce, entre otros efectos, la eliminación de problemas técnicos de jurisdicción. **El poder legislativo queda, no obstante, facultado para determinar la competencia de los tribunales**…". 4 Diario de Sesiones 2609 (Énfasis suplido). Más aun, el delegado Sr. Víctor Gutiérrez Franqui expresó que

> debe dejarse este aspecto del problema jurisdiccional del Tribunal Supremo con suficiente libertad a la Asamblea Legislativa para que no pudiendo ni abolir el Tribunal Supremo ni variar su integración, ni quitarle la condición de tribunal apelativo ni de tribunal de última instancia –que eso sí queda garantizado constitucionalmente en nuestra proposición– pueda, sin embargo disponer lo que la razón y las circunstancias aconsejen de tiempo en tiempo. 1 Diario de Sesiones 592.

De todo lo anterior, podemos concluir que el límite impuesto en la Constitución a la facultad legislativa de

determinar la competencia de los tribunales es respetado por la Ley Núm. 18. El Tribunal Supremo sigue siendo el foro de última instancia de todas las causas. Solo fueron alteradas las vías para atenderlas. En ese sentido, la Legislatura entendió que sólo se podía certificar un recurso pendiente ante el foro primario si cuenta con la anuencia de todas las partes. De no ser así, solo se podría certificar un caso pendiente ante el Tribunal de Apelaciones.[34] Por lo tanto, la Ley Núm. 18 no afecta nuestra facultad para atender la controversia en última

---

[34] De hecho, esta no es la primera vez en nuestra historia jurídica que se limita el recurso de certificación de esta manera. Tal como reseñó la Oficina de Administración de los Tribunales en sus comentarios al P. del S. 367, hoy Ley Núm. 18, desde que dicho recurso se creó por primera vez mediante la Ley Núm. 115-1958 hasta 1992, la certificación de un caso era procedente solamente cuando se encontraba "pendiente de resolución ante el Tribunal Superior, **en grado de apelación o revisión**. ... [E]l recurso de certificación no proced[ía] en relación con casos originados en el Tribunal Superior. La razón es obvia. En tales casos que están en proceso, los autos no están completos, a diferencia de los que tiene el Tribunal Superior en carácter apelativo y en los cuales ya se han archivado los autos en apelación o revisión." Álvaro R. Calderón & David Rivé Rivera, Manual de Procedimientos Apelativos, 155-156 (1987). (Énfasis suplido). Análogamente, en 1995, una enmienda a la Ley de la Judicatura de 1994 proveyó para la expedición del auto de certificación únicamente cuando una de las partes en el pleito lo solicitara y el caso estaba pendiente ante el Tribunal de Circuito de Apelaciones. Ni siquiera el Tribunal Supremo lo podía expedir *sua sponte*. H. Sánchez Martínez, Práctica Jurídica de Puerto Rico: Derecho Procesal Apelativo 55 (2001). Así se encontraba delimitada la competencia de este Tribunal hasta la Ley de la Judicatura de 2003. Cabe destacar que la Ley Núm. 18 proveía para el recurso de certificación intrajurisdiccional de casos pendientes ante el Tribunal de Apelaciones. Empero, la Resolución emitida también invalida la modificación hecha a este recurso sin fundamento alguno.

instancia, según requerido constitucionalmente; tan solo regula el momento en que ejercemos dicha facultad.[35]

No es cierto que el estatuto en cuestión tiene el interés específico de inmunizar al Estado de la revisión judicial de casos que impugnen la constitucionalidad de las leyes de retiro. La realidad es que esta controversia puede ser evaluada por esta Curia en cualquier momento posterior ya sea obviando la intervención del foro apelativo intermedio al presentarse un recurso de certificación estando pendiente el caso ante ese foro o ejerciendo nuestra competencia apelativa una vez ese foro haya emitido una sentencia. Véase P.R.T. Co. V. H.I.E. Tel., 145 D.P.R. 833 (1998) (Voto explicativo del Juez Fuster Berlingeri). Incluso, la Ley Núm. 18 provee un mecanismo que permite nuestra intervención aun antes, cuando todas las partes

---

[35] A modo comparativo, las disposiciones del 28 U.S.C. § 1254(2) permiten que una Corte de Apelaciones del Circuito Federal certifique una pregunta de derecho al Tribunal Supremo de Estados Unidos en aquellos casos civiles o criminales en que el foro apelativo intermedio interese recibir instrucciones. Bajo la normativa federal, la facultad de procurar la certificación de una pregunta reside exclusivamente en la Corte de Apelaciones y no en las partes del litigio. Incluso, como señaló recientemente el ex Juez Asociado Stevens, se ha notado en términos prácticos que "[t]he certification process has all but disappeared in recent decades." *United States v. Seale*, 130 S. Ct. 12 (2009) (Stevens, J., statement respecting the dismissal of the certified question). No obstante, nadie ha planteado que la ausencia de un recurso de certificación intrajurisdiccional, disponible para las partes o *sua sponte* en cualquier etapa del litigio federal, constituye un menoscabo al acceso a la justicia o a la jurisdicción del Tribunal Supremo como el tribunal de mayor jerarquía en el sistema federal. Véase además, A. Nielson, The Death of the Supreme Court's Certified Question Jurisdiction, 59 Cath. U. L. Rev. 483, 488 (2010).

prestan su anuencia a que se solicite la certificación estando ante el foro de primera instancia.

Con esto en mente, analicemos la distinción que hace el compañero Juez Asociado señor Estrella Martínez al aseverar que la Ley Núm. 18 no afectó la "competencia constitucional" de este Tribunal y que, por ello, el Tribunal tiene jurisdicción para intervenir en esta etapa. Esta aseveración confunde los conceptos "jurisdicción" y "competencia". Es sabido que la jurisdicción nos confiere la facultad para considerar y decidir casos o controversias y que la competencia se refiere al lugar donde se ventilará el litigio en un momento determinado. Rodríguez v. Registrador, *supra*, pág. 717-721. Recordemos que la Asamblea Constituyente eliminó las diferencias jurisdiccionales que existían anteriormente con el solo propósito de evitar los perjuicios causados ante el error técnico de presentar una causa en la sala equivocada. Íd.

Sin embargo, aunque este Tribunal tenga jurisdicción para atender todo asunto en última instancia, ello no significa que pueda decidir, *sua sponte*, su competencia. Según expusimos previamente, esa facultad es exclusiva de la Asamblea Legislativa por concesión expresa en la Constitución. Por esta razón, aunque es correcta la distinción hecha entre jurisdicción y competencia, no hay tal cosa como competencia constitucional para atender

cualquier causa en cualquier etapa por un alegado interés público.[36]

Además de facultar a la Asamblea Legislativa para determinar nuestra competencia, la Constitución afirma que el Tribunal Supremo atenderá en primera instancia el hábeas corpus y aquellos recursos y causas que se determinen por ley. Const. E.L.A., *supra*, Sec. 5. En todo caso, la única "competencia constitucional" que existe es la de atender todos los casos en última instancia y en primera instancia los recursos de hábeas corpus.[37] Sobre esto, resultan

_____

[36] Nuestra Constitución sigue el modelo federal en estos asuntos. Por eso, resulta pertinente señalar las expresiones del Tribunal Supremo en Ohio v. Wyandotte Chemicals Corp., 401 U.S. 493, 497 (1971):
[a]lthough it may initially have been contemplated that this Court would always exercise its original jurisdiction when properly called upon to do so, it seems evident to us that changes in the American legal system and the development of American society have rendered untenable, as a practical matter, the view that this Court must stand willing to adjudicate all or most legal disputes … over which this Court does have original jurisdiction. Íd.

[37] El recurso propuesto por el compañero Juez Asociado señor Estrella Martínez es el equivalente funcional al recurso de amparo existente en Europa y América Latina, el cual es ajeno a nuestro sistema de derecho. Según Hart y Weschler:
[i]n contrast with the United States, many European countries employ "constitutional courts" whose primary function is to review constitutional claims, especially regarding the constitutionality of statutes; within such regimes, other courts are generally barred from holding statutes unconstitutional. […] In such proceedings, constitutional courts characteristically require only "an abstract or objective question" to determine the constitutionality of a new law; "no concrete dispute involving individual situations" is necessary. R. Fallon, Jr., J. F. Manning, D. J. Meltzer, D. L. Shapiro, Hart and Weschler's The Federal Courts and The Federal System, Fifth Ed., Foundation Press, 2009, pág. 58.
En los Estados Unidos y Puerto Rico el sistema de revisión judicial que impera es el llamado descentralizado o difuso. Mediante este sistema se concede el poder de revisión judicial de la constitucionalidad de los actos de las otras ramas, **a todos los tribunales del sistema**

reveladoras las siguientes expresiones del delegado señor

Gutiérrez Franqui:

> [n]osotros seguimos sosteniendo que creemos que esa garantía o jerarquía constitucional debemos reservarla única y exclusivamente para el auto de hábeas corpus, que al lado de él no debe haber otros señalados en la constitución y que es suficiente con disponer "aquellas otras causas que se determine por ley", y entonces **la Asamblea Legislativa podría, de tiempo en tiempo determinar en qué procedimientos, en qué causas extraordinarias puede concedérsele o debe concedérsele jurisdicción original al Tribunal Supremo.** 3 Diario de Sesiones 1653. (Énfasis suplido).

En fin, tanto la posición de una mayoría de este Tribunal como la del Juez Asociado señor Estrella Martínez usurpan la facultad reservada exclusivamente a la Asamblea Legislativa de determinar nuestra competencia original. Tal proceder trastoca impermisiblemente el balance tripartito entre las ramas del Gobierno y representa una falta de respeto a los procesos legislativos.[38] Const. E.L.A., *supra*,

---

**jurisdiccional,** para ser usado a instancia de cualquier persona afectada por una ley o una actuación del gobierno. J. A. Andreu García, La revisión judicial de Estados Unidos, Puerto Rico y Europa: Una perspectiva de derecho comparado, 34 Rev. Jur. U. Inter. P.R. 403, 407-408 (2000) citando a M. Cappelletti & W. Cohen, Comparative Constitutional Law, Cases and Materials 73-90 (1979) (Énfasis suplido).

[38] No olvidemos que
[l]a teoría de la separación de poderes requiere que las facultades delegadas por el pueblo en la Carta Constitutiva se distribuyan entre las tres ramas. Su premisa es evitar la concentración de poderes en una sola. La relación entre los poderes del Gobierno debe ser dinámica y armoniosa. **Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Su perdurabilidad requiere que cuando haya conflicto sobre el alcance de los poderes constitucionales de cualquiera de ellas, los tribunales intervengan con prudencia y**

Art. I Sec. 2. Reiteramos que el hecho de que no podamos certificar los casos en este momento, según presentados por los peticionarios, no nos impide revisar en última instancia el dictamen que surja del foro primario.

Por último, una mayoría de este Tribunal analiza si la aprobación de la Ley Núm. 18 violó la doctrina de separación de poderes por constituir una interferencia indebida con la función judicial. Para ello, descansan en un mal llamado análisis constitucional de su faz. De una simple lectura de la Resolución surge que no estudiaron el texto de la ley, sino "**las intenciones de la Rama Ejecutiva y Legislativa** de impedir que los peticionarios acudieran a este Tribunal mediante las peticiones de certificación que nos ocupan". Resolución, pág. 22. (Énfasis suplido).

### C. Interferencia con la función judicial

Una ley puede ser declarada inconstitucional de su faz o en su aplicación. E.L.A. v. Northwestern Selecta, 185 D.P.R. 40 (2012). En lo pertinente a los casos que nos ocupan, hemos reiterado que "[c]omo parte del proceso de evaluar la constitucionalidad de una ley de su faz, **es menester considerar si de su propio texto surge el vicio que la torna inconstitucional**". Íd., pág. 71. (Énfasis suplido). Un ataque contra una norma de su faz requiere que el demandante demuestre que la norma es totalmente inválida y que no puede ser aplicada válidamente en circunstancia alguna. Asoc. Ctrl. Acc. C. Maracaibo v. Cardona, 144

---

**deferencia para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias.** Silva v. Hernández Agosto, 118 D.P.R. 45, 57 (1986). (Énfasis suplido).

D.P.R. 1, esc. 10 (1997) citando a L.H. Tribe, American Constitutional Law, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 1023; United States v. Salerno, 481 U.S. 739 (1987).

Ninguna parte de la Resolución que hoy se emite identifica que el texto de la Ley Núm. 18 tenga algún vicio que la torne inconstitucional. Lo que una mayoría de este Tribunal indica es que "ese estatuto es insostenible ya que su trámite de aprobación demuestra un interés específico en inmunizar al Estado de la revisión judicial de casos que impugnen la constitucionalidad de las leyes de retiro". Resolución, pág. 15. Así pues, la mayoría del Tribunal no realizó un análisis de la faz de la ley, como pretende hacer creer. **Más bien, la Resolución analiza la constitucionalidad del estatuto en su aplicación y ni siquiera la "intención legislativa" sino las motivaciones del legislador al adoptarlo.** Utilizando este análisis, determina que la Ley Núm. 18 infringió la doctrina de separación de poderes por constituir una interferencia indebida con la función judicial. Para ello, alude a la doctrina esbozada en Colón Cortés v. Pesquera, 150 D.P.R. 724 (2000). La mayoría expresa que en ese caso establecimos que:

> para determinar si un acto legislativo que afecta la jurisdicción de este Tribunal viola la doctrina de separación de poderes hay que analizar no solo el texto del estatuto en cuestión, sino la **intención** de la Asamblea Legislativa. Es decir, **"lo importante no es la forma del acto, sino su contenido"**. (Énfasis en la

Resolución) (Cita omitida). Resolución,
pág. 7.

En aras de ser precisos, debemos aclarar que lo que dijimos en Colón Cortés v. Pesquera, *supra*, fue lo siguiente:

> [l]o importante al determinar si cierta actuación legislativa infringe el principio de separación de poderes, es si la intención clara y específica de la ley fue **afectar el resultado de un pleito particular.** Lo importante no es la forma del acto, sino su contenido. (Énfasis suplido). Íd., pág. 764.

**Es decir, una mayoría de este Tribunal obvia que en Colón Cortés v. Pesquera, *supra*, realizamos un análisis sobre la constitucionalidad de una ley en su aplicación a un caso particular y establecimos que lo determinante es que la ley no pretenda afectar el resultado del mismo.[39]**

Asimismo, la Resolución de una mayoría de este Tribunal omite en su discusión otros precedentes sobre interferencia indebida de la Legislatura con la función judicial,[40] incluyendo el más reciente, resuelto en 2011: Clases A, B y C v. PRTC, 183 D.P.R. 666 (2011). En dicho

---

[39] El tergiversado análisis de una mayoría de este Tribunal sobre lo resuelto en Colón Cortés v. Pesquera, *supra*, los lleva a concluir que los Arts. 1 y 2 de la Ley Núm. 18 son inconstitucionales porque la intención del legislador fue impedir que las partes demandantes en estos casos acudieran ante nos mediante recurso de certificación intrajurisdiccional. ¿Qué relación tiene esta supuesta intención del legislador con el recurso de *mandamus*, el *certiorari* interlocutorio y los otros recursos mencionados en esos artículos que también fueron declarados inconstitucionales?

[40] Por ejemplo, los casos Suárez v. Tugwell, Gobernador, 67 D.P.R. 180 (1947), y Sunland Biscuit Co. v. Junta Salario Mínimo, 68 D.P.R. 371 (1948). En ambos, se sostuvo la validez de las leyes cuestionadas tras concluir que no habían interferido indebidamente con casos pendientes al momento de su aprobación.

caso, este Tribunal evaluó la constitucionalidad de la Ley Núm. 138-2005, 27 L.P.R.A. secs. 265a y 269j-1, en su aplicación al caso que tenía ante su consideración. Por voz del compañero Juez Asociado señor Estrella Martínez, esta Curia resolvió que la Asamblea Legislativa no violó el principio de separación de poderes al aprobar la Ley Núm. 138-2005, *supra*, con aplicación retroactiva. Esta ley concedió jurisdicción primaria y exclusiva a la Junta Reglamentadora de Telecomunicaciones para dilucidar todo reclamo sobre los servicios de telecomunicaciones. Ello, a pesar de que su aprobación conllevó la desestimación de un pleito de clase que estaba pendiente ante el Tribunal de Primera Instancia cuando se aprobó el estatuto. Esta ley también imponía un límite a la indemnización que se podía conceder en este tipo de casos.

Para fundamentar su decisión, este Tribunal reiteró la norma firmemente establecida de que "la Asamblea Legislativa puede, en el ejercicio de su poder inherente, afectar litigios pendientes sin contravenir el principio de la separación de poderes, **siempre que lo haga en el marco de la enunciación de una nueva norma de derecho y no meramente de la adjudicación de una controversia específica**". Íd., pág. 683, citando a <u>Misión Ind. P.R. v. J.P.</u>, *supra*, págs. 110-112. (Énfasis suplido). Asimismo, sostuvo que en <u>Colón Cortés v. Pesquera</u>, *supra*, pág. 749, establecimos que "[l]o importante al determinar si cierta actuación legislativa infringe el principio de separación de poderes, es si la intención clara y específica de la ley

fue **afectar el resultado de un pleito particular**". Íd., pág. 685. (Énfasis suplido). También destacó que se viola la doctrina de separación de poderes cuando la Asamblea Legislativa **"pretenda hacer determinaciones de hecho o dictar conclusiones de derecho** sobre un caso en trámite en los tribunales". Íd., pág. 688, citando a <u>Robertson v. Seattle Audubon Soc.</u>, 503 U.S. 429, 441 (1992). (Énfasis suplido).

Al aplicar las normas anteriormente reseñadas a la Ley Núm. 138-2005, *supra*, este Tribunal destacó lo siguiente:

> [l]a consecuencia de esta disposición de la Ley Núm. 138-2005, *supra*, es que el foro para reclamar en primera instancia se transfirió a una agencia administrativa. El asunto es tan claro que las propias clases admiten que la **"Ley 138 en que se basó la sentencia no tuvo el efecto de privar a los demandantes de su derecho a reclamar sino, más bien, a dirigir la reclamación a un foro distinto"**.

> En este caso, no hay sentencia que haya declarado ilegal el cargo de teletecla ni creado estado de derecho alguno a favor de las clases, o que pueda ser revocada por la disposición en controversia de la Ley Núm. 138-2005, *supra*. Tal disposición en manera alguna adjudica la reclamación de las clases, ni pretende hacer determinaciones de hecho o dictar conclusiones de derecho. **Tampoco dicta el resultado del caso pendiente. Y mucho menos usurpa la facultad del Poder Judicial para estructurar remedios adecuados, pues se trata de una disposición que meramente regula la autoridad para entender en primera instancia un asunto particular sin prejuzgar los méritos de la causa.** Ante las circunstancias particulares del presente caso, es forzoso concluir que la disposición en cuestión no afecta de forma impermisible el pleito pendiente.

[…]

>    Además, el foro judicial también estará disponible para revisar una determinación adversa por la Junta. <u>Clases A, B y C v. PRTC</u>, *supra*, págs. 689-690 (2011)(Citas internas omitidas).[41]

Comparemos lo anterior con los casos que nos ocupan. La Ley Núm. 18 no priva a ciudadano alguno de su derecho a que su caso sea atendido por los tribunales. En los casos de autos, no existe una sentencia o determinación que haya creado estado de derecho alguno a favor de las partes de epígrafe o que pueda ser revocada por el estatuto en cuestión. La Ley Núm. 18 no adjudica de forma alguna el pleito de marras ni persigue realizar determinaciones de hecho o dictaminar conclusiones de derecho. La Ley Núm. 18 no dicta el resultado de los casos de epígrafe. Tampoco usurpa la facultad de la Rama Judicial para proveer el remedio que en derecho proceda, pues solo enuncia una nueva norma de derecho procesal que regula la competencia para atender en primera instancia los tipos de casos enumerados en la ley, sin prejuzgar los méritos de alguna causa de acción.

Por tal razón, y de forma casi idéntica al caso que este Tribunal resolvió hace apenas año y medio, es forzoso concluir que la Ley Núm. 18 no afecta impermisiblemente la

---

[41] Nótese que los criterios a considerar para evaluar si una ley interfiere indebidamente con la función judicial en un caso no incluyen el que esta procure "dilatar su trámite en aras de evadir una revisión judicial efectiva", como se manifiesta sin fundamentación legal alguna en la página 8 de la Resolución. Aunque asegura que este Tribunal "ha dejado claro" la frase antes citada, no hemos encontrado precedente alguno que lo apoye.

adjudicación de los casos que nos ocupan, pues solo enuncia una norma procesal que provee a las partes una oportunidad adecuada para litigar su caso ante el foro judicial.[42]

### III.

Por los fundamentos antes expuestos, nos vemos obligados a disentir del dictamen de inconstitucionalidad que emite una mayoría de este Foro. Concurrimos con que la envergadura de los intereses involucrados en los pleitos ante el Tribunal de Primera Instancia amerita que estos sean resueltos de manera ponderada y diligente. Indudablemente, dicho foro está capacitado para recibir y aquilatar la evidencia necesaria para atender efectivamente los reclamos de las partes demandantes. Además, estamos convencidos de que casos como estos requieren un expediente judicial completo para resolverlos de forma adecuada y fundamentada. Domínguez Castro v. E.L.A., 187 D.P.R. 1, 101 (2010) (Op. disidente Hernández Denton, J.).

No obstante, la decisión que hoy emite una mayoría de este Tribunal hiere nuestro ordenamiento constitucional mediante una intervención inoportuna y errada que contraviene los principios básicos de justiciabilidad. La única controversia que esta Curia debe atender es si procede la certificación de los casos pendientes ante el foro primario. Dado que se denegaron las solicitudes de certificación, todo análisis ulterior es impropio. En virtud de la doctrina de autolimitación judicial, no

---

[42] Debemos resaltar que el proyecto que se convirtió en la Ley Núm. 18 fue radicado meses antes que el proyecto que se convirtió en la Ley Núm. 3 sobre el sistema de retiro.

procede abordar la constitucionalidad de la Ley Núm. 18; mucho menos, declarar inconstitucional la totalidad de los Arts. 1 y 2 del estatuto, los cuales incluyen múltiples asuntos que en nada se relacionan con los recursos de epígrafe.

El decreto de inconstitucionalidad también es incorrecto en derecho pues la Asamblea Legislativa tiene la facultad para modificar la competencia de este Tribunal. Al negarse a reconocer esta facultad, una mayoría de este Foro viola la doctrina de separación de poderes y usurpa una función constitucional inherente de la Rama Legislativa. Por otro lado, en los casos ante nuestra consideración no se configura una interferencia indebida de la Legislatura con la función judicial, según la doctrina reiterada recientemente en Clases A, B y C v. PRTC, *supra*. La aprobación de la Ley Núm. 18 es producto de la facultad concedida constitucional y exclusivamente al Poder Legislativo para modificar la competencia del Tribunal Supremo.

En cuanto al pretexto que el raciocinio mayoritario utiliza para ignorar lo anterior, insistimos en que este estatuto no frustra el acceso a la justicia, contrario a lo sucedido en los casos recientes Lozada Sánchez v. JCA, 184 D.P.R. 898 (2012), y Fund. Surfrider y otros v. A.R.Pe., 178 D.P.R. 563 (2010).[43] En ellos, una mayoría de este

---

[43] Esa mayoría olvida que el verdadero acceso a la justicia no equivale necesariamente a un paso directo al foro de última instancia, sino que se garantiza de formas diversas. Por ejemplo, brindando oportunidad a toda persona de comparecer a los tribunales para reclamar sus derechos y a

Tribunal cerró las puertas de todo el sistema judicial a miles de ciudadanos. Por el contrario, en los casos ante nuestra consideración, la Ley Núm. 18 asegura que las causas sean atendidas adecuada y oportunamente en los foros designados  mediante el recurso correspondiente.

Hoy, una mayoría de los miembros del Tribunal Supremo de nuestro País desnaturaliza el concepto de acceso a la justicia para transgredir y tronchar las facultades de la Asamblea Legislativa en una demostración insospechada de poder y de imprudencia judicial. Sin duda, esta actuación resta legitimidad al poder judicial en nuestro sistema de Gobierno. **Lamentablemente, el flujo de la marea continúa erosionando los pilares constitucionales que dan firmeza a nuestro ordenamiento jurídico y nuestro sistema democrático de Gobierno. Disentimos de este proceder.**

Federico Hernández Denton
Juez Presidente

---

que sus conflictos sean resueltos adecuada y oportunamente. También, educando a la ciudadanía sobre los procesos judiciales y asegurando que tengan representación legal competente. A su vez, todo esto requiere interpretar las leyes conforme a los principios de igualdad y equidad. Gracias al carácter unificado de nuestro sistema judicial, nuestro foro no es el único con el dominio de impartir justicia y asegurar su acceso a todos y todas. Los jueces y las juezas, incluyendo los de tribunales de menor jerarquía, cumplimos con este deber.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| María del C. Alvarado Pachecho y otros<br>            Peticionarios<br><br>                       v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br>            Recurridos | |
| Monsita Denise Otero Ruiz y otros<br>            Peticionarios<br><br>                       v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br>            Recurridos | CT-2013-0005<br>CT-2013-0006<br>CT-2013-0007 |
| Víctor A. Trinidad Hernández y otros<br>            Peticionarios<br><br>                       v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br>            Recurridos | |

Voto particular disidente emitido por la Jueza Asociada señora Fiol Matta

En San Juan, Puerto Rico, a 11 de junio de 2013.

Los votos emitidos por los jueces y las juezas de este Tribunal coinciden en reconocer que la jurisdicción es la autoridad para considerar controversias mientras que la

competencia es la forma en que se <u>canaliza el ejercicio de</u> <u>la jurisdicción</u> dentro de nuestro sistema de tribunales. Correctamente expresan también que la Legislatura tiene la potestad de determinar la competencia de los tribunales, pero no puede impedir que el Tribunal Supremo sea el juzgador <u>en última instancia</u> de todos los casos judiciales.[44]

Sin embargo, al interpretar esos puntos en relación con la Ley 18-2013, la Resolución del Tribunal y algunos votos particulares confunden los conceptos.[45] Contrario a lo que afirma la Resolución, la Ley 18 no trastoca el esquema constitucional porque la Legislatura hizo precisamente lo que tiene permitido hacer: <u>canalizó el</u> <u>ejercicio de la jurisdicción</u>. Ejerciendo el poder que la Constitución le delegó, la Legislatura determinó la competencia de los foros de instancia y apelativos, para que sea el Tribunal de Primera Instancia el que considere el caso en primera instancia, sin privar al Tribunal Supremo de poder revisar la determinación del foro inferior <u>en última instancia</u> y permitiendo omitir la intervención

---

[44] Resolución del Tribunal, págs. 16-19; Voto particular disidente del Juez Presidente Hernández Denton, págs. 12-15; Voto particular disidente de la Juez Asociada Rodríguez Rodríguez, págs. 10-23; Voto particular de conformidad del Juez Asociado Rivera García, págs. 3-4; Voto particular del Juez Asociado Estrella Martínez, págs. 6-10 y 14-15.

[45] *Véanse* los votos de los jueces asociados Rivera García y Estrella Martínez.

del foro apelativo intermedio para proveer una solución final más pronta.[46]

Es cierto que en caso de gran urgencia los tribunales tienen que actuar de manera rápida y eficaz para que las controversias no se tornen académicas, pero esa tarea le toca al tribunal que tenga autoridad para ver el caso. La necesidad de urgencia, de por sí, no es suficiente para concederle al foro de última instancia la autoridad para ver un caso en primera instancia. En los recursos ante nuestra consideración, es al Tribunal de Primera Instancia al que le corresponde evaluar la controversia y proveer remedios interdictales, si proceden para evitar un daño irreparable.[47] Después de que el foro de instancia haga sus determinaciones en el caso, las partes podrán utilizar el recurso de certificación para solicitar revisión al Tribunal Supremo.

La decisión de una mayoría de este Tribunal de declarar inconstitucionales los artículos 1 y 2 de la Ley

---

[46] Limitar la intervención del Tribunal de Apelaciones es razonable porque ese tribunal tiene, a grandes rasgos y respecto a los casos, la misma función revisora del Tribunal Supremo. Esto es muy diferente a limitar la intervención del Tribunal de Primera Instancia, que tiene la función distinta y esencial de recibir la prueba y hacer determinaciones de hechos, algo que los dos foros apelativos –el Tribunal Supremo y el Tribunal de Apelaciones- no pueden hacer.

[47] Irónicamente, la intervención de este Tribunal en este momento ha tenido el efecto contrario al que se persigue, pues ha retrasado la evaluación de las solicitudes de remedios expeditos por el foro de instancia. En caso de que el Tribunal de Primera Instancia no conceda un remedio provisional que las partes consideren necesario, estas podrán pedir revisión urgente al Tribunal de Apelaciones y luego al Tribunal Supremo mediante *certiorari*. Reglas 52.1 y 52.2 (b) de Procedimiento Civil.

18, es, en primer lugar, innecesaria, pues, de todos modos, se deniegan las peticiones y se devuelven los casos al Tribunal de Primera Instancia, el foro competente según la Ley 18. Así, la decisión ignora las normas de autolimitación judicial que recomiendan abstenerse de juzgar sobre la constitucionalidad de una ley cuando existen otros medios para resolver el caso y cuando la situación presentada no es la más adecuada para hacer el análisis constitucional, doctrina que se ha puesto en práctica consistentemente en nuestra jurisdicción desde 1958.[48] En segundo lugar, declarar la inconstitucionalidad de dichas disposiciones, a base de que no le permiten al Tribunal Supremo decidir controversias urgentes en primera instancia mediante el recurso de certificación intrajurisdiccional, como expliqué anteriormente, es una determinación profundamente errada. La Ley 18 altera la competencia del Tribunal Supremo y la Asamblea Legislativa tiene la potestad para así hacerlo. Además, las disposiciones que la Resolución declara inconstitucionales establecen normas procesales para otros recursos, además de los de certificación intrajurisdiccional, que no están en controversia. Asimismo, muchos de los fundamentos que aparecen en la Resolución aluden a teorías especulativas en vez de a la intención legislativa de la Ley 18. Al citar las expresiones del presidente del Senado en su presentación del proyecto de ley en la Asamblea Legislativa y exponer que estas son la fuente de "los verdaderos

_____

[48] E.L.A. v. Aguayo, 80 D.P.R. 552, 595-600 (1958).

propósitos" de la medida presentada en febrero de 2013, una mayoría de este Tribunal se enfoca en analizar las motivaciones políticas de los legisladores, algo muy distinto al análisis jurídico del texto y la intención de la ley.[49] Por eso disiento del análisis y las expresiones al respecto contenidas en la Resolución del Tribunal.[50]

Por otro lado y no obstante mi conformidad con declarar sin lugar en esta etapa de los procedimientos los tres recursos de certificación, entiendo que los empleados y las empleadas presentan una controversia de gran interés público que merece consideración seria, pero expedita. El Tribunal de Primera Instancia tiene la potestad de tomar medidas para agilizar el manejo del caso y sancionar a las partes que obstaculicen un trámite acelerado. Además, nada

---

[49] Resolución, págs. 12-13. La mayoría de este Tribunal debió haberse abstenido de este tipo de análisis político y debió haber denegado atender las certificaciones desde el primer momento, permitiendo así más tiempo al foro primario competente para evaluar los planteamientos de las partes, evitando el resultado desacertado de declarar inconstitucional una ley a través de una Resolución en la que no se expiden los recursos presentados ni se atienden las controversias medulares de los casos.

[50] Me uno al Voto particular disidente del Juez Presidente Hernández Denton, que analiza con más detalle las razones por las cuales la declaración de inconstitucionalidad de la Resolución es equivocada. Sobre los puntos de ese Voto, destaco la distinción entre este caso y el de Colón Cortés v. Pesquera, 150 D.P.R. 724, 754-765 (2000). En Colón Cortés, pautamos que una ley no puede aprobarse para afectar el resultado de un pleito particular, no que cualquier ley que pueda afectar un caso futuro puede declararse inválida por infringir el principio de separación de poderes. En ese sentido, las expresiones legislativas que sirven para auscultar el propósito de un proyecto de ley son las que se refieren al efecto que se busca que la ley tenga en un caso particular, no a las ideas políticas que se consideraron al legislar. Véase también el acertado análisis sobre la distinción entre estos casos en el Voto particular disidente de la Juez Asociada Rodríguez Rodríguez, págs. 24-34.

impide que este Tribunal le ordene al foro de instancia resolver los recursos en el menor tiempo posible.

Por todo lo anterior, estoy conforme con declarar sin lugar los recursos de certificación consolidados en esta etapa de los procedimientos porque la Ley 18-2013, vigente desde el pasado 15 de mayo, determina que el foro competente para atender los casos es el Tribunal de Primera Instancia[51] y siempre he favorecido que el Tribunal Supremo, como foro apelativo, cuente con un expediente completo procedente del foro de instancia antes de intervenir en un caso.[52]

Liana Fiol Matta
Jueza Asociada

---

[51] Arts. 1 y 2, Ley Núm. 18-2013, que enmiendan los artículos 3.002 (e) y (f) de la Ley de la Judicatura de 2003 sobre la competencia del Tribunal Supremo y la Regla 52.2 (d) de Procedimiento Civil sobre la presentación de recursos de certificación ante el Tribunal Supremo.

[52] *Véase, por ejemplo,* Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 112-123 (2010) (Opinión disidente, Jueza Asociada Fiol Matta).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| María del C. Alvarado Pacheco y Otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico y Otros<br><br>    Recurridos<br>_____<br><br>Monsita Denise Otero Ruiz y Otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico y Otros<br><br>    Recurridos<br>_____<br><br>Víctor A. Trinidad Hernández y Otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico y Otros<br><br>    Recurridos | CT-2013-0005<br>CT-2013-0006<br>CT-2013-0007 |

Voto particular disidente emitido por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 11 de junio de 2013

                  Cuando lo que importa es el poder por el poder mismo, eventualmente se tendrá que recurrir a la coacción para conservarlo. Y la coacción cruda a la larga genera mayor erosión de la legitimidad.

> Ello conduce inevitablemente a una gran soledad. La soledad del poder a secas.[53]

La controversia planteada en este recurso de certificación se limita a definir si, a tenor con lo dispuesto en la Ley Núm. 18 de 15 de mayo de 2013, que enmendó la Ley de la Judicatura de 2003, este Tribunal posee competencia para atender el recurso de certificación presentado. La respuesta es sencilla: **NO**. Sin embargo, la mayoría, ignorando la letra precisa de la ley y la reconocida delegación constitucional a la Asamblea Legislativa para determinar la **competencia** de este Tribunal, tuerce el texto de la ley que interpreta, desnaturaliza nuestros previos precedentes y ofusca y corrompe el contenido de nuestra Constitución para crear un espejismo de juridicidad sobre el cual asentar su Resolución.

El dictamen formulado, la inconstitucionalidad de la Ley Núm. 18, se hace emitiendo una Resolución y no una Opinión. La primera vez que ello ocurre en nuestra historia constitucional, pues como sabemos una Resolución emitida en un caso contencioso no genera precedente y sólo le aplica a las partes que se encuentran ante el Tribunal.[54] Lo intempestivo del dictamen queda por demás

---

[53] Efrén Rivera Ramos, *Poder sin legitimidad*, *en* Derecho al Derecho: Intersticios y grietas del poder judicial en Puerto Rico 68, 69 (Érika Fontánez Torres & Hiram Meléndez Juarbe eds., 2012).

[54] Cuestionable por demás la determinación de una mayoría de este Tribunal de declarar inconstitucional una ley por medio de una resolución. Este Tribunal ha sostenido reiteradamente que **sólo se establecen normas con cualidad de precedente mediante una opinión firmada o *per curiam*.**

manifiesto en el hecho de que en la Resolución en cuestión no se expidió el auto solicitado. Cabe preguntarse entonces: ¿Puede existir una controversia justiciable ante nuestra consideración cuando no hemos expedido el auto solicitado? ¿Podemos declarar inconstitucional una ley cuando no expedimos el auto discrecional? ¿Estamos ante una opinión consultiva? ¿Es la Resolución una declaración de inconstitucionalidad inoficiosa? ¿A quién le aplica? ¿Es este dictamen un precedente?

Con esta precipitada acción, la mayoría se abroga facultades constitucionales que no le corresponden y que pertenecen a la esfera de la Asamblea Legislativa. De esta manera se provoca un enfrentamiento constitucional no tan sólo a destiempo, sino innecesario y nocivo para el País.

---

*Delgado Ex parte*, 165 D.P.R. 170, 182 (2006); *Mayol v. Torres*, 164 D.P.R. 517, 546 (2005); *Díaz v. Colegio Nuestra Sra. del Pilar*, 123 D.P.R. 765, 777 (1989). En el caso de una sentencia, hemos sostenido que generalmente se utilizan para "resolver una controversia particular entre las partes litigantes, circunscrita, por lo tanto, a los hechos específicos de ese caso, o para disponer rápidamente del caso ante el gran número de casos que tiene que resolver". *Id.* Éstas sin embargo, algunos tratadistas consideran que pueden utilizarse como fuente persuasiva. R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico* 158 (2da ed. 1987). Las resoluciones, a pesar de ser decisiones de este Tribunal, tienen un uso limitado. Se limita éste a situaciones donde se declara no ha lugar a una solicitud de una parte, al establecimiento de las reglas de este Tribunal y al nombramiento de los miembros de las diferentes comisiones judiciales. En el día de hoy, sin expedir el caso ante nosotros, la mayoría del Tribunal **emite una opinión consultiva** respecto a la constitucionalidad de una ley, actuación fuera de nuestro delimitado poder judicial. *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).

Por otro lado, nos preocupa y consterna la intervención de varios miembros de este Tribunal en la determinación que se anuncia, habida cuenta que éstos expresaron públicamente su antipatía y oposición a la Ley Núm. 18, y expresaron mediante carta (que se hizo pública) ante el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Alejandro García Padilla, sus preocupaciones con la firma de la ley. Con esta actuación pública miembros de esta Curia adelantaron su criterio sobre un asunto que claramente llegaría a nuestra atención, minando de esta forma la imparcialidad de este Foro.

Todo ello no me deja otra alternativa que no sea disentir enérgicamente del errado y peligroso proceder de la mayoría este Tribunal.

## I

Por tratarse sobre la misma controversia, los tres casos de epígrafe fueron consolidados. A continuación presento un breve resumen de los hechos de cada uno de forma separada.[55]

## A

**CT-2013-5.** El pasado 8 de mayo de 2013 un grupo de empleados de la Oficina del Contralor de Puerto Rico presentó ante el Tribunal de Primera Instancia una petición de sentencia declaratoria e interdicto

---

[55] Por entender, según las razones que expondré más adelante, que en este momento este Tribunal carece de competencia para atender los reclamos en los méritos de los tres recursos ante nuestra consideración, no discutimos las alegaciones presentadas por los peticionarios referentes a la Ley Núm. 3 de 4 de abril de 2013 (Ley de Retiro).

preliminar y permanente para que se declarase inconstitucional ciertas disposiciones de la Ley Núm. 3 de 4 de abril de 2013.[56] El 9 de mayo de 2013 el Tribunal de Primera Instancia ordenó a la parte demandada a presentar su contestación a la demanda o presentar alguna petición dispositiva en o antes del 21 de mayo de 2013. De la misma manera, señaló vista para el 23 de mayo de 2013. Antes de que culminara la fecha límite otorgada a la parte demandada en este pleito para contestar la demanda o presentar alguna petición dispositiva, el 16 de mayo de 2013 la parte demandante presentó ante nosotros el recurso de certificación que hoy está ante nuestra consideración.

Una vez presentado el recurso de certificación, todos los demandados comparecieron sin someterse a la jurisdicción del Tribunal mediante mociones separadas solicitando la desestimación del recurso de certificación. Arguyen los demandados que el Tribunal carece de jurisdicción para atender la petición de certificación ya que éste no cumple con los requisitos aplicables a un auto de certificación intrajurisdiccional cuando el asunto está bajo la consideración del Tribunal de Primera Instancia. La parte peticionaria presentó su oposición a las mociones de desestimación y en esencia

---

[56] La Ley Núm. 3 de 4 de abril de 2013 es una medida legislativa enfocada en atender la actual crisis actuarial y déficit fiscal del Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado. Según su extensa exposición de motivos, se estima que el déficit actuarial del Sistema de Retiro consiste de aproximadamente $25,491 millones. Exposición de Motivos, Ley Núm. 3 de 4 de abril de 2013.

argumentó que debido al trámite legislativo de la Ley Núm. 18 de 15 de mayo de 2013, existen dudas sobre su fecha de efectividad con respecto al recurso presentado por éstos.

Por lo tanto, solicitaron al Tribunal que disponga de la controversia según la Regla 50 del Reglamento del Tribunal de Supremo y prescindamos de todo procedimiento específico en el mejor interés de todas las partes. La parte demandada presentó su Réplica a la oposición a la moción de desestimación argumentando que la Constitución del Estado Libre Asociado de Puerto Rico establece tanto los requisitos y las formalidades necesarias para que un proyecto pueda convertirse en ley y la vigencia de las mismas. Concluyen que dado el hecho de que el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Alejandro García Padilla firmó el P. del S. 367 luego de su aprobación por ambas cámaras legislativas el pasado 15 de mayo de 2013, no existe duda de la aplicabilidad y vigencia de la Ley Núm. 18 de 15 de mayo de 2013. Posteriormente la parte peticionaria presentó una dúplica a la réplica de la parte demandada, fundamentalmente bajo los mismos argumentos que en su oposición a la desestimación.

B

**CT-2013-6.** El pasado 20 de mayo de 2013 se presentó una solicitud de sentencia declaratoria, e interdicto provisional y permanente impugnando la validez constitucional de la Ley Núm. 3 de 4 de abril de 2013 por

parte de un grupo de empleados de la Oficina de Administración de Tribunales (OAT), de la Corporación del Fondo del Seguro del Estado, del Departamento de Justicia, del Departamento de Hacienda, del Departamento de Familia, del Departamento del Trabajo, de la Administración para el Sustento de Menores, del Departamento de Estado, de la Comisión Estatal de Elecciones, de la Administración de Desperdicios Sólidos, entre otras. El Tribunal de Primera Instancia celebró una vista el 23 de mayo de 2013 para evaluar la procedencia de los remedios extraordinarios solicitados. A la misma vez, el caso fue consolidado en el foro de instancia con otros dos casos que versan sobre el mismo asunto: *María del Carmen Alvarado Pacheco v. E.L.A.*, (KPE2013-2799) y *Víctor Trinidad Hernández v. E.L.A.*, (KPE2013-3050).

El pasado 31 de mayo de 2013 los peticionarios presentaron el recurso de certificación que hoy atendemos, solicitando nuestra intervención inmediata. El 3 de junio de 2013 las partes demandadas presentaron una Urgente moción de desestimación de la petición de certificación, alegando en esencia que no procede el perfeccionamiento del recurso según la Ley Núm. 18 de 15 de mayo de 2013.

C

**CT-2013-7.** El 21 de mayo de 2013 el Sr. Víctor H. Trinidad Hernández, junto a otros, presentó una petición de sentencia declaratoria e interdicto preliminar y permanente, al igual que en los otros dos casos consolidados, impugnando la constitucionalidad de la Ley Núm. 3 de 4 de abril de 2013. El 5 de junio de 2013 los peticionarios presentaron la solicitud de certificación que hoy atendemos, y posteriormente solicitó el trámite acelerado a su petición de certificación.

Luego de consolidar los recursos, hoy, una mayoría de este Tribunal proclama la inconstitucionalidad de los artículos 1 y 2 de la Ley Núm. 18 de 15 de mayo de 2013. Tanto la Resolución emitida por una mayoría de los miembros de este Tribunal como el Voto particular disidente emitido por el Juez Asociado señor Estrella Martínez pretenden justificar su determinación aduciendo, tal cual jerigonza, que la Ley Núm. 18 tenía como propósito impedir que este Tribunal descargara su función constitucional como tribunal de última instancia.

Arguye la mayoría que la actuación legislativa de aprobar la Ley Núm. 18 infringe los principios de separación de poderes al afectar ilegalmente la jurisdicción de este Tribunal. Según la Resolución y el Voto particular disidente del Juez Asociado señor Estrella Martínez, la Ley Núm. 18 permite que el Estado evada la revisión judicial, le otorga un poder de veto al Estado a cualquier solicitud de certificación intrajurisdiccional y limita la revisión de

determinaciones interlocutorias por tribunales inferiores. Esto, según la mayoría, transgrede el esquema constitucional de la Rama Judicial convirtiendo a los tribunales de inferior jerarquía en tribunales de última instancia. Además, sostienen que la verdadera intención de la Asamblea Legislativa al aprobar la Ley Núm. 18 se dirigía a maniatar a este Tribunal y limitar el acceso a la justicia.

El proceder de los jueces de la mayoría altera nuestra jurisprudencia, ignora el texto de la ley, tergiversa la Constitución y tiñe de bruma la imparcialidad de este Foro.

## II

Como se indicó, la controversia planteada ante este Foro se limita a determinar si luego de la aprobación de la Ley Núm. 18 de 15 de mayo de 2013, poseemos competencia para atender el recursos de certificación presentado por los y las demandantes. Sin embargo, ante la dúctil interpretación de una mayoría de este Tribunal del texto constitucional, conviene evaluar detenidamente las galimatías sobre los alegados vicios constitucionales de la Ley Núm. 18 de 15 de mayo de 2013. Comencemos repasando cuál es la estructura del Poder Judicial según delineado en la Constitución.

A

Como sabemos, el Artículo V de la Constitución establece la estructura del Poder Judicial en Puerto Rico. La Sección 2 de dicho Artículo establece un "sistema judicial unificado en lo concerniente a la jurisdicción, funcionamiento y administración" de los tribunales. La Constitución delega en la Asamblea Legislativa el poder "para crear y suprimir tribunales, con excepción del Tribunal Supremo", junto al poder para determinar "su competencia y organización". En lo que respecta a la competencia original del Tribunal Supremo, la única competencia de rango constitucional es la establecida para atender los casos de *hábeas corpus*. Si el Tribunal Supremo ha de tener competencia original adicional, corresponderá a la Asamblea Legislativa concederla mediante legislación. Const. P.R. Art. V, Sec. 5.

La facultad constitucional de la Asamblea Legislativa de determinar la competencia de los tribunales en nada es incompatible con el principio, también establecido en la Constitución, de un sistema judicial unificado como tampoco afecta el poder delegado al Tribunal Supremo de ser el tribunal de última instancia. Sostener lo contrario supondría que existe una cláusula constitucional que es inconstitucional o, que hay unas cláusulas en la Constitución que son más constitucionales que otras. A todas luces, ello es una incoherencia.

Así la Asamblea Legislativa es la encargada por disposición constitucional de canalizar el ejercicio de la jurisdicción de cada tribunal, es decir, establecer su

competencia. Claro está, reservándole al Tribunal Supremo la facultad de ser siempre el tribunal de última instancia. Debemos en este punto despejar la confusión creada por las expresiones de la Resolución emitida como la del Voto particular disidente, sobre los conceptos jurisdicción y competencia.

El concepto de jurisdicción consiste en el "poder o autoridad que ostenta un tribunal para decidir casos o controversias". *Peerless Oil v. Hermanos Pérez*, 186 D.P.R. 239, 249 (2012); Rodríguez v. Registrador, 75 D.P.R. 712 (1953). Etimológicamente, el término jurisdicción "procede del latín *juris-dico* o *juris decire* que. . .significan 'poder para decir o aclarar cuál es la ley". Miguel A. Velázquez Rivera, *Jurisdicción y Competencia de los Tribunales de Puerto Rico*, 48 Rev. Jur. U.P.R. 27, 29 (1979).

Distinto es el concepto de competencia, que valga aclarar **"no es sinónimo de jurisdicción"**. Rafael Hernández Colón, *Practica Jurídica de Puerto Rico Derecho Procesal Civil* 47 (5ta ed. 2010). El término competencia "no es otra cosa que la manera de ordenar; de canalizar adecuadamente el ejercicio de la autoridad o jurisdicción que la Constitución concedió al sistema unificado para adjudicar las controversias judiciales". Velázquez Rivera, *supra*, pág. 48. Así, por ejemplo, "cuando dos salas de un tribunal tienen autoridad legal o jurisdicción para entender en un mismo asunto, precisa

recurrir a criterios de competencia para canalizar el ejercicio de ese poder legal". *Id.* en la pág. 29.

Señala el profesor Miguel A. Velázquez Rivera que la "ausencia de. . .criterios [de competencia] o normas para guiar el ordenado ejercicio de jurisdicción nos llevaría inexorablemente a la anarquía". *Id.* Según el designio de nuestros constituyentes, corresponde al Poder Legislativo establecer los criterios de competencia para que haya un ordenado ejercicio de la jurisdicción. La jurisdicción, por tanto, se ejerce por medio de la distribución adecuada del trabajo judicial o competencia entre cada uno de los componentes del Tribunal General de Justicia. Hernández Colón, *supra*, pág. 47. Es decir, como bien expone el licenciado Hernández Colón, "[l]a concesión de jurisdicción que hace la Constitución..., se funcionaliza [sic] mediante la competencia". *Id.*

Al evaluar la interacción de ambos conceptos en nuestra Constitución, el profesor Velázquez Rivera señala que:

> Un análisis detenido del Artículo V...revela que, en lo concerniente a jurisdicción y competencia, el referido precepto establece cinco principios fundamentales; a saber: que la autoridad, el poder para resolver todas las controversias de naturaleza judicial que surjan en nuestro país, residirá en el Tribunal Supremo y en aquellos tribunales de justicia que se establezcan por ley; que dicha jurisdicción original para actuar en asuntos judiciales será común a todos dichos tribunales, puesto que la Ley Fundamental los convierte en parte integrante de un solo sistema judicial unificado; que el Tribunal Supremo será uno de jurisdicción general sobre todo pleito en su etapa apelativa; que, en lo que a jurisdicción original, o de primera instancia se refiere, el Tribunal Supremo tendrá jurisdicción general sobre todos los casos,

> incluyendo recursos de *Hábeas Corpus* y cualquier otro que la Asamblea Legislativa le encomiende por ley y, por último, que **la Legislatura estará facultada para canalizar la jurisdicción que a todos los tribunales concede este artículo determinando por ley su respectiva competencia y organización.**

Velázquez Rivera, *supra*, pág. 29.

En consecuencia, podemos colegir que si bien es cierto que por mandato constitucional de un sistema judicial unificado todos los tribunales tienen jurisdicción original para actuar sobre asuntos judiciales, es la Asamblea Legislativa la encargada de canalizar el ejercicio de esa autoridad o jurisdicción entre los tribunales. Éste fue el entendido de nuestros constituyentes. A esos efectos, el delegado señor Gutiérrez Franqui expresó elocuentemente lo siguiente:

> Separación de poderes es que cada rama del gobierno se ajuste a bregar con aquellos aspectos de la organización política que son de su incumbencia. Y la especificación de la jurisdicción de los tribunales ha sido generalmente reconocida como de la incumbencia de la Asamblea Legislativa y no del poder judicial.
> A pesar de eso lo cierto es que la proposición traída por la Comisión de la Rama Judicial establece ciertas limitaciones que no existen ahora en la Carta Orgánica para garantizar la jurisdicción apelativa y de última instancia del Tribunal Supremo. Aquí se dispone, claramente y en palabras que no dejan lugar a dudas, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia. Se dispone asimismo que en materia de jurisdicción del Tribunal Supremo y los demás tribunales de Puerto Rico constituirán un sistema integrado y **que solamente podrá intervenir la Asamblea Legislativa en cuestiones de competencia.**
> Eso quiere decir que está fuera del alcance de la Asamblea Legislativa de Puerto Rico la jurisdicción del Tribunal Supremo. Lo que está a su alcance es la competencia.

*Diario de Sesiones de la Convención Constituyente*, Tomo I, en las págs. 591-592 (énfasis suplido) (1961).

Asimismo, ante la presentación de enmiendas a la sección 5 del Artículo V, el delegado Gutiérrez Franqui aclaró lo siguiente:

> [L]os detalles [sobre la competencia] son pura y claramente de carácter legislativo y que si nosotros aceptásemos esa proposición, esa enmienda, lejos de estar garantizando legítimamente una independencia judicial lo que estaríamos haciendo es, en forma ilegítima, **arrancando poderes que son inherentes de la rama legislativa**. (Énfasis nuestro.)

*Id.*

Finalmente, éste concluye que la disposición constitucional "garantiza constitucionalmente aquellos aspectos jurisdiccionales que deben ser garantizados constitucionalmente como su jurisdicción general, **su condición de tribunal apelativo de última instancia**, y los derechos a expedir originalmente autos de *mandamus* y de *hábeas corpus*". *Id.*[57]

A raíz del mandato constitucional establecido de la Sección 2 del Artículo V, la Asamblea Legislativa, mediante la Ley Número 11 de 24 de julio de 1952, según enmendada, conocida como *Ley de la Judicatura del Estado Libre Asociado de Puerto Rico*, estableció "los criterios de competencia. . . para canalizar adecuadamente el ejercicio de jurisdicción que la Constitución depositó en el sistema judicial". Desde entonces, en múltiples ocasiones la Asamblea Legislativa ha ejercido su poder de determinar la competencia y organización de los tribunales sin que este

---

[57]Posteriormente, mediante enmienda en la Asamblea Constituyente se eliminó el auto de *mandamus* como uno de los recursos que el Tribunal tendría jurisdicción original. *Diario de Sesiones de la Convención Constituyente*, Tomo III, en las págs. 1650-1657 (1962) (énfasis suplido).

Foro mostrara objeción al poder delegado a la Asamblea Legislativa en controversias ante su consideración. *Véase* Comentarios con respecto al P. de la S. 367 de la Oficina de la Administración de los Tribunales, Comisión de lo Jurídico, Seguridad y Veteranos, Senado de Puerto Rico, 10 de abril de 2013.[58]

Por ejemplo, poco tiempo después de aprobada la Constitución de Puerto Rico, en *Rodríguez v. Registrador*, 75 D.P.R. 712 (1953), este Tribunal reconoció que la Asamblea Legislativa se reserva "la facultad de disponer por ley sobre la competencia de los tribunales incluyendo el lugar donde deben ventilarse los litigios". Asimismo, en *Petrovich v. Secretario de Hacienda*, 70 D.P.R. 250, 259 (1956), señalamos que:

> El Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico claramente reserva a la Asamblea Legislativa la facultad de determinar la autoridad o competencia de los tribunales, con la salvedad de que el Tribunal Supremo es 'el tribunal de última instancia en Puerto Rico' y además tiene autoridad para 'conocer en primera instancia de recursos de hábeas corpus y de aquellos otros recursos y causas que se determinen por ley'.

*Id.*

Contrario al claro precedente jurisprudencial y la merecida deferencia al Poder Legislativo de establecer la competencia de los tribunales, la mayoría de este Tribunal sostiene que en esta ocasión la eliminación del recurso de

---

[58] Por ejemplo, la Asamblea Legislativa ha variado la competencia de los tribunales en las siguientes legislaciones: Ley de la Judicatura de 1952, Ley Núm. 11 de 24 de julio de 1952, según enmendada; Ley de la Judicatura de Puerto Rico 1994, Ley Núm. 1 de 28 de julio de 1994, según enmendada; Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003, Ley Núm. 21 de 22 de Agosto de 2003, según enmendada.

certificación en casos pendientes ante el foro primario es inconstitucional. Sin embargo, en lo que atañe al recurso de certificación intrajurisdiccional, han existido diversos periodos de tiempo en los que ni este Tribunal ni las partes tenían a su haber la disponibilidad de este recurso en casos pendientes ante el Tribunal de Primera Instancia. *Véase* informe de OAT. De hecho, en ocasión anterior, el Juez Asociado señor Fuster Berlingieri, reconociendo la facultad de la Asamblea Legislativa de establecer la competencia de este Tribunal con respecto al recurso de certificación, señaló que la "[Ley de la Judicatura de Puerto Rico de 1994, según enmendada en 1995] nos privó de la autoridad para considerar con la premura que el asunto requiere recursos como el de autos, por lo que estamos impedidos de intervenir *en este momento* en este caso". *P.R.T. Co. v. H.I.E.Tel.*, 145 D.P.R. 833, 836 (1998) (Fuster Berlingieri, J.; Voto explicativo)(énfasis suplido).

Al así hacerlo, señaló además que este Foro "[n]o ten[ía] otra opción que cumplir con las leyes del país, por lo que no podemos atender *ahora* este asunto. **Muy mal ejemplo daríamos si obviáramos las restricciones legales que impiden nuestra intervención en este caso en este momento**". *Id.* Esto demuestra que la actuación de una mayoría del Tribunal en declarar inconstitucional los Artículos 1 y 2 de la Ley Núm. 18 no es más que expansión inapropiada de los poderes de la Rama Judicial.

Irónicamente, el límite a la competencia del Tribunal Supremo que hoy se declara inconstitucional fue precisamente el mismo límite que nuestros constituyentes establecieron en la Constitución. Parece ser, sin embargo, que la mayoría de este Tribunal, en su interés desmedido de ejercer el poder, no hayan encontrado un detente en los límites constitucionales del Poder Judicial. No es de extrañar que las contenciones mayoritarias sobre los alegados vicios constitucionales de la Ley Núm. 18 carezcan de fundamentos constitucionales y se circunscriban a la crítica sobre la sapiencia de la Asamblea Legislativa en determinar, precisamente, el cauce del ejercicio de jurisdicción de los tribunales.

A tenor con la discusión anterior, no queda la menor duda de que la Asamblea Legislativa es la rama de gobierno constitucionalmente facultada para canalizar la competencia y organización de los tribunales. Repasemos entonces las disposiciones estatutarias que hoy una mayoría este Tribunal convenientemente declara inconstitucional.

El Artículo 1 de Ley Núm. 18 enmienda el Artículo 3.002 de la Ley de la Judicatura el cual establece la competencia del Tribunal Supremo. En esencia, las enmiendas al Artículo 3.002 limitan la competencia original del Tribunal Supremo al límite establecido en nuestra Constitución, a saber, la competencia original para atender el recurso de *hábeas corpus*. El Artículo 2, por su parte, enmienda las disposiciones de las Regla 52.2 (d) de las de Procedimiento Civil sobre el recurso de certificación ante

el Tribunal Supremo para adecuarlas a las enmiendas a la Ley de la Judicatura. Ahora, con la nueva enmienda, la competencia del Tribunal Supremo para atender una certificación proveniente el Tribunal de Primera Instancia se circunscribe a aquellas instancias en que ambas partes, demandante y demandado, así lo soliciten. Por el contrario, una vez un caso esté ante el Tribunal de Apelaciones, cualquier parte está facultada para acudir en certificación ante este Foro. En ambos escenarios es este Tribunal quien tiene la última palabra sobre el recurso instado.

La mayoría del Tribunal y el Voto particular disidente emitido consideran que este esquema es inconstitucional porque le permite a una de las partes, al negar su anuencia a la presentación de un recurso de certificación intrajurisdiccional, determinar la jurisdicción del Tribunal Supremo, lo que a su vez interfiere con la facultad de este Tribunal ejercer su rol como tribunal de última instancia. Francamente, esta explicación se revela, más que nada, como un artilugio diseñado para alcanzar un objetivo predeterminado y no como un razonamiento con base jurídica.

Para llegar a esta conclusión, la mayoría obvia la facultad constitucional de la Asamblea Legislativa de canalizar adecuadamente el ejercicio de la jurisdicción de los tribunales, determinando cuál es la competencia de cada foro, incluyendo el Tribunal Supremo, según lo hemos reconocido en múltiples ocasiones. Igualmente ofuscan la

distinción entre el concepto de competencia y jurisdicción haciendo parecer que son una misma cosa. De ahí que se alegue que estas medidas limitan:

> [L]a jurisdicción de este Foro para emitir autos de *certiorari* con relación a decisiones interlocutorias del Tribunal de Apelaciones. . .[;] limitan la intervención de este Tribunal a decisiones interlocutorias del foro apelativo intermedio que denieguen mociones de carácter dispositivo, que versen sobre la admisibilidad de testigos de hechos o peritos esenciales, que involucren asuntos de privilegio evidenciario, descalificaciones de abogados, anotaciones de rebeldía o en casos de relaciones de familia.

Resolución del Tribunal, en la pág. 16.

Como se puede apreciar, todas estas alegadas intervenciones "sobre la jurisdicción" de este Tribunal a lo que se refieren es a la **competencia** de este Tribunal. Por más que se invoque la palabra jurisdicción sabemos que se trata de competencia, de la misma forma que sabíamos que el emperador no llevaba el precioso traje invisible que le había confeccionado su sastre, sino que iba desnudo.

Lo cierto es que aun cuando los Artículos 1 y 2 de la Ley Núm. 18 inciden sobre la competencia de este Tribunal, en nada afectan la jurisdicción de este Foro para que eventualmente descarguemos nuestra función de tribunal de última instancia. Cualquier determinación interlocutoria podrá ser revisada tan pronto los tribunales inferiores hayan culminado el trámite ordinario y hayan emitido una determinación final.

Por otro lado, la mayoría busca apoyo para su determinación invocando el principio de acceso a la justicia, al considerar que la Ley Núm. 18 incide sobre este valor. Dos comentarios sobre ésta aseveración:

primero, lo dicho va dirigido a cuestionar la sabiduría de la ley y la política pública que encarna. Como sabemos, le corresponde a la Asamblea Legislativa establecer la política pública sobre los distintos temas que se ventilan en el País. Igualmente, no le corresponde a este Tribunal entrar en consideraciones sobre la sabiduría de una ley. Segundo, para justipreciar la sinceridad de este señalamiento, debemos plantearnos cuál ha sido la trayectoria judicial de la mayoría en estos últimos años. Un somero repaso de la actuación judicial demuestra que, si algo, este Tribunal se ha caracterizado por cerrar las puertas de este Foro a los litigantes y por limitar los derechos ciudadanos: *Lozada Sánchez v. AEE*, 2012 T.S.P.R. 50 (niega acceso al Tribunal por parte de los vecinos colindantes a la construcción del Gasoducto por entender que los carecían de legitimación activa); *Asociación de Fotoperiodistas v. Rivera Schatz*, 180 D.P.R. 920 (2011)(deniega el acceso al Tribunal bajo la doctrina de academicidad); *Fundación Surfrider v. ARPE*, 180 D.P.R. 931 (2010)(deniega el acceso al Tribunal a los residentes colindantes de un proyecto de construcción por carecer de legitimación activa); *Junta de Planificación v. Cordero Badillo*, 177 D.P.R. 177 (2009)(niega la participación de partes interventoras en el procedimiento administrativo y abandona la figura de participante activo); *AAR Ex Parte*, 2013 T.S.P.R. 16 (deniegan la solicitud de adopción por parte de una de las mujeres de una pareja del mismo sexo y reconocen que la orientación sexual no es una categoría

protegida por la Constitución), *Mundo Ríos v. CEE*, 2012 T.S.P.R. 166 (niegan el derecho al voto a ciudadanos que aparecen en la lista de electores excluidos sin un debido proceso de ley); *Pantoja Oquendo v. Mun. de San Juan*, 182 D.P.R. 101 (2011) (se le niega la protección al derecho de libertad de expresión a un grupo de mujeres que alegaban que una ordenanza municipal interfería indebidamente con su derecho); *Pueblo v. Flores Flores*, 181 D.P.R. 225 (2011)(Sentencia)(deniega la protección bajo la Ley 54 a una mujer víctima de violencia doméstica por su pareja); *UPR v. Laborde,* 180 D.P.R. 253 (2010)(limita el derecho a la libertad de expresión de los estudiantes universitarios); *In re Solicitud para Aumentar el Número de Jueces en el Tribunal Supremo*, 180 D.P.R. 54 (2010); *Domínguez Castro v. ELA*, 179 D.P.R. 178 D.P.R. 1 (2010)(declara que los empleados públicos no poseen un derecho adquirido en sus puestos de carrera); *Suarez Cáceres v. C.E.E.*, 176 D.P.R. 31 (2009)(deniega el derecho a que el voto en blanco de un ciudadano sea contabilizado).

La mayoría además indica que la Ley Núm. 18 le concede al Estado un poder de veto ante la solicitud de un auto de certificación intrajurisdiccional, al exigir la anuencia de ambas partes en el litigio cuando se presenta el recurso en un caso ante la consideración del Tribunal de Primera Instancia. Esto, según la mayoría, permite que el Estado determine la jurisdicción del Tribunal. Nuevamente, la lógica del argumento se me escapa.

En primer lugar, nuevamente observamos una confusión latente con los conceptos de jurisdicción y competencia por parte de la mayoría. El requisito de anuencia de ambas partes al presentar el recurso de certificación intrajurisdiccional no presenta vicios de tratamiento desigual ya que no considera quiénes son las partes del litigio. Para poder garantizar un procedimiento judicial equitativo a todas las partes en un litigio, éste debe ser de aplicación general. Tan es así, que en una de las limitadas excepciones en las que se toma en consideración que el Estado es parte en el litigio, la extensión en los términos para contestar alegaciones, le es aplicable a todas las partes en el pleito. Regla 10.1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. V R. 10.1. Fuera de estas excepciones, el Estado, cuando forma parte de un procedimiento judicial se le considera como un litigante cualquiera, y por lo tanto podrá beneficiarse como afectarse por los requisitos y condiciones que establezcan las Reglas de Procedimiento Civil.

La determinación de la Asamblea Legislativa de requerir el consentimiento de ambas partes para presentar un recurso de certificación intrajurisdiccional de un caso proveniente del Tribunal de Primera Instancia, como se puede apreciar del texto de la ley, le aplica tanto al litigante privado como al Estado. El requisito establecido no supone un poder de veto unilateral al Estado en todos sus procedimientos, supone un requisito prudencial para

**todos** los casos independientemente de quienes sean las partes.

La mayoría de este Tribunal llama anómalo el "que una de las partes, con tan solo negar su anuencia, tenga el poder de determinar si existe jurisdicción del Tribunal Supremo" en el auto de certificación intrajurisdiccional. Primero, llamamos la atención al uso del concepto jurisdicción cuando se trata de competencia. Segundo, esta súbita preocupación de la mayoría de este Tribunal apunta a un desconocimiento sobre los requisitos y normas de procedimientos de nuestro ordenamiento. El requisito de consentimiento de ambas partes ha sido reconocido tanto por la Asamblea Legislativa como por este Tribunal, particularmente en cuestiones de competencia. *Véase* R. 3.2 de las de Procedimiento Civil, 32 L.P.R.A Ap. V R. 3.2. A modo de ejemplo, en *Lemar S.E. v. Vargas Rosado*, 130 D.P.R. 203, 207 (1992), específicamente señalamos que "[l]a competencia, por su naturaleza, puede obviarse si concurren el acuerdo de las partes y la anuencia del juez". Este requisito, sin embargo, no ha levantado suspicacia alguna de los miembros de la mayoría. ¿Es inconstitucional permitir que el Estado consienta, al igual que cualquier otro litigante, la competencia de un Tribunal? Nuevamente, la mayoría recurre a argumentos en el vacío para llegar a su determinación preconcebida sobre la constitucionalidad de la Ley Núm. 18.

En vista de que entendemos que la Asamblea Legislativa actuó conforme a los poderes delegados por nuestra

Constitución, veamos si las actuaciones de la legislatura iban dirigidas a afectar la controversia ante nuestra consideración, otro de los argumentos de la mayoría.

B

La Resolución del Tribunal concluye que la Ley Núm. 18 tiene la intención de atacar determinaciones de este Tribunal y dilatar el caso de empleados gubernamentales que impugnen la constitucionalidad de la Ley Núm. 3 con respecto al sistema de retiro del Estado Libre Asociado de Puerto Rico. En otras palabras, la mayoría busca encajar la controversia ante nosotros a los hechos ocurridos en *Colón Cortés v. Pesquera II*, 150 D.P.R. 724 (2000). Sin embargo, el análisis llevado a cabo por éstos para llegar a esa conclusión tergiversa la jurisprudencia de este Tribunal en cuanto a la invasión ilegal del campo judicial por el poder legislativo. Ciertamente, "la autoridad para interpretar la Constitución y las leyes del país reside exclusivamente en la Rama Judicial", *Santa Aponte v. Ferré Aguayo*, 105 D.P.R. 670, 671 (1977), y esto incluye la determinación de qué facultad le corresponde a una u otra Rama. *Id.*

En *Colón Cortés II,* resolvimos que la actuación legislativa que infringe el principio de separación de poderes es aquella en la que la legislación promulgada tiene "la intención clara y específica [de] **afectar el resultado de un pleito particular**". *Colón Cortés II v. Pesquera,* 150 D.P.R. 724, 764 (2000). A tales fines, en *Colón Cortés II* nuestros señalamientos iban dirigidos a la

actuación de la Asamblea Legislativa de **"revoca[r] acciones tomadas por este Foro"**. *Id.*(énfasis suplido).  Esa fue la intención de la Asamblea Legislativa al aprobar dos leyes: La Ley Núm. 323 de 6 de noviembre de 1999 y la Ley Núm. 324 de 6 de noviembre de 1999, apenas un mes luego de que este Tribunal emitiera una resolución en un caso pendiente.[59]

No hay más que estudiar la discusión en el pleno de la Cámara de Representantes para captar la intención específica de los legisladores de cercenar el poder de revisión judicial de este Foro revocando  en los méritos el dictamen emitido por este Tribunal.[60]

---

[59] *Véase Colón Cortés v. Pesquera II*, 150 D.P.R. en las págs. 747-748.
[60] Las expresiones del Representante Aníbal Vegas Borges son sólo un ejemplo:

> Es importante, señor Presidente, que tengamos que establecer claramente, y que no se puede perder de nuestro punto de vista, de que en todos estos procedimientos se requiere una DIA, que es una Declaración de Impacto Ambiental.  Eso es importante.  Aquí la Asamblea Legislativa no está diciendo que no se va a hacer una Declaración de Impacto Ambiental.  Dentro de las facultades constitucionales que tiene la Asamblea Legislativa está el velar por el ambiente de Puerto Rico y la salud.  Y nosotros, mediante un procedimiento que se establece, velamos por ese derecho constitucional de cada uno de los ciudadanos.
> El municipio, luego de haberse decretado la Declaración de Impacto Ambiental, el Municipio de San Juan acude ante el Tribunal Apelativo y le solicita al Tribunal Apelativo que paralice la obra del Trío. **El Apelativo no procede a paralizar esa obra, el Municipio de San Juan acude ante el Tribunal Supremo, y el Tribunal Supremo determina que el Apelativo tiene que resolver.**
> Fíjese, señor Presidente, que el Apelativo resuelve esta controversia.  El Apelativo pasa juicio sobre la Declaración de Impacto Ambiental y dice que la Declaración de Impacto Ambiental cumple con todos los requisitos en el desarrollo

del complejo que se va a llevar en el complejo de La Concha, mejor conocido como El Condado Beach Resort.

**Se acude al Tribunal Supremo sobre esa determinación, y el Tribunal Supremo en esa determinación interpreta que los procedimientos, específicamente que tienen que ver con la DIA**, es un procedimiento cuasi sui generis, como si fuera un procedimiento cuasi judicial.  Y eso es lo que nosotros queremos dejar claro en la tarde de hoy, el determinar que eso no es un procedimiento cuasi judicial, eso es un procedimiento que se hace... el mero hecho de que se apruebe una Declaración de Impacto Ambiental de por sí no obliga a las agencias a otorgar ese permiso.  Puede que exista una Declaración de Impacto Ambiental favorable, y la agencia del Gobierno rechace el permiso que ante su consideración tiene.

**¿Qué hace el Tribunal Supremo?**  El Tribunal Supremo interpreta la Ley de Procedimiento Administrativo Uniforme y también interpreta la Ley que aprobamos aquí el año pasado, en la Cámara de Representantes, que tiene que ver específicamente con la Ley Número 295, donde establecimos un procedimiento informal para la Declaración de Impacto Ambiental.

El Tribunal Supremo dice, mire, "La Junta de Calidad Ambiental tiene que hacer una determinación de hecho y conclusiones de derecho, para revisar entonces nosotros en el foro del Tribunal Supremo."  Sin embargo, es importante traer a colación en la tarde de hoy, señor Presidente, que por primera vez, y en la disidencia, en esta disidente que está escrita por Negrón, también por el Juez Rebollo y el Juez Baltazar (sic), aunque Baltazar (sic) no emitió una opinión, sí su decisión era que favorecía o estaba en una opinión disidente.  Mire una cosa sencilla, señor Presidente, dice la opinión disidente, que por primera vez este Tribunal Supremo está exigiendo para una lectura Declaración de Impacto Ambiental, que se haga una determinación de hechos y conclusiones de derecho.  Que en el caso de Misión Industrial, que tuvieron ante su consideración, allí cuando paralizaron el Superacueducto no necesitaron que la Junta de Calidad Ambiental, en su Declaración de Impacto Ambiental hiciera una declaración de determinación de hechos y conclusiones de derecho.  Fueron al expediente.

....

Ahora, señor Presidente, **nosotros estamos claros en que queremos que si ha habido un error juicioso por parte del Tribunal Supremo en**

En ese caso, para determinar la intención de la Asamblea Legislativa evaluamos tanto los informes rendidos en las comisiones legislativas, como la discusión en el pleno de ambas cámaras, sin pecar de ingenuidad.[61] *Id.* Pasemos a considerar en este momento el trámite de aprobación de la Ley Núm. 18 para ver si, en efecto, se asemeja a lo que ocurrió en *Colón Cortés II*, 150 D.P.R. 724 (2000).

---

**interpretar cuál es el debido procedimiento de ley y cuál es la ley**, lo estamos dejando claro en la tarde de hoy con el Proyecto de la Cámara 2904.
Muchas gracias, señor Presidente.
Decimotercera Asamblea Legislativa, Diario de Sesiones de la Cámara de Representantes, 3 de noviembre de 1999, Discusión de los P. de la C. 2904 y 2905, Páginas 40-67 (énfasis suplido).

[61] Al describir los sucesos que desembocaron en la controversia en *Colón Cortes II,* el profesor Luis M Villaronga advierte que:

Debe recordarse que quienes acudieron al Tribunal Supremo en *Colón Cortes I* fueron la [Autoridad de Carreteras y Transportación] y la [Junta de Calidad Ambiental] y que una vez que obtuvieron un resultado desfavorable que las obligaba a corregir numerosas deficiencias del procedimiento de la [Declaración de Impacto Ambiental], optaron por no cumplir con los señalamientos del Tribunal. Antes bien, se pusieron de acuerdo para manipular el proceso administrativo para obtener un resultado distinto. Más aun, confrontadas con el caso de *mandamus* pendiente en el Tribunal en *Colón Cortés II* y la orden de paralización del proyecto, logran una legislación de encargo dirigida a impedirle al Tribunal seguir adelante con el caso para hacer valer lo que ya había resuelto en *Colón Cortés I*.

Luis M. Villaronga, *Derecho Constitucional*, 70 Rev. Jur. U.P.R. 353, 374-375 (2001).

El P. del S. 367 de la autoría del Presidente del Senado fue presentado el pasado 8 de febrero de 2013. Huelga señalar, que en ese momento no existía legislación sobre el sistema de retiro de los empleados del Estado Libre Asociado y mucho menos el caso que hoy se encuentra ante nuestra consideración. Así las cosas, al día siguiente de la presentación de la medida se llevó a cabo su primera lectura en el pleno del Senado, y como ocurre con la mayoría de los proyectos, estuvo sin progreso legislativo por un periodo corto de tiempo. Eventualmente fue evaluado por la Comisión de lo Jurídico, Seguridad y Veteranos del Senado, el cual recomendó su aprobación con ciertas enmiendas. El 13 de mayo de 2013 el pleno del Senado aprobó la medida cuyo texto fue enviado a la Cámara de Representantes. Visto que ya una de las cámaras legislativas había aprobado el proyecto, esta Cámara inició prontamente su proceso de evaluación de la medida.

El 14 mayo de 2013 la Comisión de lo Jurídico de la Cámara de Representantes presentó su informe positivo, y la medida fue aprobada por el pleno de la Cámara ese mismo día. Al otro día, el 15 de mayo de 2013, el Hon. Alejandro García Padilla, al estamparle su firma, completó el trámite constitucional necesario para que el proyecto se convirtiese en la Ley Núm. 18 de 15 de mayo de 2013. La mayoría en este caso asume que este procedimiento se llevó a cabo debido a una demanda presentada ante el Tribunal de Primera Instancia que cuestiona la constitucionalidad de la Ley Núm. 3 de 4 de abril de 2013. Se nos hace difícil

validar el salto conceptual de la mayoría para llegar a esta conclusión.

En primer lugar, y como apuntamos, el P. del S. 367 se presentó como proyecto de ley el 8 de febrero de 2013, mientras que el proyecto legislativo que eventualmente se convirtió en la Ley Núm. 3 de 4 de abril de 2013 ("Ley de Retiro"), ley que impugnan los peticionarios en este recurso de certificación, fue presentado por el Presidente de la Cámara de Representantes, Hon. Jaime Perelló, el 1 de marzo de 2013. Debido a la marcada diferencia de fechas, me parece improbable que el autor de la medida P. del S. 367, por un lado, vislumbrara las especificidades de la ley en controversia; por otro, anticipara específicamente el pleito ante nuestra consideración. La conclusión razonable y sin ánimo prevenido es que el P. del S. 367 fue diseñado para que aplicara a todos los trámites judiciales y no con este pleito en particular en mente. Tal intención va claramente dirigida a ejercer su facultad constitucional de regular la competencia de este Tribunal según la política pública que estime conveniente la Asamblea Legislativa.

Lo cierto es que para que las elucubraciones de la mayoría tuviesen algún viso de coherencia interna habría que suponer que, al presentarse el P. del S. 367, se sabía que se iba a aprobar una ley regulando el sistema del retiro de los empleados del gobierno, que esa ley sería del desagrado de los empleados públicos por lo que la impugnarían, que se sabía que ese caso llegaría al

Tribunal Supremo y **que se sabía que este Foro resolvería en contra del gobierno declarando la ley, cuyo contenido no se conocía, inconstitucional.**

En segundo lugar, la Ley Núm. 18 de 15 de mayo de 2013, al enmendar varias disposiciones de aspecto procesal de la Ley de la Judicatura de 2003, de las Reglas de Procedimiento Civil y de la Ley de Permisos, no afecta ningún caso en particular y mucho menos hace alguna determinación de hecho o de derecho de casos pendientes. Recordemos que la actuación legislativa que interfiere de manera impermisible con el Poder Judicial es aquella que deja sin efecto, modifica o menoscaba una sentencia por un tribunal con jurisdicción, *P.R. Tobacco Corp. v. Buscaglia, Tes.*, 62 D.P.R. 811 (1944); que permita que una sentencia quede sujeta la acción posterior por la Asamblea Legislativa o que elimine la posibilidad de este Tribunal de revisar una sentencia, tal y como le corresponde a la Rama Judicial. *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64 (1998).

De la misma manera, al evaluar la discusión llevada a cabo por el pleno del Senado el día de la aprobación del P. del S. 367, no hay indicios de que las intención legislativa estuviera dirigida a afectar un caso en particular. La preocupación que refleja la discusión en el Senado de Puerto Rico no es en cuanto a que se impugne ley alguna, sino al hecho que el Tribunal ha limitado el derecho a litigantes a tener su día en corte, certificando recursos sin que éstos hayan generado algún expediente con

el cual se pueda hacer un juicio adecuado. Expuso el
senador Bhatia:

> Este Tribunal Supremo, lamentablemente,
> lamentablemente ha tomado como norte el **usurpar,
> el usurpar el derecho de las partes de tener un
> juicio.** Simplemente toman el caso y deciden como
> ellos quieren, como simplemente un grupo de...si
> son los jueces del Supremo. **Pero hay que tener
> una oportunidad para que se desfile la prueba.
> Hay que tener una oportunidad para ver la prueba.
> Hay que tener la oportunidad para juzgar los
> eventos y ver la veracidad de los eventos que
> ocurren.** Si fuera una excepción lo que ha
> ocurrido en el Tribunal Supremo, yo entiendo, yo
> entiendo que a lo mejor deberíamos repensar todo
> esto. Pero es que se ha convertido en la norma.
> **Ahora la norma es que sin permitir que las partes
> puedan desfilar pruebas, simplemente con una
> llamada, con una expresión, con una solicitud se
> llevan los casos en medio. De hecho, señor
> Presidente, en medio de estar empezando a
> desfilar prueba, se llevan los casos.** Y qué, qué
> coincidencia que se llevan los casos, se llevan
> los casos que afectan al Partido Nuevo
> Progresista.
> . . . .
> Señor Presidente, como ha quedado enmendado este
> Proyecto, las partes pueden solicitar ir al
> Tribunal Supremo, por acuerdo de ambas partes si
> no hay un asunto que no haya [que] desfilar
> prueba pueden ir a una disputa sobre Derecho,
> pueden ir directamente al Supremo. El recurso de
> hábeas corpus pueden ir directamente al Supremo.
> Las partes todavía pueden lograr ese acceso. Pero
> de ahora en adelante, de ahora en adelante, se le
> quita la facultad ésta al Tribunal Supremo porque
> han abusado, han abusado, esta facultad que se
> les dio y han cogido de rehén a las partes en
> estos conflictos que hay en Puerto Rico.

Diario de Sesiones, Senado de Puerto Rico, Vol. LXI,
Núm. 31, págs. 3655-3657 (énfasis suplido).[62]

Estas expresiones del Senador Bhatia no muestran la
intención de afectar un caso en particular, y mucho menos
demuestran que el P. del S. 367 **busque revocar alguna**

---

[62] Si éstas expresiones para la mayoría del Tribunal
constituyen *res ipsa loquitur*, ¿qué podremos pensar de las
expresiones del Portavoz de la minoría, Senador Seilhamer
Rodríguez, con respecto a un alegado acuerdo con miembros
de esta Curia y anticipando que el P. del S. 267 sería
declarado inconstitucional?

**sentencia o función revisora de este Tribunal**. Las expresiones del Senador Bhatia van dirigidas a cuestionar el uso apropiado por el Tribunal Supremo de la competencia otorgada en leyes anteriores, según dispone la Constitución. Valga aclarar que el P. del S. 367 en nada menoscabó nuestra jurisdicción como tribunal revisor de **última instancia** en cualquier caso presentado ante el Tribunal General de Justicia.

La Ley Núm. 18 tampoco convierte a los tribunales de menor jerarquía en tribunales de última instancia. Como se sabe, este Tribunal se reserva el poder de revisión judicial sobre cualquier sentencia o determinación final. Más bien, como ya hemos reseñado, la Ley Núm. 18 es una actuación de la Asamblea Legislativa en el ejercicio de su discreción constitucional en modificar tanto la competencia de los distintos tribunales inferiores como la competencia original del Tribunal Supremo, según estime conveniente, considerando las circunstancias y el interés público.

Muy distinta fue la situación presentada ante esta Curia en *Colón Cortés v. Pesquera II*, 150 D.P.R. 724 (2000), donde la Asamblea Legislativa actuó en respuesta a la determinación de este Tribunal con respecto a un caso en particular. La intención legislativa de las dos leyes en aquella ocasión buscaban decirle al Tribunal Supremo cómo resolver la controversia ante sí. Tampoco se asemeja la actuación de la Asamblea Legislativa al aprobar la Ley Núm. 18 a la medida declarada inconstitucional en *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64 (1998). En aquella ocasión la

Asamblea Legislativa en efecto revocó mediante legislación una sentencia del antiguo Tribunal de Circuito de Apelaciones (TCA) que detenía la construcción del Superacueducto de la Costa Norte.[63]

Mediante la Ley Núm. 19 de 12 de junio de 1997, la legislatura autorizó a la Autoridad de Acueductos y Alcantarillados a continuar con la construcción, revocando así la determinación del TCA. En aquel entonces señalamos que [d]e ser válida [] la Ley Núm. 19[,] eliminaría las controversias adjudicadas en las controversias cuya revisión se [nos] solicita[ba]". *Id.* en la pág. 84. Esto, entendimos, vulneró la doctrina de separación de poderes al usurpar el poder de revisión judicial.[64]  No existe correlación entre las actuaciones que declaramos inconstitucional en *Misión Industrial* y *Colón Cortés II*, y la determinación de la Asamblea Legislativa de determinar nuestra competencia según dispone nuestra Constitución. Nuestra función como Rama Judicial no es evaluar las bondades de las intenciones de actuaciones reservadas por la Constitución a otra rama de gobierno, sino proteger los

---

[63] Para una discusión detallada sobre *Misión Ind. P.R. v. J.P. véase* José Julián Álvarez González, *Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos Casos y Materiales* 47-67 (2009).

[64] En aquel entonces la preocupación de este Foro se circunscribía  a evitar que luego de que un Tribunal emitiera una determinación, la Asamblea Legislativa intentará aprobar una ley para cambiar el dictamen emitido respecto a las partes, abrogándose así facultades judiciales. De este modo, se entendió que si se acataba la Ley 19, "las ramas políticas del gobierno podrían intervenir para asegurar el resultado de cualquier litigio, convirtiendo así a la rama judicial en un instrumento de su voluntad". David M. Helfeld, *Derecho Constitucional*, 68 Rev. Jur. U.P.R. 345, 375 (1999).

mecanismos establecidos en nuestra Carta Magna que garantizan una efectiva separación de poderes.

Como vemos la mayoría en este caso al decretar la inconstitucionalidad de los Artículos 1 y 2 de la Ley Núm. 18, no puede articular un razonamiento coherente de por qué la ley es inconstitucional. El efecto real de lo que hace es abrogarse prerrogativas constitucionales de otra rama de gobierno en perjuicio del fino balance que se estableció en la Constitución. Balance de poderes, que, como nos recuerda el Juez Asociado señor Negrón García:

> [*S]igue siendo el mejor antídoto* contra la tiranía de uno solo.
> *La más preciada fuente de autoridad está en la fuerza persuasiva inherente de nuestros fundamentos y nuestras decisiones. En la medida en que vía interpretación o reglamento recurramos al artificio, el sofisma, al fingimiento, destrozamos el fundamento del alto sitial de este Foro, trabajo de muchas generaciones que nos precedieron y del cual todos somos celosos custodios. Somos testigos de un esquema reglamentario simbiótico —Jueces [-Políticos]— que excede lo racionalmente tolerable. ¡Y lo peor de todo, convirtiendo a la mayoría de este Tribunal en juez y parte de la in constitucionalidad de sus propios actos!*

*Berríos Martínez v. Gobernador II*, 137 D.P.R. 195, 265-266 (1994)(Negrón García, J., Op. Disidente)(énfasis en original)(citas omitidas).

## III

### A

Visto que la Ley Núm. 18 no contraviene la doctrina de separación de poderes, y por ende es una actuación legislativa válida que regula la competencia de este Tribunal, procede que evaluemos, según adelanté, si luego de la aprobación de dicha ley poseemos competencia para

atender los recursos presentados. Evaluado el texto de la ley contestamos en la negativa.

Nuestra Constitución "prescribe las formalidades más importantes que debe seguir todo proyecto para convertirse en ley". *Acevedo Vila v. Aponte Hernández*, 168 D.P.R. 443, 462 (2006). En particular, la Constitución dispone que "[c]ualquier proyecto de ley que sea probado por una mayoría del número total de los miembros que componen cada cámara se someterá al Gobernador y **se convertirá en ley si éste lo firma**". Const. PR, Art. III, Sec. 19. Por otro lado, la Constitución también dispone que "las leyes deberán ser promulgadas conforme al procedimiento que se prescriba por ley y **contendrán sus propios términos de vigencia**". Const. PR, Art. VI, Sec. 5.

Quiere decir que según la Constitución del Estado Libre Asociado de Puerto Rico, los requisitos formales para que un proyecto se convierta en ley son la aprobación por cada cámara y la firma del poder ejecutivo. No existe ningún requisito adicional. En cambio, la vigencia de la ley aprobada dependerá de la determinación por la Asamblea Legislativa en la propia ley.

Por otro lado, este Tribunal ha reiterado el principio general de interpretación de estatutos, según establece el Artículo 14 de nuestro Código Civil. Éste expresa que "[c]uando la ley es clara libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". Cod. Civ. PR,

Art. 14, 31 L.P.R.A. sec. 14. La razón de ser de esa regla de interpretación consiste en que "[c]uando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de la intención legislativa". *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 D.P.R. 345, 362 (2009)(Martínez Torres, J., Op. Mayoritaria). Ante la presencia de un estatuto que posee un texto claro e inequívoco, este Tribunal no "debe buscar más allá del texto de la ley para encontrar la verdadera voluntad del legislador, sino que se debe descubrir y dar efecto a la intención expresada en la letra del estatuto". *Morales v. Marengo*, 181 D.P.R. 852, 858-59 (2011)(Pabón Charneco, J., Op. Mayoritaria).

Finalmente, la Regla 32 del Reglamento del Tribunal Supremo de Puerto Rico dispone en su inciso (b) que cualquier parte puede solicitar mediante moción la desestimación por cualquiera de los siguientes motivos: (1) que este Tribunal carezca de jurisdicción para considerarlo; (2) **que no ha sido perfeccionado de acuerdo con la ley**; (3) que no se ha proseguido con la diligencia debida o de buena fe; (4) que el recurso es frívolo; o (5) que el recurso se ha convertido en académico. Regla 32(b), Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. XXI-B R. 32(b). Además, este Tribunal tiene la facultad para desestimar *motu proprio* cualquier recurso ante cualquiera de los motivos antes mencionados. *Id.* R. 32(d).

B

El P. del S. 367 fue radicado por el Sen. Eduardo Bhatia Gautier el pasado 8 de febrero de 2013. Tomando su curso ordinario por el trámite legislativo fue aprobado por el Senado y enviado a la Cámara de Representantes según establece nuestra Constitución. La segunda Cámara de la Asamblea Legislativa igualmente aprobó el proyecto. Luego de su aprobación por ambas cámaras, el único trámite que necesita el P. del S. 367 para convertirse en ley es la firma del Gobernador de Puerto Rico, acto ocurrido el pasado 15 de mayo de 2013. *Véase* Ley Núm. 18 de 15 de mayo de 2013.

Con respecto a su vigencia, la Asamblea Legislativa dispuso en el Artículo 15 de la Ley Núm. 18, que "**[e]sta Ley comenzará a regir inmediatamente después de su aprobación** y aplicará a todos los casos pendientes ante el Tribunal General de Justicia". Art. 15, Ley Núm. 18 de 15 de mayo de 2013 (énfasis suplido). Por lo tanto, no cabe duda de la intención legislativa de la vigencia de la Ley Núm. 18 a partir de la firma del Gobernador del Estado Libre Asociado de Puerto Rico el 15 de mayo de 2013. Esclarecido el hecho de que el P. del S. 367 cumplió con el trámite constitucional para convertirse en ley, procede aplicar sus disposiciones a la controversia ante nosotros.

Luego de evaluar la Ley de la Judicatura de 2003, según enmendada por la Ley Núm. 18. de 15 de mayo de 2013, no podemos más que concluir que carecemos de la competencia para atender los recursos presentados.

Estamos ante un estatuto cuya letra clara y sin ambigüedad establece de manera precisa los requisitos para que este Tribunal pueda atender un recurso de certificación intrajurisdiccional. El Artículo 3.002 de la Ley de la Judicatura de 2003, según emendado por la Ley Núm. 18 de 15 de mayo de 2013, dispone lo siguiente sobre la competencia del Tribunal Supremo respecto al recurso de certificación:

> (e) Mediante auto de certificación a ser expedido discrecionalmente, motu proprio, o a solicitud de parte, podrá traer inmediatamente ante sí para considerar y resolver **cualquier asunto pendiente ante el Tribunal de Apelaciones** cuando se plantee la existencia de un conflicto entre decisiones previas del Tribunal de Apelaciones, se planteen cuestiones noveles de derecho, o se planteen cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial al amparo de la Constitución del Estado Libre Asociado de Puerto Rico o de la Constitución de Estados Unidos.

> (f) Mediante auto de certificación, a ser expedido discrecionalmente, cuando medie **solicitud de ambas partes**, podrá traer inmediatamente ante sí para considerar y resolver cualquier asunto pendiente ante el **Tribunal de Primera Instancia** cuando se plantee la existencia de un conflicto entre decisiones previas del Tribunal de Apelaciones, se planteen cuestiones noveles de derecho, o se planteen cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial al amparo de la Constitución del Estado Libre Asociado de Puerto Rico o la Constitución de Estados Unidos.

Artículo 1, Ley Núm. 18 de 15 de mayo de 2013 (énfasis suplido).

En cuanto a la vigencia de las enmiendas a la Ley de la Judicatura, la Ley Núm. 18 de 15 de mayo de 2013 dispone en su Artículo 15 que: "**[e]sta Ley comenzará a regir inmediatamente después de su aprobación y aplicara a todos los casos pendientes ante el Tribunal General de**

**Justicia**. Los recursos apelativos presentados con anterioridad a la vigencia de la presente ley se regirán por el ordenamiento procesal anterior". Artículo 15, Ley Núm. 18 de 15 de mayo de 2013 (énfasis suplido).

La enmienda aprobada por la Asamblea Legislativa y firmada por el Gobernador de Puerto Rico el pasado 15 de mayo de 2013 consiste de un cambio en la competencia del Tribunal Supremo, facultad reconocida a la Asamblea Legislativa por la Sección 2 del Artículo V de nuestra Constitución. Const. PR Art. V, Sec. 2. Con respecto al recurso de certificación intrajurisdiccional, la Ley de la Judicatura ahora reconoce dos situaciones que permiten al Tribunal atender, discrecionalmente, una controversia que no ha completado la vía ordinaria de revisión apelativa. La primera situación sólo está disponible para aquellas controversias que se encuentren pendientes ante el Tribunal de Apelaciones. Mientras que aquellas controversias que se encuentran aún ante el Tribunal de Primera Instancia, requieren de una solicitud conjunta de todas las partes en el pleito, además de plantear una cuestión novedosa de derecho, un conflicto entre decisiones del Tribunal de Apelaciones o que posea alto interés público.

El caso CT-2013-0005 comenzó el pasado 8 de mayo de 2013. De manera diligente el Tribunal de Primera Instancia ordenó a la parte demandada a que en un término preciso contestara la demanda o presentara alguna solicitud dispositiva. Conjuntamente dispuso para la

celebración de una vista el jueves 23 de mayo de 2013, vista que en efecto se llevó a cabo. Mientras que los casos CT-2013-006 y CT-2013-007 comenzaron posteriormente.

En el caso CT-2013-005, el 16 de mayo de 2013, antes de que venciera el término dispuesto por el Tribunal de Primera Instancia para que la parte demandada contestara la demanda o presentara alguna solicitud dispositiva, la parte demandante y peticionaria presentó el recurso de certificación, solicitando que este Tribunal atendiera con premura la controversia en sus méritos. Ahora bien, según las disposiciones estatutarias aplicables a la solicitud presentada, este Tribunal claramente carece de competencia para expedir el recurso. *Véase* Ley Núm. 18 de 15 de mayo de 2013.

En todos los casos ante nuestra consideración, la partes peticionarias presentaron un recurso de certificación de manera ex parte y claramente sin la anuencia de las partes demandadas. Además, los recursos de certificación se presentaron sin cumplir con el inciso (e) en la medida en que aún no hay un asunto pendiente ante el Tribunal de Apelaciones. Sin entrar en consideración de los demás requisitos del auto de certificación, los recursos ante nuestra consideración no cumplen con los incisos (e) y (f) de la Ley Núm. 18 de 15 de mayo de 2013, por lo tanto no queda más remedio que declararnos sin competencia.

IV

Concluyo llamando la atención a lo que me referí inicialmente y es aquella situación que, como poco, es incómoda y tiene el nocivo efecto de poner en tela de juicio la imparcialidad de este Foro y sus miembros. Me explico.

Mientras estaba pendiente de aprobación el Proyecto del Senado 367 en la Asamblea Legislativa, varios miembros de este Tribunal solicitaron y obtuvieron una reunión con el Presidente del Senado, reunión que se celebró en este Tribunal. De más está decir que algunos miembros de este Tribunal no sabíamos que esa reunión se había solicitado y que se habría de llevar a cabo en los predios de Tribunal, como tampoco conocíamos qué se discutiría.[65]

Semanas después, el proyecto fue aprobado por ambas cámaras legislativas y remitido al Gobernador para su firma. En ese momento se le envió una carta al Gobernador objetando que se firmara la ley. **Carta que se hizo pública coetáneamente a la prensa del país.** Poco después, en una **actividad pública** de la Rama Judicial,

---

[65] Curiosamente, tal parece que miembros de la minoría del Partido Nuevo Progresista en el Senado de Puerto Rico conocían de esa reunión. Eso explica las siguientes expresiones del Portavoz de la minoría, Hon. Larry Seilhamer Rodríguez, durante la discusión del P. del S. 367:

> **Y yo tendría que plantearle al Presidente del Senado y él sabe la respuesta, si él discutió este asunto con los miembros y los jueces del Tribunal Supremo. Si él dialogó con ellos y llegó a algún tipo de acuerdo con los jueces asociados del Tribunal Supremo.**

*Véase*, Diario de Sesiones, Senado de Puerto Rico, Vol. LXI, Núm. 31, pág. 3658 (énfasis suplido).

varios jueces de este Foro **condenaron enérgicamente la legislación aprobada por la Asamblea Legislativa.**[66] Es evidente entonces que desde que se hizo pública la carta al señor Gobernador y luego en la actividad que reseñó la prensa, **miembros de esta Curia adelantaron públicamente su parecer sobre la ley que hoy declaran inconstitucional. Las expresiones públicas de desagrado se hicieron con el conocimiento que, más tarde que temprano, tendríamos que pasar juicio sobre las disposiciones de esa ley.**

Nuestra sociedad, al igual que todas, es conflictiva pues así es la vida social. Y son esos conflictos que se generan en la convivencia los que como jueces estamos llamados a dirimir. Ello hay que hacerlo de forma tal que contribuyamos con nuestros dictámenes a la paz y al orden social y la estabilidad y defensa de nuestras instituciones. Para que podamos cumplir a cabalidad con este mandato, el deber de imparcialidad en nuestra gestión es central e imprescindible. "[L]a imparcialidad [es] el primer deber, el bien interno de la judicatura. Un juez que no es imparcial ha perdido el alma de su profesión." J. De la Torre, *Deontología de Abogados, Jueces y Fiscales, Reflexiones tras una década de docencia* 235 (2008). Es, el "principio supremo del

---

[66] *Véase* Yamilet Millán Rodríguez, *Suprema advertencia a AGP* 4, El Vocero de Puerto Rico (15 de mayo de 2013).

proceso".[67]   Y es que, como acertadamente indica el magistrado Francisco Soto Nieto:

> El Juez no puede, anticipadamente, situarse por entero en uno de los campos conflictuales, tiene que permanecer neutral a lo largo de ese *iter* dialogante y contradictorio que el proceso va consumiendo....No se trata de conceder al hombre-juez un estatuto olímpico de persona por encima de las pugnas, un aventino amurallado. Se trata simplemente de reconocer un paso obligado en su tarea, el de la apertura de un paréntesis de sano escepticismo. **Tiene que ser un hombre que escuche e intente comprender, sobre todo que escuche que deje explicarse, que no imponga.**

F. Soto Nieto, *Compromiso de Justicia* 368 (1977).

El juez imparcial no es sólo aquél que actúa con independencia frente a las partes sino también, frente al objeto del proceso.   Expresarnos anticipadamente y de manera pública sobre lo que será objeto de un proceso judicial nos abre a cuestionamientos válidos sobre nuestra propia imparcialidad.   ¿Cómo un litigante puede confiar que sus reclamos o posturas jurídicas serán escuchadas y sopesadas en sus méritos, de manera imparcial y sin ideas preconcebidas, si antes de que éste acuda a este Tribunal ya nos hemos expresado públicamente sobre esos reclamos o esas posturas?   Es decir, que antes de dirimir el conflicto ya hemos tomado parte públicamente en la contienda.

De otra parte, el juez imparcial tiene que ser "obediente al Derecho".   Josep Aguiló Regla, *Independencia e Imparcialidad de los Jueces y Argumentación Jurídica*, Isonomía, no. 6, 1997, pág. 77.   Los conflictos que llegan

---

[67] *Véase* Werner Goldschidt, *La imparcialidad como principio básico del proceso* ("partialidad" y "parcialidad"), discurso de incorporación como miembro de número del Instituto Español de Derecho Procesal, *disponible en* www.academiadelderecho.org.

ante nuestra consideración no pueden ser resueltos mediante contorsiones jurídicas sino aplicando la norma que regula el caso. De ahí el aforismo/regla medieval, que encuentra su sustrato en el Derecho romano, *iura novit curia* ("el juez conoce el derecho"). Esta regla, que es garantía de la legalidad de la decisión, se configura también como deber ético del juez de, no tan sólo conocer el derecho, sino de "tomar decisiones cuyo contenido sea una aplicación correcta del Derecho que preexiste a la decisión". Josep Aguiló Regla, *Aplicación del Derecho, Independencia e Imparcialidad*, NEJ (electrónica), Vol. 17, n. 2, 161 (2012) *disponible en* www.univali.br/periodicos.

Cuando con nuestras acciones creamos la impresión de carecer de independencia frente a las partes o al objeto del proceso creamos el caldo de cultivo que permite que cuestionen nuestra imparcialidad. Igualmente ocurre cuando las justificaciones de un dictamen son construcciones jurídicas enrevesadas de dudosa validez jurídica. Al así actuar, impedimos que quienes acuden ante nosotros sean juzgado desde el Derecho y minamos, en ese proceso, la credibilidad que merecen nuestras decisiones y las razones jurídicas en la que se sustentan. De ahí que el profesor Aguiló Regla asevere que "[n]ada hay más distorsionador para el funcionamiento del Estado de Derecho que el hecho de que las decisiones judiciales se interpreten como motivadas por razones extrañas al Derecho y las argumentaciones que tratan de justificarlas como puras racionalizaciones". *Id*. pág. 78.

El distinguido profesor y ex Juez Presidente del Tribunal Supremo de Israel reconoce que se deben dar tres precondiciones en toda democracia para que un juez pueda llevar a cabo su función adecuadamente. Estas son: (1) imparcialidad y objetividad judicial; (2) tomar decisiones enmarcadas en el consenso social; y (3) la confianza pública en la judicatura. Aharon Barak, *The Judge in a Democracy* 101 (2006). La imparcialidad significa que "the judge treats the parties before him equally, providing them with an equal opportunity to make their respective cases, **and is seen to treat the parties so**". *Id.* (énfasis suplido).

Por otro lado, la confianza pública en el Tribunal es fundamental para que los jueces podamos cumplir con nuestro rol en la democracia. Esta confianza significa que el pueblo al que le servimos reconozca la existencia en nosotros de principios de independencia, rectitud, justicia e imparcialidad. *Id.* pág. 109. Significa que "judges are not interested parties to the legal struggle and that they are not fighting for their own power but to protect the constitution and democracy". *Id.*

**El dictamen que hoy emite una mayoría de los miembros de este Tribunal es la antítesis de todo lo anterior.**

Es con gran consternación pero profunda responsabilidad institucional, que tomo distancia y cuestiono la participación de varios miembros de esta Curia en este proceso adjudicativo. Considero que su

participación en la adjudicación de este caso lacera la imagen de imparcialidad de este Tribunal y sus jueces como celosos guardianes del Estado de Derecho cuyo resultado es atestarle un rudo golpe a la confianza de la ciudadanía en nuestros dictámenes y en esta Curia.[68]  La grave herida que se le inflige hoy a esta Institución tardará décadas en sanar, pero sanará.  Le corresponderá a los futuros miembros de esta Curia devolverle el prestigio perdido.


                                  V

     Por todos los fundamentos discutidos disiento del proceder de una mayoría de este Tribunal de declarar inconstitucional los Artículos 1 y 2 de la Ley Núm. 18 de 15 de mayo de 2013. Procede declarar con lugar las mociones de desestimación presentadas por la parte demandada y permitir que la controversia sea atendida en su curso ordinario ante el Tribunal de Primera Instancia.


                              Anabelle Rodríguez Rodríguez
                              Juez Asociada

---

[68] *Véase Bush v. Gore*, 531 U.S. 98, 123 (2000) (Stevens, J., Op. Disidente).